## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>PURSUIT CAPITAL<br>MANAGEMENT, LLC,<br><br>          Debtor. | Bankruptcy Case No. 14-10610<br>(LSS) |
| PURSUIT PARTIES,<br><br>          Appellants,<br><br>   v.<br><br>JOEFFREY L. BURTCH, CHAPTER 7<br>TRUSTEE,<br><br>          Appellee. | Case No. 1:15-cv-00801-RGA |

## PURSUIT PARTIES' OPENING BRIEF

R. Craig Martin, Delaware Bar No. 5032
craig.martin@dlapiper.com
**DLA PIPER LLP (US)**
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801-1147
Telephone:  302.468.5700
Facsimile:  302.394.2341

*Attorneys for Appellants, Pursuit Parties:*
*Anthony Schepis, Frank Canelas,*
*Pursuit Investment Management, LLC,*
*Pursuit Opportunity Fund I, L.P., and*
*Pursuit Capital Management Fund I, L.P.*

## STATEMENT OF CORPORATE OWNERSHIP

As required by Federal Rule of Bankruptcy Procedure 8012(a), appellants Pursuit Investment Management, LLC, Pursuit Opportunity Fund I, L.P. Pursuit Capital Management Fund I, L.P., hereby state that each is a privately held entity and no publically held entity holds more than 10% of the interests in any of Pursuit Investment Management, LLC, Pursuit Opportunity Fund I, L.P. Pursuit Capital Management Fund I, L.P.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ...........................................................1

ISSUES PRESENTED AND STANDARD OF REVIEW .......................................2

    I.    Issues Presented on Appeal ...................................................2

    II.    Standard of Review ..........................................................3

STATEMENT OF THE CASE.................................................................5

SUMMARY OF THE ARGUMENT .......................................................17

ARGUMENT AND AUTHORITIES.......................................................24

    I.    The Trustee Lacked Authority to Assign Causes
        of Action arising under the Bankruptcy Code to
        a non-fiduciary, third party, because "only" the
        Trustee may bring those actions.........................................24

    II.    In the Alternative, if the Trustee may Assign
        Estate Causes of Action, he failed to submit
        Evidence that the Assigned Claims Are Colorable............................27

    III.    The Trustee modified the bidding procedures
        during the auction in contravention of the
        procedures order ..................................................30

        A.    The Trustee offered no evidence regarding
            how modifying the court-approved bidding
            procedures enabled him to comply with his
            fiduciary duties..........................................30

        B.    Even if the modification was appropriate
            It was applied in a discriminatory fashion................................33

    IV.    The Pursuit Parties were not allowed to depose
        the Trustee in advance of the Final Sale Hearing,
        despite assurances that they would be permitted
        and their attempts to do so................................................35

i

V.    The Trustee did not obtain the highest and best
      offer for the sale of assets and, therefore, it was
      erroneous to approve the sale ............................................................38

      A.    The Bankruptcy Court erred when it usurped
            the Trustee's business judgment by making
            the decision that the auction would end, the
            Sale Hearing would proceed, and the Trustee
            would not consider the Pursuit Parties' higher
            bids ..........................................................................................38

      B.    The Bankruptcy Court erred when it
            to close the auction and refused to allow
            bidding to continue....................................................................43

CONCLUSION ....................................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Case of Hayburn*,
2 U.S. 408 (1792)............................................................................38

*Commodity Futures Trading Comm'n v. Weintraub*,
471 U.S. 343 (1985)........................................................................31

*Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.)*,
262 F.3d 96 (2d Cir. 2001) .............................................................28

*Corporate Assets, Inc. v. Paloian*,
368 F.3d 761 (7th Cir. 2004) ..........................................................45

*Culp v. Stanziele (In re Culp)*,
___ B.R. ___, 2015 WL 7257917 (D. Del., Nov. 17, 2015) ...............1

*Eastman v. Union Pac. R.R. Co.*,
493 F.3d 1151 (10th Cir. 2007) .........................................................3

*First Nat'l Bank v. M/V Lightning Power*,
776 F.2d 1258 (5th Cir.1985) ..........................................................45

*Fitzgerald v. Ninn Worx Sr., Inc. (In re Fitzgerald)*,
428 B.R. 872 (B.A.P. 9th Cir. 2010) ...............................................43

*Fowler Bros. v. Young (In re Young)*,
91 F.3d 1367 (10th Cir.1996) ...........................................................3

*Goodwin v. Mickey Thompson Enterps. Grp. (In re Mickey Thompson Enterps. Grp.)*,
292 B.R. 415 (B.A.P. 9th Cir. 2003) ...............................................50

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
530 U.S. 1 (2000)......................................................................passim

*In re C.W. Mining Co.*,
636 F.3d 1257 (10th Cir. 2011) .......................................................45

*In re Castre, Inc.*,
312 B.R. 426 (Bankr. D. Co. 2004) ....................................................................41

*In re Chapman Lumber Co., Inc.*,
343 B.R. 217 (Bankr. N.D. Iowa 2006) .......................................................26, 27

*In re Cooper*,
405 B.R 801 (Bankr. N.D. Tex. 2009) .....................................................24, 26, 27

*In re Edwards*,
228 B.R. 552 (Bankr. E.D. Pa. 1998) ................................................................49

*In re Electroglas, Inc.*,
2009 WL 8503455 (Bankr. D. Del. Sept. 23, 2009) ...........................................47

*In re Exaeris, Inc.*,
380 B.R. 741 (Bankr. D. Del. 2008) ...................................................................42

*In re Filene's Basement, Inc.*,
Case No. 09-11525-MFW (Bankr. D. Del. June 10, 2009) ...........................48, 49

*In re Fin. News Network Inc.*,
980 F.2d 165 (2d Cir. 1992) .........................................................................40, 45

*In re Foamex Int'l, Inc.*,
Case No. 09-10560 (KJC) (Bankr. D. Del. May 21, 2009) ................................47

*In re Food Barn Stores, Inc.*,
107 F.3d 558 (8th Cir.1997) .........................................................................44, 45

*In re Fox*,
305 B.R. 912 (B.A.P. 10th Cir. 2004) ..........................................................24, 26

*In re Gil–Bern Indus, Inc.*,
526 F.2d 627 (1st Cir.1975) .........................................................................44, 46

*In re Gulf States Steel Inc. of Ala.*,
285 B.R. 497 (Bankr. N.D. Ala. 2002) ...............................................................41

*In re Jacobsohn v. Larkey*,
245 F. 538 (3d Cir. 1917) ..................................................................................43

*In re Landscape Props., Inc.*,
   100 B.R. 445 (Bankr. E.D. Ark. 1988) ........................................................39, 40

*In re Mundy Ranch, Inc.*,
   484 B.R. 416 (Bankr. D. N.M. 2012) .................................................45

*In re NEPSCO, Inc.*,
   36 B.R. 25 (Bankr. D. Me. 1983) .......................................................38

*In re Parirokh*,
   Case No. DG 11-05409 (Bankr. W.D. Mich. May 2, 2013) .......................18, 26

*In re Planned Sys., Inc.*,
   82 B.R. 919 (Bankr. S.D. Oh. 1988).................................................42

*In re Psychometric Sys., Inc.*,
   367 B.R. 670 (Bankr. D. Colo. 2007).................................................45

*In re Revel AC, Inc.*,
   Case No. 14-22654 (Bankr. D. N.J. Mar. 4, 2015)............................................50

*In re SGL Carbon Corp.*,
   200 F.3d 154 (3d Cir. 1999) .................................................................4

*In re Stanley Eng'g Corp.*,
   164 F.2d 316 (3d Cir. 1947) .......................................................43

*In re Sunland, Inc.*,
   507 B.R. 753 (Bankr. D. New Mex. 2014)........................................42

*In re Trailer Source, Inc.*,
   555 F.3d 231, 245 (6th Cir. 2009) .....................................................28

*In re Wilson*,
   527 B.R. 253 (Bankr. N.D. Tex. 2015).....................................26, 27

*In re WPRV-TV*,
   983 F.2d 336 (1st Cir. 1992)..............................................................44

*Larson v. Foster (In re Foster)*,
   516 B.R. 537 (B.A.P. 8th Cir. 2014) .................................................29

*Matter of Phoenix Steel Corp.*,
    82 B.R. 334 (Bankr. D. Del. 1987) ................................................................47

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*,
    226 F.3d 237 (3d Cir. 2000) .............................................18, 26, 30

*Pierce v. Underwood,*
    487 U.S. 552 (1988)................................................................................3

*Pineda v. Ford Motor Co.*,
    520 F.3d 237 (3d Cir. 2008) .................................................................3

*PW Enters., Inc. v. North Dakota Racing Comm'n. (In re Racing Servs., Inc.)*,
    540 F.3d 892 (8th Cir. 2008) .............................................................29

*Salve Regina Coll. v. Russell*,
    499 U.S. 225 (1991)................................................................................3

*Scott v. National Century Fin. Enteps., Inc. (In re Baltimore Emergency Servs. II, Corp.)*,
    432 F.3d 557 (4th Cir. 2005) ........................................................27, 28

*United States v. Ferreira,*
    54 U.S. 40 (1851).................................................................................38

*United States v. U.S. Gypsum Co.*,
    333 U.S. 364 (1948)................................................................................3

**STATUTES**

11 U.S.C. § 506(c) .......................................................................................24

11 U.S.C. § 704(a)(1).............................................................................17, 31

11 U.S.C. § 341 ..............................................................................................5

11 U.S.C. § 363(b) .......................................................................................38

28 U.S.C. § 157(b) .........................................................................................1

28 U.S.C. § 158(a)(1)......................................................................................1

vi

28 U.S.C. §§ 1334 ................................................................................................1

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 8002(a)(1) ...............................................................................1

Fed. R. Bankr. P. 9014 .......................................................................................35

Fed. R. Bankr. P. 7028–7037 .............................................................................35

H.R. Rep. 95-595, *reprinted in* 1978 U.S.C.C.A.N. 5963 ...............................38

## JURISDICTIONAL STATEMENT

On August 27, 2015, the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") entered an Order Approving Agreement to Settle, Transfer and Assign Certain Claims, Rights and Interests (the "**Sale Order**").  The Bankruptcy Court had subject-matter jurisdiction to enter the Sale Order under 28 U.S.C. §§ 1334(a) and (b) and 157(b)(1) and (2), because the issues addressed arose in a bankruptcy case and under Title 11.  This Court's Amended Order of Reference, dated February 29, 2012, referred the bankruptcy case and all proceedings arising in that case or under Title 11 to the Bankruptcy Court.

Under Bankruptcy Rule 8002, the deadline for appealing the Sale Order was within 14 days after the entry of the Sale Order (September 10, 2015).  *See* Fed. R. Bankr. P. 8002(a)(1).  On September, 8, 2015, appellants, Anthony Schepis, Frank Canelas, Pursuit Investment Management, LLC, Pursuit Opportunity Fund I, L.P., and Pursuit Capital Management Fund I, L.P. (collectively, the "**Pursuit Parties**") timely filed their Notice of Appeal of the Sale Order.  *See* D.I. 191.  The Pursuit Parties assert that this appeal is from a final order.  *See Culp v. Stanziele (In re Culp)*, ___ B.R. ___, 2015 WL 7257917 (D. Del., Nov. 17, 2015).  This Court therefore has jurisdiction over this appeal under 28 U.S.C. § 158(a)(1).

## ISSUES PRESENTED AND STANDARD OF REVIEW

### I.    **Issues Presented on Appeal**

1.    Whether a chapter 7 trustee may sell and assign its power to prosecute estate causes of action to a non-fiduciary, third-party that will prosecute them when the Bankruptcy Code—as interpreted by the Supreme Court and Third Circuit—provides that the trustee may not sell his powers and only the trustee may bring estate causes of action?

2.    In the alternative, if a chapter 7 trustee may sell and assign its powers to prosecute estate causes of action, was it erroneous for the Bankruptcy Court to approve the assignment of claims without the required evidentiary showing that such claims are "colorable"?

3.    Was it legal error for the Bankruptcy Court to approve a sale based on a chapter 7 trustee's unilateral decision to modify mandatory bidding procedures when the evidence did not show that the change in procedures discharged the chapter 7 trustee's fiduciary duty to, among other things, maximize the value of the estate's assets or permit him to close the estate as expeditiously as possible?

4.    Was it error for the Bankruptcy Court to allow the final sale hearing to proceed without giving the Pursuit Parties the opportunity to depose the chapter 7 trustee?

5.      Was it erroneous for the Bankruptcy Court to authorize the sale of assets for a lower cash price when a bidder was present and bid a higher cash price for the offered assets?

## II.     **Standard of Review**

Decisions by trial courts are traditionally divided into three categories, denominated: 1) questions of law, which are reviewable *de novo*; 2) questions of fact, which are reviewable for clear error; and 3) matters of discretion, which are reviewable for abuse of discretion. *Pierce v. Underwood,* 487 U.S. 552, 558 (1988)*; Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1370 (10th Cir.1996). *De novo* review requires an independent determination of the issues, giving no special weight to the bankruptcy court's decision. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991).  A factual "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).  Under the abuse of discretion standard, a court abuses its discretion only when it makes a clear error of judgment, exceeds the bounds of permissible choice, or when its decision is arbitrary, capricious or whimsical, or results in a manifestly unreasonable judgment.  *Eastman v. Union Pac. R.R. Co.*, 493 F.3d 1151, 1156 (10th Cir. 2007) *see also Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (abuse of

3

discretion exists when the "Court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact."). A bankruptcy court abuses its discretion when it bases its decision on an erroneous conclusion of law or when the record contains no evidence on which it could rationally base its decision. *See In re SGL Carbon Corp.*, 200 F.3d 154, 159 (3d Cir. 1999) ("an abuse of discretion exists where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact").

The first and third issues presented above are subject to a *de novo* standard of review. The second, fourth, and fifth issues presented are subject to the abuse of discretion standard, because, among other problems, the Bankruptcy Court exercised its discretion in the absence of any evidence in support of the issues on which that discretion could be based.

## STATEMENT OF THE CASE

This appeal involves issues arising from irregularities in sale procedures directed by a chapter 7 trustee.  On April 7, 2014, Pursuit Capital Management, LLC (the "**Debtor**") filed a voluntary petition for protection under chapter 7 of title 11 of the United States Code (the "**Bankruptcy Code**") in the Bankruptcy Court. The Office of the United States Trustee appointed Jeoffrey L. Burtch (the "**Trustee**") as the Debtor's interim chapter 7 trustee and Mr. Burtch became the permanent Trustee after the conclusion of the April 29, 2014 meeting of creditors conducted under section 341 of the Bankruptcy Code.

On March 2, 2015, the Trustee filed a Motion for an Order Approving Agreement to Settle, Transfer and Assign Certain Claims, Rights and Interests ("**Sale Motion**") (R. 2).  By the Sale Motion, the Trustee sought approval of a transaction where a group of bidders (the "**Litigation Consortium**") would pay $125,000 to purchase the Debtor's non-privileged books and records and claims and causes of action, defined as (i) the Debtor Claims, (ii) the Indemnification Claims, and (iii) the UBS Claim (collectively, the "**Estate Claims**").  (R. 2 at ¶ 17(i)).

The rationales that the Trustee put forward in support of the Sale Motion were, among others, that retaining the Estate Claims "would require pursuing acrimonious and lengthy litigation at considerable risk and without funding[,]" that

5

the sale would "enable the Trustee to pay administrative expense claims incurred by the Estate[,]" and that the Trustee would be able to proceed to "close this case in a reasonably prompt fashion after approval and consummation of the Agreement." (R. 2, ¶ 24).[1]  As part of the Sale Motion and to "test the fairness of the proposed Agreement" the Trustee indicated that he would consider additional proposals for the assets on similar terms through the objection deadline of the Sale Motion and that if he received an additional proposal in writing that was higher than $125,000, the Trustee would request that all bidders submit their "last, best and final written proposals by sealed bid" no later than three business days before the hearing on the Sale Motion.  (R. 2, ¶ 31).

The Pursuit Parties filed a preliminary objection in which they opposed various aspects of the Sale Motion, including the provisions that purported to permit other parties to make offers for the Estate Assets.  (R. 3).  This objection, led to the entry of an order by the Bankruptcy Court that expressly provided that the Sale Motion would be subject to higher and better bids by May 13, 2015, and expressly ordered the Trustee to "entertain any and all such offers and take actions with respect thereto consistent with his duties under the United States Bankruptcy Code." (R.7 at 2, ¶ 6).  On May 13, 2015, the Pursuit Parties filed their final

---

[1]     As discussed below, the evidence adduced at the Sale Hearing did not support any of these asserted rationale put forth by the Trustee in the Sale Motion.

objection to the Sale Motion and also made a higher offer consistent with the Trustee's requirements to buy the Estate Assets.  (R. 9; *see also* R. 11, ¶ 6 (stating that the Pursuit Parties submitted a bid of $147,500)).

During this time period, the Pursuit Parties were also seeking discovery of the Trustee, specifically, the right to take the Trustee's deposition prior to a final hearing on the Sale Motion.  The Bankruptcy Court and the Trustee informed the Pursuit Parties that they would be able to take only one deposition of the Trustee respecting all Sale Motion related issues.  (R. 8, at 2 (denying further discovery in an order because "the Pursuit Parties have an opportunity to depose the Trustee;" R. 14 at 11:22–24 and 31:17–18 (counsel for the Trustee stating that there should be time for a deposition of the Trustee prior to a final sale hearing); D.I. 172[2] at 18:20–24 (same); *id*. at 25:18–23 (statement of the Bankruptcy Court to Pursuit Parties' counsel that they would be afforded but "one deposition" and they could elect to take it before the sale hearing or before the auction procedures hearing, but that they would be permitted only one deposition of the Trustee).  In reaction, the Pursuit Parties only sought to take the Trustee's deposition following the close of bidding and prior to a final sale hearing when all issues would be identified.

---

[2]      The Appellees did not number their designation, but instead use the Bankruptcy Court's docket index number, which is how those record items are referenced in this Opening Brief.

As a result of the competing Pursuit Parties' bid, the Bankruptcy Court ordered the Trustee to file a formal motion of bidding procedures. (R. 22 at 23:3–9, R. 11, ¶ 12). On June 18, 2015, the Trustee filed a motion for approval of procedures for an auction of the Estate Claims. (R. 11). The Bankruptcy Court granted the motion and approved the Auction Procedures on June 30, 2015. (R. 13). The procedures set a date and time for an auction, permitted the Trustee to offer the Estate Claims in lots, provided that the bidding increments would be a minimum of $10,000, and provided other procedures for the auction. (R. 11, ¶ 13). Relevant to this appeal, the court-ordered procedures specifically provide that "all bids shall be made and received in one room, on an open basis, and each bidder shall be entitled to be present for all bidding, and all material terms of each bid shall be fully disclosed to all bidders[.]" (R. 11, ¶ 13(xi)). The procedures were subject to modification by the Trustee only "to comply with his fiduciary obligations." (R. 11, ¶ 13).

The Trustee, through counsel, commenced an auction on July 7, 2015, which was adjourned that day and from time to time. (R. 21 at 19:21–20:5). The auction was not reconvened for formal bidding after an initial adjournment due to scheduling conflicts among the bidders. (R. 21 at 20:2–7). Instead, on July 24th, 2015, the Trustee modified the court-ordered procedures in contravention of the Bankruptcy Court's order and requested final sealed bids to be hand-delivered by

8

4:00 p.m. on July 30, 2015.  (R. 21 at 20:6–10).  The Litigation Consortium offered to pay $180,000.01 for the Estate Claims on terms that were not acceptable to the Trustee; yet, rather than seeking an open re-bid from the Litigation Consortium, the Trustee, through his counsel, negotiated *in private* a new bid from the Litigation Consortium.  (R. 21 at 20:18–25).  On July 31, 2013, the Trustee announced that he would accept the Litigation Consortium's negotiated, revised bid and that he would present that revised bid for approval at the August 10, 2015 hearing scheduled on the Sale Motion (the "**Sale Hearing**").

The Pursuit Parties were not provided an opportunity to make a competing bid under the changed procedures.  Nevertheless, since the court-ordered procedures required open bidding and sealed bidding was expressly rejected by the Bankruptcy Court earlier in the process, the Pursuit Parties continued to attempt to submit a higher bid.[3]  (R. 18, Ex. P-1).  On August 6, 2015, the Pursuit Parties offered $200,000 on terms negotiated with Trustee's counsel and intended to be responsive to comments of the Trustee.  (R. 21 at 31:22–32:7 and Exhibit P-1).  On

---

[3]     At the Sale Hearing, the Bankruptcy Court advised the Pursuit Parties that there had been some discussion of the Trustee's acceptance of sealed bids; however, the Bankruptcy Court previously sustained the Pursuit Parties' objection to a sealed bid process and ordered the filing of an auction procedures motion.  (R. 22 at 23:3–9).  Additionally, the only other time that the Trustee discussed the sealed bid process was at a hearing where the Bankruptcy Court approved resignation of the Pursuit Parties' counsel, leaving the Pursuit Parties unrepresented at the hearing where a shift back to sealed bids was mentioned by Trustee's counsel.  (D.I. 172 at 5:17–23).

that same day, the Pursuit Parties also moved to adjourn the Sale Hearing, primarily because in the absence of an emergency, the Pursuit Parties believed the Trustee should continue the auction process. (R. 15, ¶ 8). In addition, the Pursuit Parties sought an adjournment so that they could take the Trustee's deposition prior to the Sale Hearing, because, as noted above, they reasonably expected that deposition would occur prior to the Sale Hearing.

The Trustee and the Litigation Consortium, which has animosity toward the Pursuit Parties since they are engaged in extensive litigation against each other, constantly pushed a theme that the Pursuit Parties were trying to delay the chapter 7 case and that the auction simply had to end, even though through the Pursuit Parties' involvement in the sale process the Trustee's initial proposed price of $125,000 doubled and had the Trustee continued the process, the price likely would have continued to escalate. Said another way, the auction did not come to a natural conclusion where the bidders expressed their exhaustion in submitting topping bids.[4] (*compare* R. 2, ¶17(i) *with* R. 21 at 36:24–37:3). No party

---

[4]     The Pursuit Parties cannot represent what the Litigation Consortium represented to the Trustee in his direct negotiations with the Litigation Consortium that brought about an end to the bidding or that the Litigation Consortium had not engaged in impermissible collusion, because the Pursuit Parties where not permitted an opportunity to depose the Trustee prior to the Sale Hearing, despite the Bankruptcy Court's representations, Trustee's counsel's representations, the Pursuit Parties' efforts to meet and confer with the Trustee to take the deposition and the Pursuit Parties' efforts to obtain relief from the Bankruptcy Court implementing its prior instructions to the Pursuit Parties. The Bankruptcy Court

articulated any urgency that would justify terminating the auction so abruptly with a sudden, final, and sealed bid process, after which the Trustee would negotiate bids with only one bidder.  Indeed, the Litigation Consortium's bid contemplates the continuation of the administration of the bankruptcy case for years as the Estate Claims are litigated in the case.

After the Bankruptcy Court ruled that the Sale Hearing would go forward and based on additional comments from the Trustee, the Pursuit Parties bid against themselves and increased their offer by $20,000.00, bringing the total consideration under the Pursuit Parties' bid flowing to the Debtor's estates to $220,000, conditioned only on the Trustee's acceptance of the bid as higher or otherwise better than the last bid of the Litigation Consortium negotiated by the Trustee and the Trustee's agreement to pursue approval of the Pursuit Parties' bid at the hearing scheduled on the Sale Motion.  (R. 21 at 32:8–24).  The Trustee rejected this bid and instead elected to present the lower $180,000 negotiated, revised bid from the Lender Consortium.  Remarkably, the Trustee later testified that he rejected the Pursuit Parties' $220,000 bid, which is 22% higher than the Litigation Consortium bid, because he "didn't think it was appropriate to cut off

---

denied the Pursuit Parties' motion to adjourn the sale hearing at a Friday afternoon hearing and noted that the hearing on the Sale Motion would go forward the following Monday morning.  (R. 23 at 15:18–5).

the bidding if it was going to be reopened for the additional $20,000. . ..." (R. 21 at

33:4–6).[5]

At the Sale Hearing, the Trustee asked the Pursuit Parties to advise the

Bankruptcy Court of their ongoing negotiations and the current status of their bid.

(R. 21 at 4:12–19).  Because the Trustee rejected the condition attached to their

$220,000 all-cash bid, on the record at the Sale Hearing the Pursuit Parties offered

$205,750 for the Estate Claims.  (R. 21 at 5:15).  Counsel for the Pursuit Parties

further indicated that he had full authority to participate in an immediate auction

and that the Pursuit Parties were ready, willing, and able to go back to an auction

and allow bidding against the offer.  (R. 21 at 6:19–7:2).  Instead of accepting the

Pursuit Parties' offer to reopen the auction, permit further bidding, and increase the

value to the Debtor's estate, the Trustee informed the Bankruptcy Court he did not

know what to do regarding reopening the auction.  (R. 21 at 14:20–21).  The

Trustee was torn notwithstanding that, contrary to his allegations in the Sale

Motion, neither bid would pay for the administrative expenses of the estate and

that the Litigation Consortium bid would "require this case to remain open

potentially for years" with the Trustee would have to remain involved; thus

increasing those administrative expenses.  (R. 21 at 10:1–3 and 10:14–15).  The

---

[5]    In fact, the Pursuit Parties' last bid of $220,000 was $40,000 more than the
Litigation Consortium's negotiated bid.

Trustee deferred to the Bankruptcy Court on the question of whether the auction should be reopened. (R. 21 at 14:17–15:21). The Bankruptcy Court then exercised "its business judgment" in lieu of the Trustee's and determined that the auction should not be reopened; the Sale Hearing would proceed. (R. 21 at 17:6–7; *see also id.* at 34:17–25 (refusing to let the Trustee answer a cross-examination question about whether he decided to accept the $180,000 offer and not reopen the bidding and stated that the Bankruptcy Court "made that decision.")).

At the Sale Hearing that followed, the Trustee, who had the burden of proof on whether the sale of the Estate Claims was permissible, offered direct testimony through a proffer of testimony and a copy of the Agreement, which had been modified just prior to the hearing by changes to the proposed form of order. (R. 21 at 38:24 (noting that the Litigation Consortium Bid was modified as "recently as five minutes before [the] hearing."). The Pursuit Parties had no prior notice of the final terms of the Litigation Consortium's bid and no opportunity to depose the Trustee, but were left only to cross-examine the Trustee and offer an exhibit of the various offers they made to the Trustee over the weekend of August 6 to August 8.[6]

---

[6]    The Transcript of the Sale Hearing, together with the two exhibits admitted into evidence is included in an Appendix to this Opening Brief (together with the Order Entered by the Court and the Transcript Ruling). The material in the Appendix is the only relevant record material this court need consider as the Trustee's counsel asked the Bankruptcy Court to "take judicial notice of the docket and the pleadings that have been filed in connection with these proceedings . . .." (R. 21 at 37:17–21). The Pursuit Parties objected to this request for judicial notice,

During this cross-examination, counsel for the Pursuit Parties further notified the Trustee that he had just received an e-mail authorizing an all-cash bid of $250,000; the Bankruptcy Court refused to permit counsel to "do it from the podium." (R. 21 at 36:24–37:3).

The Bankruptcy Court took the matter under advisement, eventually reconvening to announce that it determined to approve the Sale Motion and the Agreement. (R. 18). What is most notable about the Bankruptcy Court's ruling in support of the Sale Order is not the findings of fact that the Bankruptcy Court did make, but the findings of fact and conclusions of law that were not made. For example, the Bankruptcy Court, did not find or conclude that the Trustee's modification of the bidding procedures from an open, public auction to a sealed bid auction, after which he negotiated a revised bid with one bidder to the exclusion of the Pursuit Parties' participation, enabled the Trustee to "comply with his fiduciary obligation" as required by the court-ordered auction procedures. The Bankruptcy Court also did not find that the cash price offered by the Litigation Consortium, $180,000.01, was higher (it is not) than the Pursuit Parties' $250,000 bid, or even their $205,750 bid (*see, e.g.,* R. 18 at 11:16–21 (stating only that the $180,000.01 bid was higher than the original offer of $125,000). Rather, the Bankruptcy Court

---

R. 21 at 39:19–25, which objection the Bankruptcy Court granted, stating that it would "rule on the evidence that's been presented today in court." (R. 21 at 39:19–40:2).

14

accused the Pursuit Parties of ignoring the auction procedures to their benefit even though their bid was proposed on the terms similar to the Litigation Consortium's final, sealed bid—e.g., terminating the auction.  (R. 18 at 13:22–14:10).  There is no rationale in the ruling explaining the Bankruptcy Court's discretion imposing one set of bidding rules against one bidder and another set of rules against a second bidder, then holding that conduct against the second bidder when it was simply trying to compete to offer more money for the assets offered for sale.  Instead, the Bankruptcy Court just stated in conclusory fashion that under the unspecified circumstances of the case (the Bankruptcy Court refused to take judicial notice of the docket and case generally granting the Pursuit Parties' objection to a request that it do so), requiring sealed bids to conclude the auction was appropriate, however, the Bankruptcy Court failed to find or conclude that the Trustee's follow-on private negotiation of the terms of the Litigation Consortium's bid, without permitting the Pursuit Parties an opportunity to counter, was appropriate.

Finally, the Bankruptcy Court stated it did not "quarrel with the [T]rustee's decision" that the Pursuit Parties' offers of $200,000, $205,700, $220,000, or $250,000 are not higher or better than $180,000, because the Litigation Consortium's bid contains some unspecified and unquantified potential recovery; yet the Bankruptcy Court determined in "its business judgment" to conclude the auction without hearing testimony as to the value the Trustee ascribed to such

15

amorphous bid terms and permitting the Pursuit Parties an opportunity to top such offer.  The Bankruptcy Court also did not make findings or conclusions to address the fact that the Trustee testified that the proposed transaction would leave the estate administratively insolvent and that it would require the estate to remain open, potentially for years, deepening the estate's insolvency with no assurance of receipt of any additional funds.  Finally, with respect to the Pursuit Parties' argument regarding the impermissible assignment by the Trustee of his powers to prosecute the Estate Claims, the Bankruptcy Court held that the "Pursuit Parties must be able to raise any and all defenses they have to whatever litigation is brought . . .."  (R. 18 at 14:11–17).

Thus, the Pursuit Parties appeal to challenge the Bankruptcy Court's Sale Order entered after an irregular sale process and an insufficient record to support entry of the Sale Order.

## SUMMARY OF THE ARGUMENT

The principal role of a trustee in a chapter 7 case is to "collect and reduce to money the property of the estate . . . and close such estate as expeditiously as is compatible with the best interests of the parties in interest."  11 U.S.C. § 704(a)(1). The Bankruptcy Code empowers a chapter 7 trustee to achieve these goals by providing that "a trustee may" take specific action.  In this case, the Bankruptcy Court's approval of a sale transaction with the Litigation Consortium results in legal error, clearly erroneous determinations, and abuses of discretion in several different ways, summarized below.

1.      The Supreme Court has held that the phrase "the trustee may [take a specific action]" in the Bankruptcy Code means that only the trustee may take the specified action, because the trustee acts with a special fiduciary role when exercising Congressionally conferred powers.  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000).  In this case, the Bankruptcy Court authorized the chapter 7 trustee to assign and sell the Estate Claims that include causes of action that arise under Bankruptcy Code provisions permitting "the trustee" to prosecute those causes of action.  Because only the Trustee may prosecute such actions, many courts around the country have held that a chapter 7 trustee may not sell them, meaning that the Bankruptcy Court erred when it approved a transaction that permitted the transfer of such Estate Claims.  Indeed,

17

the Third Circuit case law that discuss these types of claims and causes of action focuses on the fact that a chapter 7 trustee is conferred with special powers that exclusively belong to that quasi-public official. *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 244 (3d Cir. 2000). Recent cases that have interpreted the Third Circuit's decision have clarified that under the *Cybergenics* standard, a bankruptcy court lacks authority to permit a chapter 7 trustee to delegate, i.e. transfer, the "powers" of prosecution of claims like those conveyed among the Estate Claims. *See, e.g. In re Parirokh*, Case No. DG 11-05409 (Bankr. W.D. Mich. May 2, 2013) (slip opinion). Accordingly, it was clear error to approve the Sale Motion that allowed assignment of the Estate Claims.

2. There is a split of authority in the case law and some cases do permit assignment of estate causes of action both before the Supreme Court's decision in *Hen House* (most typically in chapter 11 cases) and to a lesser extent after that decision, but the courts that permit assignment, require assignees to demonstrate that an assigned claim is "colorable." In this case, no evidence satisfying this requirement was submitted with respect to certain Estate Claims and the Court made no finding that the claims had any value or merit; instead, the Bankruptcy Court merely determined only that the Trustee did not have any cash to pursue the assets. (R. 18 at 11: 4–11). In the absence of evidence on the point, the

18

Bankruptcy Court could not make a finding or conclude that the Estate Claims are "colorable" and the Trustee submitted none.  As such, it was clear error to approve the Sale Motion.

3A.    When bankruptcy courts permit auctions it is normal for there to be court-approved procedures for an auction that will occur outside of the bankruptcy court.  In this case, the Bankruptcy Court approved procedures and as approved, those procedures required that "all bids shall be made and received in one room, on an open basis, and each bidder shall be entitled to be present for all bidding, and all material terms of each bid shall be fully disclosed to all bidders[.]" Notwithstanding this mandatory requirement, the Trustee modified the bidding requirements and demanded final sealed bids relying on his ability to modify the procedures to comply with his "fiduciary duty."  Despite this questionable modification, the Trustee went further and engaged in private negotiations with the Litigation Consortium after the sealed bid deadlines right up to five minutes before the hearing; yet never provided a path to the Pursuit Parties to empower them to submit a winning bid, which conduct is outside the scope of the Trustee's discharge of his fiduciary duty.

Moreover, at the Sale Hearing, there was no evidence regarding how changing the procedures enabled the Trustee to comply with his fiduciary duty. Indeed, the Trustee's duty is to maximize value and in liquidation it is essential to

19

select the highest and best bid available bid; an auction where parties bid against one another until they stop is generally considered to be one of the best ways to achieve this goal.  Nonetheless, the Court permitted the modification of the procedures specifically to end bidding and the auction, thus ensuring less value to the estate.  And, while Trustee initially argued that the sale of the Estate Claims to the Litigation Consortium would permit him to "proceed to close this case in a reasonably prompt fashion after approval and consummation of the Agreement[,]" (R. 2, ¶ 24), by the time of the Sale Hearing, the Trustee admitted that the transaction with the Litigation Consortium would "require this case to remain open, potentially for years . . ."  but that the Pursuit Parties' bid "would enable, potentially, this Court to remove itself from this case, to close out this case quickly . . .."  (R. 21 10:1–6).  In the face of the evidence of the Pursuit Parties' bids and no evidence at all on how the Trustee's decision to accept sealed bids enabled him to maximize value or close the case expeditiously, it was clear error for the Bankruptcy Court to usurp the Trustee's business judgment, shut down the auction and approve Litigation Consortium's bid.

3B.    Additionally, the Bankruptcy Court found that the Litigation Consortium satisfied the auction procedures by submitting a sealed bid by the deadline; however, the evidence showed that the bid it submitted was unacceptable to the Trustee and he continued to negotiate the bid with the Litigation Consortium

up to five minutes before the Sale Hearing, resulting in a different bid than that made by the sealed bid deadline.  When the Pursuit Parties tried to negotiate with the Trustee, the Trustee and the Bankruptcy Court applied a different standard to the Pursuit Parties and argued or found that they did not comply with the auction procedures.  This irregular and inequitable application of bidding rules by the Trustee was certainly not consistent with the auction procedures and the Bankruptcy Court abused its discretion by permitting the Trustee to discriminate against the Pursuit Parties and by refusing to permit them to bid up to just before the commencement of the Sale Hearing just as the Litigation Consortium was allowed to do.

4.     The Pursuit Parties objected to the sale of assets and were assured by counsel to the Trustee in open court and by the Bankruptcy Court in a court order that they would be permitted to take a deposition of the Trustee prior to a final hearing on the Sale Motion; however, the final hearing was scheduled without granting the Pursuit Parties a promised deposition.  When the Pursuit Parties moved to adjourn the hearing, pending their ability to take that deposition, the Bankruptcy Court denied the request and allowed the final sale hearing to go forward.  This was an abuse of discretion.

5A.     Bankruptcy law allows a chapter 7 trustee to sell estate property for the highest and best price available.  In this case, the chapter 7 trustee sought court

approval to sell assets for $180,000.01 plus some undisclosed potential future value that may be derived from the Estate Claims; however, at the Sale Hearing, the Pursuit Parties offered to pay first $205,750 for a similar sale and then offered $250,000 and to exclude certain claims from the Estate Claims.  The Bankruptcy Court refused to re-open the auction to permit bidding on the assets based on these new offers and instead approved the lower cash offer without any testimony from the Trustee quantifying or weighing the cash and prospective aspects of each bid. While under the Bankruptcy Act of 1898, the courts had much greater authority to administer bankruptcy estates, one of the major changes of the Bankruptcy Code in 1978 was to put business decisions like when and for what price to sell assets into the hands of a trustee and leave the courts to render independent decisions of matters brought before the court.  The Bankruptcy Code provides that the Trustee is supposed to make the sale decision and present it to the Bankruptcy Court for approval.  If the Court determines that a proposed sale is insufficient, it denies that sale and the trustee has to go back to the drawing board.  Here, the Trustee refused to select the highest bid made or whether to continue to the auction and put those business decisions to the Bankruptcy Court, which accepted the Trustee's abrogation of his duties and applied its business judgment to end bidding and send the parties into a Sale Hearing.  This was a legal error.

5B.   The Bankruptcy Court articulated that it ended the auction, because "the integrity of the auction process, by far, trumps any potential higher bid."  This was clear error, because the policy of auction finality is much stronger when an open public auction naturally concludes and an overbid is made after entry of a Sale Order.  This finality policy typically yields to the policy of higher and better value in an overbid situation when permitting the overbid does not upset the expectations of the parties, especially where, as here, there was no clear end of the sale process.  In this situation, the expectation of the parties was that the bidders would have to bid against each other in successive rounds.  Moreover, in the District of Delaware (as well as in the other trial courts in the Third Circuit) it is customary for courts to permit overbidding.  Accordingly, the Bankruptcy Court abused its discretion when it refused to allow bidding to continue.

## ARGUMENT AND AUTHORITIES

I.   **The Trustee Lacked Authority to Assign Causes of Action arising under the Bankruptcy Code to a non-fiduciary, third party, because "only" the Trustee may bring those actions.**

The Bankruptcy Code contains numerous provisions that authorize a trustee, and only a trustee, to take action on behalf of the estate in the trustee's exclusive discretion. *See, e.g., In re Cooper*, 405 B.R. 801, 807–08 (Bankr. N.D. Tex. 2009) (listing the statutory provisions that empower the trustee to act by use of the phrase, "the trustee may . . ."). The Supreme Court has held that the phrase, "the trustee may . . ." means the trustee ***exclusively*** may exercise the power conferred, which power may not be exercised by a creditor. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000) (only a trustee may surcharge lender collateral under 11 U.S.C. § 506(c)); *see also In re Fox*, 305 B.R. 912, 916 (B.A.P. 10th Cir. 2004) (finding that only a trustee may bring a fraudulent transfer action and that a creditor cannot commence such action).

While the *Hartford* Court, in a footnote, left open the possibility that in certain circumstances someone other than the trustee may exercise the rights of the trustee under the Bankruptcy Code, subsequent decisions have decided that in a chapter 7 case a trustee may not delegate his duties and that a creditor cannot bring actions on behalf of the chapter 7 trustee or estate. *See, e.g., In re Cooper*, 405 B.R. at 811–14. The Court in *Cooper* explained the logic for its result that while it

24

made sense under the Bankruptcy Code to allow a creditors' committee, a fellow

fiduciary in a chapter 11 case, the authority to bring action on behalf of an estate,

allowing a creditor to do so in a chapter 7, makes no sense:

> In Chapter 7, unlike Chapter 11, there is always a trustee
> in place.  There is not the potential for a conflicted board
> of directors pulling its punches.  There is not the risk of
> the proverbial fox guarding the henhouse.  The trustee
> does not have the potential for conflicts of interest that a
> debtor-in-possession sometimes has, since the trustee has
> no prepetition relationship with the debtor's
> management, shareholders or creditors.  The trustee has a
> unique role as an independent fiduciary, with a
> completely different perspective and interest in a
> bankruptcy estate than either a debtor or an individual
> creditor.  The trustee also is expected to be a gatekeeper
> and to exercise reasonable business judgement in
> deciding what actions to bring and what are not worth the
> expense.  In theory at least (and hopefully in reality), the
> trustee is a fair, balanced, and experienced (not to
> mention bonded . . .) official who can be depended upon
> to exercise good litigation judgment.  Because of the
> unique role of a trustee, there would seem to be no
> equitable rationale to deviate from the Bankruptcy
> Code's apparent remedial scheme vis-à-vis avoidance
> actions and other estate causes of action.  If a creditor
> does not like the job the trustee is doing, they can file a
> motion to compel him or her to act, or a motion for
> removal of the trustee . . ..  In the context of such a
> motion, the court can scrutinize the business judgment
> and litigation zeal (or lack thereof) that is being exercised
> by the trustee.  But simply allowing a creditor – a non-
> statutory fiduciary – to go forward in a Chapter 7
> trustee's stead could facilitate a creditor "hijacking" a
> Chapter 7 bankruptcy case in a manner that Congress did
> not envision.

*Id*. at 812 (adding that an "experienced bankruptcy trustee, unlike a potentially angry and out-for-justice creditor, may have a better instinct for what is worth chasing and what is worth foregoing.").

While the Third Circuit Court of Appeals has not considered the issues in *Cooper*, it had issued a decision before the *Hartford* decision that discusses the issues in a chapter 11 context and that many point to in the Third Circuit for the authority that trustees in this circuit may not assign causes of action.  *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 242 (3d Cir. 2000).  Bankruptcy Courts that have considered this case in the context of the Supreme Court's decision in *Hartford* have held that because *Cybergenics* describes the trustee's avoidance actions as "powers" delegated to a trustee that may not be sold, much like a public official may not auction off the powers of its office to the public.  *See In re Parirokh,* Case No. DG 11-05409 (Bankr. W.D. Mich. May 2, 2013) (slip opinion).  Other bankruptcy courts also have held that a creditor in a chapter 7 case has no authority to prosecute actions on behalf of the estate.  *See e.g. In re Wilson*, 527 B.R. 253, 256 (Bankr. N.D. Tex. 2015); *In re Chapman Lumber Co., Inc.*, 343 B.R. 217, 221 (Bankr. N.D. Iowa 2006); *see also In re Fox¸* 305 B.R. at 914-17 (holding that the Bankruptcy Code does not allow creditors to bring suits on behalf of a bankruptcy estate).

Here, by entering into the sale agreement, the Trustee has assigned the estate causes of action included in the Estate Claims identified in the Agreement.  But, under the Bankruptcy Code, only a chapter 7 trustee has the authority to prosecute any of these actions and has a fiduciary duty to ensure that they are prosecuted for the express purposes contemplated by the Bankruptcy Code.  Allowing the Trustee to delegate that authority to the Litigation Consortium, which may prosecute the actions for each member's own selfish reasons, many of which might be prosecuted for the Litigation Consortium's sole benefit or with little or no economic return to the estate, is completely anathema to the purposes of the Bankruptcy Code.  This Court should review the Bankruptcy Court authorization of the Sale of the Estate Claims *de novo* and should not allow the Trustee to delegate and sale his powers and duties.

II.    **In the Alternative, if the Trustee may Assign Estate Causes of Action, he failed to Submit Evidence that the Assigned Claims Are "Colorable."**

While the *Cooper*, *Wilson*, and *Chapman Lumber* decisions stand for the proposition that the Trustee lacks the authority to assign the estate causes of action included in the Estate Claims, some courts nonetheless conduct the pre-*Hartford Underwriters* derivative standing test to determine whether an estate may assign a cause of action to a creditors' committee, recognizing that even if permitted, allowing assignment or prosecution by a non-debtor is the exception and not the rule.  *See, e.g., Scott v. National Century Fin. Enters., Inc. (In re Baltimore*

27

*Emergency Servs. II, Corp.)*, 432 F.3d 557, 561 (4th Cir. 2005) (noting that the

Fourth Circuit has never decided whether creditor suits are permitted in bankruptcy

courts and that it is "far from self-evident" that the Bankruptcy Code permits a

creditor to prosecute an action on behalf of an estate).   "If derivative standing is

permissible at all, requiring a formal determination of its propriety in a given case

is the only way to prevent the creditor from unjustly hijacking the bankruptcy

proceedings." *Id*. at 563.   Indeed, where a creditors' committee is the party to

whom a cause of action is assigned or standing is granted, the assignment to an

estate fiduciary "permits a reasoned and practicable division of labor between the

creditors committee and the debtor in possession and the trustee, while also

providing the bankruptcy courts with significant authority to manage the litigation

and to check for any potential abuse by the parties."   *Commodore Int'l Ltd. v.*

*Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96, 100 (2d Cir. 2001).

        But, where, as here, there is no creditors' committee and instead creditors

seek to prosecute estate causes of action, the courts that permit claim assignments

notwithstanding the Supreme Court's decision in *Hartford*, apply a multi-factor

test that requires the movant, usually a creditor, to demonstrate: (1) whether a

demand was made on the trustee to act, (2) that the trustee declined, (3) that a

colorable claim exists that would benefit the estate, and (4) the trustee's inaction

was an abuse of discretion.   *See, e.g., In re Trailer Source, Inc.*, 555 F.3d 231, 245

(6th Cir. 2009); *see also PW Enters., Inc. v. North Dakota Racing Comm'n. (In re Racing Servs., Inc.)*, 540 F.3d 892, 900 (8th Cir. 2008).  The last prong of the foregoing test requires the creditor that seeks to pursue the claim on behalf of the estate "to persuade the bankruptcy court that the trustee unjustifiably refuses to bring its claims."  *Racing Servs.,* 540 F.3d at 900.  "To satisfy its burden, the creditor, at a minimum, must provide the bankruptcy court with specific reasons why it believes the trustee's refusal is unjustified."  *Id.*  (emphasis in original). This burden, which remains on the creditor, requires more than a "naked assertion" that the trustee acted unjustified, but requires submission of competent evidence such as affidavits and oral testimony at an evidentiary hearing.  *Id.*  In analyzing this last factor, the Court may consider the probability of success in litigation, potential financial recovery, expenses which could be incurred, and the delay in case administration.[7]  *See Larson v. Foster (In re Foster)*, 516 B.R. 537, 543 (B.A.P. 8th Cir. 2014) (affirming denial of a claim assignment because the trustee was justified in not pursuing the claim due to the complexity, risks, and expenses

---

[7]     In the case *sub judice*, while the Trustee introduced conclusory testimony that the estate was insolvent and lack the liquid resources to prosecute such estate causes of action, the Trustee did not introduce evidence of his attempt to engage contingency counsel or evidence that he was unable to finance the litigation of any Estate Claims under the permissions of the Bankruptcy Code that allow the Trustee to borrow money.

even though the proposed assignment was to the estate's largest creditor who was willing to compromise its claim so that other creditors would be paid in full).

Here, the Trustee has not provided any evidence with respect to the foregoing four factors for any single estate cause of action included in the Estate Claims. Of special significance is that there was no evidence at the Sale Hearing to demonstrate that any of the estate causes of action included in the Estate Claims are colorable. In the absence of any evidence on this point, it was clear error to approve the assignment, if this Court determines such an assignment is otherwise permissible under *Hartford* and *Cybergenics*.

III. **The Trustee modified the bidding procedures during the auction in contravention of the procedures order.**

    A. **The Trustee offered no evidence regarding how modifying the court-approved bidding procedures enabled him to comply with his fiduciary duties.**

Among other items that the court-approved auction procedures provided were that the "auction shall continue with subsequent rounds of bidding, and at the conclusion of the individual lots bidding, and any round of bidding on all assets, the Trustee shall announce the leading bid(s)," and that the "auction may include individual negotiations with each bidder and/or open bidding; provided, however, that all bids shall be made and received in one room, on an open basis, and each bidder shall be entitled to be present for all bidding, and all material terms of each bid shall be fully disclosed to all bidders[.]" (R. 11, ¶ 13(ix) and (xi)). The

Bankruptcy Court's order approving the auction procedures allowed the Trustee to modify the procedures to "comply with is fiduciary obligation".  One of the Trustee's core fiduciary obligations is the duty to maximize the value of the estate. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 353 (1985). Additionally, the Bankruptcy Code provides that the Trustee has the duty to "close such estate as expeditiously as is compatible with the best interest of parties in interest[.]"  11 U.S.C. § 704(a)(1).

In this case, the Trustee proposed a private sale to the Litigation Consortium at $125,000.  When faced with the Pursuit Parties' objections and higher bids, the Trustee proposed to consider other bids under court-approved auction procedures, but ultimately reverted to a private sealed bid auction, refusing to continue open and transparent bidding.  The Pursuit Parties objected to this and ultimately succeeded in having the Court impose transparent auction procedures after they offered $147,500.  At the Auction, the bidding occurred in accordance with the auction procedures until the Pursuit Parties had the highest and otherwise best bid at $170,000; however, as often happens in these situations, due to scheduling issues, the auction had to be adjourned.  Rather than continue the auction, the Trustee decided to once again revert to his sealed bid proposal, demanding that final bids be hand delivered by a date certain.

The only evidence on the record as to why the Trustee decided to modify the auction proceeds was that during late summer in August, just before Labor Day, he was having trouble finding a mutually convenient date to reconvene the auction so "rather than engage in further delay" he requested final sealed bids. (R. 21 at 20:6–10). The Trustee offered no further evidence or explanation as to how this modification enabled him to "comply with his fiduciary obligations," or how his reversion to a private sale to the Litigation Consortium enabled through his concealed negotiations with them fulfilled his fiduciary duties or was compliant with the letter or spirit of the court-approved procedures.

As noted above, the Pursuit Parties' offer was more cash (indeed during the hearing itself, the Pursuit Parties communicated first an offer of $205,700 and then $250,000) and would permit the Trustee to expeditiously close the case without deepening the insolvency of the estate, unlike the Litigation Consortium offer. The Trustee's sealed bid process was a private negotiated sale that resulted in less cash to the estate. The evidence is that it would result in a longer administration and the estate would lack sufficient funds to pay administrative expenses. (R. 21 at 35:4–21). The Bankruptcy Court nonetheless approved the modification in the bid procedures, "under the circumstances of the case," whatever that means in the context of the very limited record presented at the Sale Hearing, not because it enabled the Trustee to comply with his fiduciary obligations. (R. 18 at 14:8–10).

Thus, it was clearly erroneous for the Bankruptcy Court to permit the change in

procedures and to usurp the Trustee's business judgment in determining to end the

auction despite higher bids being made and accept the lower and riskier Litigation

Consortium bid.  It is no surprise that having provided no evidence, the Bankruptcy

Court made no finding that the modification enabled the Trustee to comply with

his fiduciary obligation, resulting in it abusing its discretion

B.   **Even if the modification was appropriate it was applied in a discriminatory fashion.**

The evidence at the Sale Hearing demonstrated that the Litigation

Consortium's final bid, first disclosed at the Sale Hearing, was not the same bid

that it made by the sealed bid deadline.  (R. 21 at 26:23–27:9)  Indeed, the

Litigation Consortium's sealed bid was not acceptable to the Trustee and was

rejected; yet, the Trustee engaged in negotiations until the bid was finally crafted

into a form that the Trustee could present to the Court, which occurred roughly

"five minutes" before the commencement of the Sale Hearing.  The Bankruptcy

Court found that negotiating a bid like this after the bid deadline is "not unusual in

a context of an auction," R. 18 at 12:7, however, the Bankruptcy Court did not

discuss whether such negotiations are not unusual in the context of an auction that

started with a request to approve a private sale but that was converted to a public

auction under court order that all bids be fully disclosed in each round of a public

auction.  Apparently the Bankruptcy Court first determined that transparency in the

33

process would yield the highest bid, but then for some undisclosed reason, wholly unsupported by any competent evidence, reversed to approve the privately negotiated bid submitted by the Litigation Consortium in the face of higher bids being submitted throughout the process and at the Sale Hearing.

But when it came to the Pursuit Parties, the Trustee's testimony was that with respect to the bid made before the Sale Hearing he "didn't consider it." (R. 21 at 29:22). And, the Bankruptcy Court treated the Pursuit Parties differently, not stating that what they did under these circumstances was usual, but instead excoriating them for ignoring the auction procedures to their benefit by offering an additional $20,000 if the Trustee would declare its bid the highest and otherwise best, relying on this conditional offer to conclude that it was "clear that the Pursuit Parties are not opposed to offers that are not made in an open forum . . .." (R. 18 at 13:22-14:5). At the Sale Hearing, the Pursuit Parties offered to resume the auction immediately and continue bidding in an open forum (and made its bid in the open forum of the Courtroom). The Bankruptcy Court's finding on this is not supported by the Record.

The Trustee's refusal to negotiate with the Pursuit Parties' bid after his own sealed bid deadline compounded by the Bankruptcy Court's diametrically opposed findings with respect to the Litigation Consoritum's post-auction deadline negotiations being "not unusual" and the Pursuit Parties attempts to follow suit

34

resulting in the Bankruptcy Court's determination of the Pursuit Parties "ignore[ing] the auction procedures to their benefit[]" demonstrates an irregular sale process employed by the Trustee and Bankruptcy Court. In this unusual process, the Pursuit Parties were not treated equally. Unequal treatment of bidders with ready cash that are attempting to actively participate in an auction to pay more for assets, as a policy concern, has a chilling effect on bidders' willingness to participate in bankruptcy auctions. There is no justification for the disparate treatment of the bidders in this case; the Trustee and Bankruptcy Court should have treated all bidders fairly and in a non-discriminatory fashion. That did not happen here and as a result, the Sale Order should be reversed.

IV. **The Pursuit Parties were not allowed to depose the Trustee in advance of the Final Sale Hearing, despite assurances that they would be permitted and their attempts to do so.**

As part of the contested matter process under the Sale Motion, the Pursuit Parties sought discovery as they are entitled to do under Federal Rule of Bankruptcy Procedure 9014, which incorporates, among other rules, Federal Rules of Bankruptcy Procedure 7028–7037—the Rules that apply the Federal Rules of Civil Procedure related to discovery, including depositions, to contested matters like the Sale Motion. As part of the disputes over discovery, the Trustee repeatedly stated to the Court that the losing bidder would be able to depose the Trustee prior to the Sale Hearing. The Bankruptcy Court also informed the Pursuit

Parties that it could take a deposition of the Trustee and entered an order to that effect. (R. 7 at 2, ¶ 6). Yet, when the Pursuit Parties sought that promised deposition, the Trustee's counsel told the Pursuit Parties' counsel to file a motion seeking to continue the Sale Hearing if it wanted to take a deposition. The Pursuit Parties did this and the Bankruptcy Court denied them the right to take the Trustee's deposition.

One reason the Bankruptcy Court expressed in its denial of the requested continuance to permit the deposition was because the August 10 Sale Hearing date was set on July 16 in court. (R. 23 at 16:6–8). What the Bankruptcy Court overlooked is that at this July 16 hearing, the motions being dealt with were the Bankruptcy Court's approval of motions of Pursuit Parties' counsel to withdraw. D.I. 172. Mr. Cane, the Pursuit Parties' lead trial counsel was not in attendance at that hearing. At the very end of the hearing, after signing orders approving withdrawal of the Pursuit Parties' Delaware bankruptcy counsel and other bankruptcy counsel, the Trustee asked for and obtained a hearing date, significantly however, which the Trustee never noticed. Between Thursday, July 16 and the following Friday, July 24, when the Trustee announced sealed bids were due in four business days, the Pursuit Parties were required to hire new Delaware counsel and, even though they had been promised a deposition, they were supposed to discover a hearing date that was not noticed by the Trustee and

formally schedule a notice of deposition. The evidence and record show that on Friday, July 31, the Trustee circulated what it declared to be the winning bid and the Pursuit Parties, through counsel, made a request to continue the auction hearing the following Monday, which was rejected. The Pursuit Parties then asked the Trustee to reconsider that request two days later, because among other reasons, it would be difficult to schedule a deposition due to a conference that counsel would be attending the Thursday and Friday before the Monday Sale Hearing. (R. 21 at 27:14–28:11). The Trustee simply instructed the Pursuit Parties on Wednesday, August 5th, to file a Motion for Continuance, which they did almost immediately. That request was denied despite the "rule of the case" that the Trustee would be deposed once before the Sale Hearing. (R. 23 at 17:20–21).

While the Pursuit Parties recognize that a bankruptcy court has great discretion in addressing discovery issues, they submit that a bankruptcy court abuses that discretion when it promises one deposition in advance of a hearing, then permits the deponent to manipulate the process to avoid being deposed before the final hearing even though the party moves for a continuance because of the time exigencies occasioned by refusal to be deposed. Only the Trustee and his counsel knew of the scheduled hearing date and only the Trustee and his counsel knew that his negotiations with the Litigation Consortium purportedly ended on July 31, notwithstanding that such discussions apparently continued through to the

37

commencement of the Sale Hearing.  At bottom, there was no opportunity to take

the Trustee's deposition following the conclusion of the auction and the

commencement of the Sale Hearing.  Pushing ahead with the Sale Hearing in light

of the circumstances then existing was an abuse of discretion.

V.      **The Trustee did not obtain the highest and best offer for the sale of assets and, therefore, it was erroneous to approve the sale.**

   A.      **The Bankruptcy Court erred when it usurped the Trustee's business judgment by making the decision that the auction would end, the Sale Hearing would proceed, and the Trustee would not consider the Pursuit Parties' higher bids.**

Section 363(b) of the Bankruptcy Code provides that "the trustee, after

notice and a hearing, may sell…other than in the ordinary course of business,

property of the estate."  In enacting the Bankruptcy Code, Congress expressed its

specific intent that judges of the United States Bankruptcy Court should not

participate in the administration of bankruptcy estates.  *In re NEPSCO, Inc.,* 36

B.R. 25, 27 (Bankr. D. Me. 1983); *see also* H.R. Rep. 95-595, at 3–4, *reprinted in*

1978 U.S.C.C.A.N. 5963, 5966.  This House Report points out that as early as

1793, the Supreme Court enunciated the principle that courts of the United States

may not be invested with administrative functions—they may only decide cases or

controversies.  H.R. Rep. 95-595, at 113–114, *reprinted in* 1978 U.S.C.C.A.N.

5963, 6074–75 (citing *United States v. Ferreira*, 54 U.S. 40 (1851) and *Case of*

*Hayburn*, 2 U.S. 408 (1792)).  In abolishing the system of referees in bankruptcy

and then creating the bankruptcy court system, Congress also created an expanded

trustee's system.  The trustee is invested with administrative powers, business

judgment, and fiduciary duties, formally the province of the referees in bankruptcy.

These principles were discussed at length in *In re Landscape Props., Inc.*,

100 B.R. 445, 447 (Bankr. E.D. Ark. 1988).  In that case, a bankruptcy court was

faced with competing bids for the purchase of real property initially on the same

price with different terms.  At a hearing on these competing bids, one bidder raised

its bid and the Trustee nonetheless elected to present the lower bid as the best bid.

The court initially decided that the lower bid could not be approved, because

among other reasons, it is "legally essential" to approve the highest offer in a

liquidation case.  *Id*. at 447 (citations omitted).

The court ultimately reconsidered its decision to pick between bids, realizing

it had no authority to designate a bidder among competing parties.  The Court

noted that the situation is complicated and that there is a "strong policy favoring

competitive bidding and finality to sales" in bankruptcy proceedings but that "the

only avenue available to the Trustee which would accommodate all the concerns

and which will accord the fullest possible measure of fairness and finality is by

way of a public auction."  *Id*. (citations omitted).  The court added that in a

situation like the one presented here, where the Trustee essentially seeks a private

sale approval in the face of higher bids, is not unusual, and that the interested

parties are entitled "to full disclosure of the proposed terms of sale and agreements and **should not be denied access**." *Id.* In a similar vein, the Second Circuit upheld a reopening of an auction to consider late bids, noting that it is consistent with the purpose of bankruptcy sales "which is to secure for the benefit of creditors the best possible bid. In the past we have noted that in bankruptcy proceedings substance should not give way to form, and that a bankruptcy judge's broad discretionary power in conducting the sale of a debtor's assets should not be narrowed by technical rules mindlessly followed." *In re Fin. News Network Inc.*, 980 F.2d 165, 169 (2d Cir. 1992).

The *Landscape Properties* case recognized that an "objection to a sale based simply on the fact that there is a higher offer is a valid objection to sale and one the Court believes it must sustain under certain circumstances." 100 B.R. at 448 (citations omitted). The remedy imposed by the *Landscape Properties* court was not to pick between bids but to require the party with the lower bid and the trustee that had proposed it, to prove to the court that the lower cash bid was otherwise a better bid.

Here, the Trustee expressly refused to perform his administrative function and exercise his business judgment and asked the Bankruptcy Court to do it for him. And, the Bankruptcy Court, presented with a Trustee that refused to decide

whether to continue to run an auction or select a higher bid, made the decision for

the Trustee,

> Q.    Okay, and even though my client [the Pursuit
> Parties] is willing to put the new bid on the table and
> return to the auction and continue bidding, should the
> other parties make other bids, you've decided that you
> would prefer to present the hundred-and-eighty-
> thousand-dollar offer?
>
> THE COURT:    No.  I decided that . . .He's not going
> to answer that question.  I've made that decision.
>
> MR. MARTIN:    Okay.  Understood.
>
> THE WITNESS:   Thank you Judge.  That was my
> answer.

(R. 21 at 34:17–35:2).  The Bankruptcy Court abused its jurisdiction and discretion

by performing the administrative function Congress relegated exclusively to the

Trustee, rather than consider a bid presented by the Trustee and rejecting it if

evidence did not show it was the highest or otherwise best bid.  *See In re Gulf*

*States Steel Inc. of Ala.*, 285 B.R. 497, 516 (Bankr. N.D. Ala. 2002) ("Even though

the discretion is not without limit, a Court should not step in and assume a role and

responsibility properly placed in the hands of the trustee."); *In re Castre, Inc.*, 312

B.R. 426, 430 (Bankr. D. Co. 2004) ("In enacting the Bankruptcy Code, Congress

expressed its specific intent that Bankruptcy court judges should not participate in

the administration of bankruptcy estates, but leave that task to the trustee.").

*Accord In re Sunland, Inc.*, 507 B.R. 753 (Bankr. D. New Mex. 2014) (noting that it is not the bankruptcy court's job to choose between competing bids).

Moreover, the Trustee offered no evidence beyond the terms of the Agreement that the Litigation Consortium's bid was actually for a higher value than the Pursuit Parties' bids.  The Trustee offered no evidence at the Sale Hearing that the Estate Claims had any value or would yield any recovery to the estate. Without such evidence, the court cannot find that the terms of a sale are fair or that a sound business purpose exists justifying the sale.  *See In re Exaeris, Inc.*, 380 B.R. 741 (Bankr. D. Del. 2008).  The evidence showed only that the Trustee would have to be involved in the administration of this case for years to come and no costs were estimated for that involvement.  As such, the bankruptcy court had no basis to conclude that the Litigation Consortium's negotiated bid was higher or otherwise better than the Pursuit Parties $200,000 bid, $220,000 bid, $205,750 bid, or their $250,000 bid.  *See In re Planned Sys., Inc.*, 82 B.R. 919, 923 (Bankr. S.D. Oh. 1988) (noting that absent evidence of value court cannot approve a proposed sale as in the best interest of an estate).  The Bankruptcy Court instead found that the price was fair, because $180,000.01 was more than $125,000 and that there was some upside to the estate by the Litigation Consortium's pursuit of the Estate Claims, which supposed upside was not quantified with any evidence.  Absent assuring optimal value was received through a fair and transparent process, the

Sale Order approving the sale must be reversed. *See Fitzgerald v. Ninn Worx Sr., Inc. (In re Fitzgerald)*, 428 B.R. 872, 884 (B.A.P. 9th Cir. 2010) ("Once faced with opposition to the sale, the bankruptcy court had the ultimate responsibility to assure that optimal value was being realized by the estate. . . . [I]t is not enough for Trustee to have stopped his inquiry when he determined that the sale price was adequate as long as it covered administrative expenses and the claims of non-insider creditors.")

B.  **The Bankruptcy Court erred when it determined to close the auction and refused to allow bidding to continue.**

The underlying tension where bids are made in a case between an auction and a hearing is the balancing of the need for finality and regularity in the sale of bankruptcy estate assets against the general need of a trustee to obtain the highest value for the benefit of the estate and its creditors.  The Third Circuit has not provided guidance on this tension since the Bankruptcy Code was enacted;[8]

---

[8]      The Third Circuit rulings all predate the enactment of the Bankruptcy Code and were decided under Section 70 of the Bankruptcy Act, which required three appraisals of property before a sale could occur and then required that 75 per cent of the appraised value be paid for assets unless the court confirmed the sale for a lower price at a confirmation hearing.  The first Third Circuit case to address the overbid issue under the Bankruptcy Act allowed a successful bidder to be overbid at the sale confirmation hearing. *See, e.g. In re Jacobsohn v. Larkey*, 245 F. 538 (3d Cir. 1917).  Thereafter, the Third Circuit would approve bids after entry of a sale order if there was (1) fraud, unfairness or mistake in the conduct of the sale or (2) the price brought at the sale was so grossly inadequate as to shock the conscience of the court and raise a presumption of fraud, unfairness or mistake. *See, e.g., In re Stanley Eng'g Corp.*, 164 F.2d 316 (3d Cir. 1947).  As noted in this

however, other circuits have used "bidders' reasonable expectations as a guidepost in . . . balancing the need for finality against the interest in maximizing the estate's worth." *In re Food Barn Stores, Inc.,* 107 F.3d 558, 565 (8th Cir.1997); *See also In re Gil–Bern Indus, Inc.*, 526 F.2d 627, 628 (1st Cir.1975) ("it is important that the bidder receive what he had reason to expect, and that nothing impair public confidence in the regularity of judicial sales."). Within that balance, "the importance of estate enhancement diminishes as an auction participant's reasonable expectations, and the gravity of finality, increase." *Food Barn*, 107 F.3d at 565. Thus, the policy tension tugs toward finality once the Sale Order has been entered; however, prior to a hearing and after an auction ends, the balance tips toward maximizing value. *See, e.g., In re WPRV-TV*, 983 F.2d. 336, 341 (1st Cir. 1992) (noting that the "finality" policy is only relevant when a sale order has been entered suggesting that bids made at the Sale Hearing are appropriate).[9]

As mentioned, the Third Circuit has not directly addressed the issue of whether, and under what circumstances, a bankruptcy court can disapprove a

---

Opening Brief, the auction and sale process were fraught with irregularities and the price differential ($180,000.01 compared to $250,000 offered by the Pursuit Parties), should shock the conscience. Thus, under the Third Circuit precedent interpreting the Bankruptcy Act, the Sale Order would also be subject to reversal.

[9]   In this case, there was no period of time between the conclusion of the auction and the commencement of the Sale Hearing because the Bankruptcy Court ended the auction during the Sale Hearing. This case presents a unique set of facts that in themselves pull the irregularities off the page.

regularly conducted § 363 auction sale and reopen bidding because of a late upset

bid.  In considering this issue, other circuits typically weigh two competing

considerations: the best interests of creditors and the integrity and finality of

judicial auctions.  *See, e.g., Corporate Assets, Inc. v. Paloian*, 368 F.3d 761, 767

(7th Cir.2004); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 562 (8th Cir.1997); *In

re Financial News Network Inc.*, 980 F.2d 165, 166 (2nd Cir.1992); *First Nat'l

Bank v. M/V Lightning Power,* 776 F.2d 1258, 1259 (5th Cir.1985).  "[T]he

governing principle at a confirmation proceeding is the securing of the highest

price for the bankruptcy estate.  A central purpose of bankruptcy, after all, is to

maximize creditor recovery."  *Paloian*, 368 F.3d at 767 (citation omitted).  *See

also In re C.W. Mining Co.*, 636 F.3d 1257, 1265 (10th Cir.2011) (noting that the

major purpose behind bankruptcy law is "maximizing the value of the estate for its

creditors"); *In re Mundy Ranch, Inc.*, 484 B.R. 416, 422 (Bankr. D. N.M. 2012)

(The purpose behind a § 363(f) sale is "to maximize the value of the asset, and thus

enhance the payment made to creditors.") (internal quotations omitted).  Where a

trustee does not pursue the highest offer a sale cannot be considered the highest

and best.  *See In re Psychometric Sys., Inc.*, 367 B.R. 670 (Bankr. D. Colo. 2007).

The concern over harming confidence in judicial sales by accepting an

overbid can be ameliorated if the court acts consistently with the rules governing

the sale "and in compliance with the bidders' reasonable expectations."  *Food

45

*Barn*, 107 F.3d at 565; *see also In re Gil-Bern Indus.*, 526 F.2d at 629 (focusing on local custom to determine whether an overbid should be permitted at a sale hearing).  In this situation, based on the auction procedures, the local custom in Delaware regarding overbids, and the practices of bankruptcy courts in New Jersey and Philadelphia, the parties here should have anticipated and expected that a bid may have been made at any time up to and including the Sale Hearing, especially once the Trustee decided to modify the auction procedures to revert to a negotiated private sale process after he demanded sealed bids—the Trustee ended from whence he came and both the Trustee and his chosen buyer should have expected the bidder that had bid higher at every chance would not be pleased with an ending where the Trustee started, a private, negotiated deal with no bidding and that that bidder would continue to bid both before and at the Sale Hearing.

First, the auction procedures clearly contemplate a sale to the successful bidder at an auction, but placed the parties on notice that the process would be fluid, could change and would never be final until approved by the Court.  The procedures specified that acceptance of the highest bid by the Trustee is conditioned upon approval by the Bankruptcy Court of the successful bid and entry of a sale order approving such successful bid.  (R. 11, ¶ 13 (xii) to (xiv)).  The Trustee further reserved the right to reject a Qualified Bid or adjourn the hearing on final approval of the sale if he determines that accepting a particular bid is

46

contrary to the best interests of the estate.  (R. 11, ¶ 13(x)).  Indeed, the agreement

submitted contains a clause that subjects the agreement to approve the by the

Bankruptcy Court demonstrating an awareness of the flexibility of an auction and

the necessity of court approval of the bid.  (R. 20 at Ex. A, ¶ 14).

Additionally, it has long been the custom in Delaware that a bid can be upset

if a higher bid becomes available, with early cases giving bidders the chance to top

a bid after a Sale Hearing and providing that if the second bidder does not top the

bid, then and only then, can a lower bid be approved.  *See, e.g., Matter of Phoenix

Steel Corp.*, 82 B.R. 334 (Bankr. D. Del. 1987).  This tradition has long been part

of the fabric of Delaware cases and it is not unusual for a Delaware bankruptcy

court to send the parties back to the auction room to ensure the value of debtor

assets are enhanced in the midst of a sale hearing, even where the parties have been

engaged for months in difficult and tense bidding.  *See, e.g., In re Electroglas, Inc.,*

2009 WL 8503455, at *4 (Bankr. D. Del. Sept. 23, 2009) (after finding that two

bidders made impermissible credit bids the court held that it was "appropriate for

the Debtor to reconvene the Auction and conduct an all cash auction").  It is no

surprise that the bidder whose bid is upset by these rulings does not like having to

continue to bid and pay more, but the policy requires maximizing value and that is

the Delaware tradition.  *See also In re Foamex Int'l, Inc.*, Case No. 09-10560

(KJC) (Bankr. D. Del. May 21, 2009) (Transcript Ruling at 77:13–22 (ruling that

with respect to the policy tension between maximizing value and "finality" where "there may be more value to the estate" in reopening auction, a trustee may not refuse to reopen an auction).  Parties quite simply should expect anything in a fair and transparent Delaware bankruptcy auction, including submission of bids at a sale hearing and a return to the auction table as a result of such a bid.

For example in *In re Filene's Basement, Inc.*, Case No. 09-11525-MFW (Bankr. D. Del. June 10, 2009), the debtors began with a bidder who offered to pay cash for only a portion of the debtors' assets.  At the auction, a number of bids emerged for substantially all of the debtors' asset, some cash, some not. Eventually the debtors picked a bid that would sell the assets under a Plan of Reorganization as the winning bidder and closed the auction.  On the eve of a "status hearing" set on the date that had been scheduled as the sale hearing, the Debtors received a new all-cash global bid from another party and sought to move forward with the sale hearing to the new bidder.

Multiple parties objected, notably the original bidder, who asserted that they walked away from the auction when it seemed like the debtors were favoring a plan-based bid, indicating to the bankruptcy court that they would have continued to participate if it was clear that cash bids were still in play.  They also asserted that the Debtors had made multiple changes to the procedures during the auction process (not least of which involved accepting a brand-new bid after the auction

48

closed).  The bankruptcy court reopened the auction, to begin with the new cash

bid, finding that: "it's clear that we're going to have to reopen the bidding"

because the "procedures were not quite followed" and even if they were,

announcement of a new winning bid made after the auction closed "doesn't follow

the procedures" and it "preclude[s] other bidders from countering that bid."  50:9–

16; *see also*  50:22–51:2. ("I think it's clear that additional bids have been

received…that should be considered.  But I think it has to be considered in the

context of a further auction that allows all other bidders who participated in the

original auction the opportunity to bid against that.").

While the tradition of permitting upset bids to be presented between the end

of an auction and up to and including at a sale hearing is consistent with local

custom, other courts in the area also permit these types of bids or defer sale

hearings to permit further bidding on assets.  This is true in Philadelphia, *see, e.g.,*

*In re Edwards*, 228 B.R. 552 (Bankr. E.D. Pa. 1998), and recently happened in

Camden, New Jersey in a case involving the Revel Casino.  There, a liquidating

debtor proposed a bid to a buyer when no parties made bids under the bidding

procedures.  At the Sale Hearing, counsel for a new bidder appeared and indicated

that his client was interested in bidding and needed time to negotiate with creditors

and the debtors.  The bankruptcy court gave the potential bidder time to proceed

over the objections of the debtor, the potential purchaser, the creditors' committee,

and the debtor in possession lender. *See generally In re Revel AC, Inc.*, Case No. 14-22654 (Bankr. D. N.J. Mar. 4, 2015) (Transcript Ruling at 123:23–25, 127:5–6, and 164:22–165:3 ("But approving the sale today I think is premature, because I don't know that there's enough here for me to make that call based on what you presented[]" because "every stone" must be "unturned to find the best deal" and providing a bidder that appeared at a final sale hearing to perform diligence to possible bid on the assets offered "so that hopefully, if they're in a position to make an offer that they think is as good as or better than the one that's before the Court and want to make that offer, that it can be done in advance of the hearing next week.").

Quite simply, in Delaware, a bidder should always expect that its bid can be topped as the policy and custom in this district is that the courts favor the policy of maximizing the value of estate assets over the "finality" policy. Thus, when a higher bid was made to the Trustee prior to and during the Sale Hearing, he should have reopened the bidding, when he failed to do so and the Bankruptcy Court did not require it, it demonstrated an error in judgment and an abuse of discretion on the part of the Bankruptcy Court, because here the Bankruptcy Court usurped the Trustee's business judgment on such issues. *See, e.g., Goodwin v. Mickey Thompson Enterps. Grp. (In re Mickey Thompson Enterps. Grp.)*, 292 B.R. 415,

422 (B.A.P. 9th Cir. 2003). Accordingly, the Sale Order should be reversed and the matter should be remanded to the Bankruptcy Court for further proceedings.

## CONCLUSION

Based on the foregoing this appeal should be granted and the Court should render a decision in favor of the Pursuit Parties with respect to the first issue presented or in the alternative reverse the Sale Order and remand the matter to the Bankruptcy Court.

Dated:  December 1, 2015          Respectfully submitted,
Wilmington, Delaware

By: */s/ R. Craig Martin*
    R. Craig Martin
    Delaware Bar No. 5032
    craig.martin@dlapiper.com
    **DLA PIPER LLP (US)**
    1201 North Market Street, Suite 2100
    Wilmington, DE  19801-1147
    Telephone:302.468.5700
    Facsimile: 302.394.2341

    Attorneys for Appellants, the Pursuit Parties Anthony Schepis, Frank Canelas, Pursuit Investment Management, LLC, Pursuit Opportunity Fund I, L.P., and Pursuit Capital Management Fund I, L.P.

## CERTIFICATE OF COMPLIANCE WITH
## RULE 8015(A)(7)(B) OR 8016(D)(2)

This brief complies with the type-volume limitation of Rule 8015(a)(7)(B) or 8016(d)(2) because this brief contains 13,650 words, excluding the parts of the brief exempted by Rule 8015(a)(7)(B)(iii) or 8016(d)(2)(D).

By: */s/ R. Craig Martin*

R. Craig Martin
Delaware Bar No. 5032
craig.martin@dlapiper.com
**DLA PIPER LLP (US)**
1201 North Market Street, Suite 2100
Wilmington, DE  19801-1147
Telephone:302.468.5700
Facsimile: 302.394.2341

Attorneys for Appellants, the Pursuit Parties Anthony Schepis, Frank Canelas, Pursuit Investment Management, LLC, Pursuit Opportunity Fund I, L.P., and Pursuit Capital Management Fund I, L.P.