## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>PURSUIT CAPITAL MANAGEMENT, LLC,<br><br>Debtor. | Bankruptcy Case No. 14-10610 (LSS) |
| PURSUIT PARTIES,<br><br>Appellants,<br><br>v.<br><br>JOEFFREY L. BURTCH, CHAPTER 7 TRUSTEE,<br><br>Appellee. | Case No. 1:15-cv-00801-RGA |

## APPENDIX TO PURSUIT PARTIES' OPENING BRIEF

R. Craig Martin, Delaware Bar No. 5032
craig.martin@dlapiper.com
**DLA PIPER LLP (US)**
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801-1147
Telephone:  302.468.5700
Facsimile:   302.394.2341

*Attorneys for Appellants, Pursuit Parties:*
*Anthony Schepis, Frank Canelas,*
*Pursuit Investment Management, LLC,*
*Pursuit Opportunity Fund I, L.P., and*
*Pursuit Capital Management Fund I, L.P.*

# TABLE OF EXHIBITS

1. *In re Pursuit Capital Mgmt., LLC*, Case No. 14-10610 (LSS) (Bankr. D. Del. August 10, 2015) (Transcript of Sale Hearing).

2. Exhibit P-1 To August 10, 2015 Sale Hearing.

3. Exhibit T-1 To August 10, 2015 Sale Hearing.

4. *In re Pursuit Capital Mgmt., LLC*, Case No. 14-10610 (LSS) (Bankr. D. Del. August 17, 2015) (Transcript of Ruling)

5. *In re Foamex Int'l, Inc.*, Case No. 09-10560 (KJC) (Bankr. D. Del. May 21, 2009) (Transcript of hearing).

6. *In re Filene's Basement, Inc.*, Case No. 09-11525-MFW (Bankr. D. Del. June 10, 2009) (Transcript of hearing).

7. *In re Revel AC, Inc.*, Case No. 14-22654 (Bankr. D. N.J. Mar. 4, 2015) (Transcript of hearing).

8. *In re Parirokh*, Case No. DG 11-05409 (Bankr. W.D. Mich. May 2, 2013) (slip opinion).

EXHIBIT 1

1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|                                   |   |                                  |
|-----------------------------------|---|----------------------------------|
|                                   | . | Chapter 7                        |
| IN RE:                            | . |                                  |
|                                   | . | Case No. 14-10610 (LSS)          |
| PURSUIT CAPITAL MANAGEMENT, LLC,  | . |                                  |
|                                   | . | Courtroom No. 2                  |
|                                   | . | 824 Market Street                |
| Debtor.                           | . | Wilmington, Delaware 19801       |
|                                   | . |                                  |
| . . . . . . . . . . . . . . . .   | . | Monday, August 10, 2015          |

TRANSCRIPT OF HEARING
RE:   TRUSTEE'S MOTION FOR ORDER APPROVING AGREEMENT TO SETTLE,
TRANSFER, AND ASSIGN CERTAIN CLAIMS, RIGHTS, AND INTERESTS
BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Chapter 7
Trustee:                         Mark E. Felger, Esq.
                                 COZEN O'CONNOR
                                 1201 N. Market Street, Suite 1001
                                 Wilmington, Delaware 19801


Chapter 7 Trustee:               Jeoffrey L. Burtch, Esq.
                                 COOCH AND TAYLOR
                                 The Brandywine Building
                                 1000 West Street, 10th Floor
                                 Wilmington, Delaware 19801



(Appearances Continued)

Audio Operator:                  Electronically Recorded
                                 by Michael Miller, ECRO


Transcription Company:           Reliable
                                 1007 N. Orange Street
                                 Wilmington, Delaware 19801
                                 (302) 654-8080
                                 Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

```
APPEARANCES:   (Continued)

For Reed Smith, LLP:          Marcos A. Ramos, Esq.
                              RICHARDS, LAYTON & FINGER, PA
                              920 North King Street
                              Wilmington, Delaware 19801

For the Pursuit Parties:      R. Craig Martin, Esq.
                              DLA PIPER, LLP (US)
                              1201 North Market Street
                              Suite 2100
                              Wilmington, Delaware 19801

For Alpha Beta:               John Scott, Esq.
                              Richard A. Robinson, Esq.
                              REED SMITH, LLP
                              599 Lexington Avenue, 22nd Floor
                              New York, New York 10022

For the "Schneider
Parties":                     Jesse N. Silverman, Esq.
                              DILWORTH PAXSON, LLP
                              1500 Market Street, Suite 3500E
                              Philadelphia, Pennsylvania 19102

                              Jonathan Harris, Esq.
                              HARRIS, O'BRIEN, ST. LAURENT
                               & CHAUDHRY, LLP
                              111 Broadway
                              New York, New York 10006

APPEARANCES VIA TELEPHONE:

For Reed Smith:               Matthew J. Moses, Esq.
                              SCHULTE, ROTH & ZABEL, LLP

For the Pursuit Parties:      Peter S. Cane, Esq.
                              CANE & ASSOCIATES
```

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| JEOFFREY L. BURTCH, ESQ. | *17 | 25 | | |

*Via Proffer

| | Page |
|---|------|
| ARGUMENT | 41 |
| COURT DECISION | (Reserved) |

| Exhibit | | Evid. |
|---------|-----|-------|
| P-1 | Email | 31 |
| T-1 | Revised Agreement | 39 |

4

1      (Proceedings commence at 2:06 p.m.)

2             THE COURT:  Please be seated.

3             Mr. Felger.

4             MR. FELGER:  Good afternoon, Your Honor.  Mark Felger

5      of Cozen O'Connor on behalf of Jeoffrey Burtch, the Chapter 7

6      Trustee.

7             We're here on the Pursuit Capital Management, LLC

8      matter.  We have just one item on the agenda.  It's the much

9      anticipated and long awaited hearing on the trustee's motion

10     for an order approving agreement to settle, transfer, and

11     assign certain claims, rights, and interests.

12            I understand from Mr. Martin that he'd like to address

13     the Court before we get started, so I will cede the podium to

14     Mr. Martin.

15            THE COURT:  Okay.  Mr. Martin.

16            MR. MARTIN:  Thank you, Your Honor.  I would like to

17     address the Court, and much -- I'm doing this, in large part,

18     based on conversations that Mr. Felger and I continued to have

19     over the weekend after our hearing on Friday.

20            Specifically, over the weekend, we exchanged offers.

21     If the Court may recall from Friday's hearing, I had indicated

22     that my client had made an additional offer, which, in general

23     terms, consisted of a cash payment of $200,000 for a release

24     from the estates, leaving behind the UBS claim, allowing it to

25     pass through the bankruptcy unaffected, and permitting and

1    requesting as part of the settlement that the trustee would

2    take steps to commence the closure of the case by preparing a

3    trustee's final report and seeking the various approvals for

4    that.

5         As part of those negotiations, the release provision

6    was unacceptable to Mr. Felger.  He felt like our bid was not

7    apples-to-apples.  I further tried to clarify that over

8    Saturday afternoon.  I understand from Mr. Felger that he and

9    the trustee considered our revised offer and still had some

10   uncertainty about what we were -- what we were proposing.

11        And Mr. Felger and I had a further conversation about

12   that this morning, after which I was able to speak with my

13   client, who authorized me to inform both the Court and the

14   trustee and the parties that my client is willing to pay

15   $205,750 to purchase the actions identified in the agreement to

16   settle, transfer, and assign certain claims, rights, and

17   interests, that we understand the trustee will seek approval of

18   today.  As defined therein, that would be the New York action,

19   the indemnification claims, and the insider avoidance claims.

20        As we previously proposed to the trustee, the UBS

21   litigation would not be administered by the estate, and the

22   parties' rights would pass through the bankruptcy.  The trustee

23   would then begin to take the steps to complete his final

24   report, having fully administered the scheduled assets and

25   dismissed the bankruptcy cases.  As a consequence, the -- what

```
 1      are defined as the "debtor claims" would not need to be

 2      purchased by any parties.

 3              We made that -- I make that offer.  It's probably the

 4      first time Mr. Felger is hearing it.  However, as I say, we

 5      make this based on conversations we had this morning.  Mr.

 6      Felger indicated that I should advise the Court of this offer;

 7      that he and his client would be here to listen to it, and that

 8      we should request that the auction be reopened to permit other

 9      parties to bid on that.

10              The reason for that request is that the bid we made on

11      Saturday contemplated an additional amount of money if the

12      trustee would declare us as the highest or otherwise best offer

13      at today's hearing, so we could wrap up this sale process.  Mr.

14      Felger indicated that the trustee was uncomfortable with that,

15      and thought that --

16              THE COURT:  Without giving any party an --

17              MR. FELGER:  Without giving any party -- so I spoke

18      with my client about that concern and have addressed it.

19              And if the Court were to elect, or the trustee were to

20      elect, we would be willing to go back to an auction with this

21      new offer, allow the other parties to bid.  And Mr. Cane, who's

22      on the telephone, and I have the ability to get in touch with

23      our client, who, although he's on vacation this week, has made

24      himself available for an auction today or tomorrow.  And Mr.

25      Kane and I have guidance from him on bidding, and we have --
```

```
1    will have his authority with respect to any recommenced

2    auction.

3           So I wanted to make the Court aware of that.  And I

4    don't know if Mr. Felger wants to react to that, but that's the

5    statement that I intended to make.

6           THE COURT:  Thank you.  Mr. Felger?

7           MR. CANE:  (Via Telephone)  And Your Honor, this is

8    Peter Cane.  If I may, just for the avoidance of doubt.  Our

9    client is out of the country, but has given me full authority

10   and all the parameters to go forward.  Thank you.

11          THE COURT:  Thank you.

12          MR. FELGER:  I may have missed it, Mr. Martin.  But

13   what about the payment of the $205,750; is that paid upon

14   approval, or is that paid at some later time?

15          MR. MARTIN:  In conversation with my client, we would

16   be willing to work with you on the mechanics.  The idea is that

17   we -- if we were to pay it on approval, we would want to have a

18   mechanism to ensure that it was either held in escrow by the

19   trustee, perhaps, subject to a court order, to be distributed

20   in accordance with the approve trustee's final distribution.

21   Is that responsive to your question, Mr. Felger?

22          MR. FELGER:  Somewhat, yeah.

23          MR. MARTIN:  Thank you.

24          MR. FELGER:  Well, Your Honor, this is the first time

25   that I've heard this particular offer.  I have had -- and the
```

1    trustee, of course, who's in the courtroom.  We --

2              THE COURT:  If you'd like some time --

3              MR. FELGER:  Well --

4              THE COURT:  -- to consult with your client, I'm happy

5    to give it to you.

6              MR. FELGER:  Yeah, I think we might need that.  But

7    preliminarily, I mean, this is sort of the framework that I had

8    broached with this side of the room several months ago --

9              THE COURT:  Uh-huh.

10             MR. FELGER:  -- several months ago, before Mr. Martin,

11   of course, was actively engaged, as a way of moving this

12   process ahead.  And you know, we're in that very difficult

13   spot, Your Honor, where we have a party on this side that has

14   adhered to the rules, conformed to the rules, provided bids

15   when they were required and requested; and even after the

16   auction, after they submitted their final bid, agreed to make

17   some additional language changes to the agreement, to make the

18   trustee and the estate comfortable.  So you have that tension,

19   Your Honor, of competing policies here.

20             I'm not -- and generally, my experience is that, when

21   a court considers reopening auctions, it's generally with

22   respect to problems with the process, or possibly new parties

23   who didn't have notice being afforded notice.

24             Here, you know, it's really sort of disconcerting that

25   we have a party that's been actively involved for months, the

1    insiders of this company that know these claims better than

2    anyone.  And it's the insiders that have been delaying this for

3    the last four to five months, and who are here now, seeking to

4    have an auction reopened that they've delayed for months.

5          With a proposal that's -- it's intriguing, and it's

6    hard to determine whether it's, in fact, better.

7          THE COURT:  Uh-huh.

8          MR. FELGER:  It's higher.  Two hundred and five

9    thousand dollars is clearly higher than the $180,000.  But at

10   the same time, it settles a six-hundred-and-forty-thousand-

11   dollar avoidance claim, whereas the other claims -- the other

12   bid, it's 180,000, and that claim gets pursued, and the net

13   proceeds come into the estate to be shared by creditors.

14         And of course, you have the UBS claim, which is really

15   what's driving this whole case.  And the creditor group's bid

16   would have those claims assigned to the creditor group to

17   pursue, with any recovery coming into the estate, and the

18   Pursuit Parties' proposal would have that claim ride through

19   the bankruptcy, not be administered by the trustee; would

20   reside in the debtor post-bankruptcy, and creditors would have

21   their rights under state law against the debtor entity,

22   presumably to pursue a recovery from the UBS litigation under

23   applicable state law, creditors' rights remedies.

24         The creditors' bid likely would result in this Court

25   having a lot of work to do.  It could be a bunch of claims

1    pursued in this court, to require this case to remain open,

2    potentially for years, if history is any indicator.  The

3    trustee would have to remain involved.

4         The bid on this side by the Pursuit Parties would

5    enable, potentially, this Court to remove itself from this

6    case, to close out this case quickly, and allow all of these

7    parties to go back to state court, which is where they were

8    before this case was filed, and which is consistent with what

9    the trustee's position was right out of the gate in this case.

10        The very first hearing we were saying to the Judge, we

11   don't belong here.  These parties were all in state court,

12   pursuing their rights and remedies, and now we're here, and now

13   we're a year and a half down the road with a lot of attorneys'

14   fees.  And quite frankly, neither of these bids covers the

15   legal fees in the case.  Both of these claims -- both of these

16   bids are less than the total administrative expense in this

17   case.

18        However, the creditors' bid, as I indicated, would

19   allow the claims to be pursued, with recoveries coming into the

20   estate, and possibly generating proceeds sufficient to pay the

21   administrative claims, and generating a distribution to

22   creditors.  The Pursuit Parties' bid would not do that.

23        So perhaps, Your Honor -- I'm ruminating a bit.  And I

24   don't know if anybody wishes to be heard.  But I'm thinking we

25   might want to take just a couple -- a few minutes for me to

1    talk with Mr. Burtch about this development.

2              THE COURT:  I think that would be advisable.

3              MR. HARRIS:  Your Honor, I would like to be heard.

4    Jonathan Harris representing the (indiscernible - away from

5    microphone)

6              THE COURT:  I guess I don't think it matters, so if

7    you'd like to be heard now, that's fine.

8              MR. HARRIS:  So, Your Honor, the creditor group are

9    the only legitimate, non-insider creditors in this case, as you

10   know.  We've bid $180,001, plus we're going to pursue the

11   fraudulent conveyance claim, which I believe it's a sixty-

12   hundred-forty-odd-thousand-dollar claim, which I believe it's

13   pretty clear that these folks, they -- values at at least

14   $205,000.

15             And then, in addition, we're going to pursue that for

16   the benefit of the estate.  We think it's worth more than that;

17   it's a very strong claim.  We have the wire transfers showing

18   the money going -- being taken out of the partnership, contrary

19   to representations made to an arbitrator and representations

20   made to me.  It goes to the general partner on the eve of an

21   arbitration hearing, and that day, it gets transferred out to

22   the insiders and their wives.  It's a very strong claim, we

23   have all that.  They think it's obviously worth at least

24   $200,000.  Plus, we would be contributing the UBS claim to the

25   estate; that would all go to the estate.

1          Importantly, we followed all the procedures.  This was

2     a -- as Your Honor knows, we first tried getting this settled

3     and approved, I think, five, six months ago.  Mr. Felger

4     eventually set up procedures under which there was a sealed

5     bid, and I think that's very important because, when you have a

6     sealed bid, it's supposed to be a sealed bid, right?

7          And we -- you know, we originally had an auction.  We

8     had an auction.  We got to the middle of the afternoon, and

9     they said they were no longer available to continue.  So we

10    couldn't find a new date for the auction, so Mr. Felger said

11    sealed bids.

12         So what happens?  We submit.  We complied fully with

13    the process, a hundred percent down the line.  We submit a

14    sealed bid within the deadline.  They do not submit a sealed

15    bid.  After Mr. Felger reveals our bid to them, as the highest

16    and best bid, what do they do?  They start playing games.

17         First, they try to adjourn the hearing.  And then,

18    when that fails, they come in, and having seen our bid, full

19    knowledge of what it is, exactly antithetical to what a sealed

20    bid process is supposed to be, they come in and they try to

21    overbid us.  The first we hear of it, this -- right now, as we

22    walk into this courtroom.  And Mr. Felger had told us over the

23    weekend that he was talking to them, but there was no bid

24    conveyed to us.

25         So we follow the process, we do a sealed bid.  They

1    play games.  They wait to see what our sealed bid is.  They

2    move to adjourn.  Then they try to come in at two o'clock, at

3    the hearing and top it.

4            And you know, the integrity of the process is very

5    important here.  You know, there's a bidding process, which is

6    important, which we followed, which this Court and the trustee

7    set in line.  And then, the second part of the integrity of the

8    process here is that these folks engaged in transactions that

9    emptied out the debtor.  They drop it here on the doorstep of

10   this Bankruptcy Court.  And now they propose an offer which

11   would result in not one single dollar going to the creditors.

12           We've been here 18 months; their choice, not our

13   choice.  They filed for bankruptcy.  We've been here 18 months,

14   we've spent money.  We've had endless hearings, motion

15   practice.  And now they're just saying, okay, never mind, we're

16   going to take the $640,000 we moved from the company, we're

17   going to pay $200,000 over to the estate here, you won't get a

18   penny, and you know, we'll just kind of go back to where we

19   were a year and a half ago in state court.

20           And you know, we can't go back.  We just spent a lot

21   of time, a lot of effort here.  We followed a process, we did

22   it.  And what they want here is to reward the folks who looted

23   the debtor, who sought endless adjournments, who ignored the

24   sealed bid process, and came in at the twelfth hour playing

25   games.

1          We just strongly, strongly urge this Court to go ahead

2    with the hearing and approve the creditors' bid.

3          THE COURT:  Thank you.

4          MR. HARRIS:  Thank you.

5          MR. CANE:  Your Honor, this is Peter Cane.  May I be

6    heard?

7          THE COURT:  Not right now, no.

8          I'm going to take a recess for 10 minutes, so that Mr.

9    Felger can speak with his client.

10        (Recess taken at 2:23 p.m.)

11        (Proceedings resume at 2:39 p.m.)

12        THE COURT:  Please be seated.

13        Mr. Felger?

14        MR. FELGER:  Good afternoon, again, Your Honor.  Mark

15   Felger, Cozen O'Connor, on behalf of the trustee, for the

16   record.

17        Thank you for giving us some time to consider what

18   we've just heard from the Pursuit Parties.  I guess we're in a

19   similar place to where we were on Friday afternoon, Your Honor.

20   The trustee isn't inclined to support or necessarily oppose the

21   request to reopen the auction.  We've heard what Mr. Martin

22   conveyed.  We have concerns about what was conveyed, in terms

23   of when the payment would be made and certainly in terms of

24   being quite far removed from having an actual agreement versus

25   a few bullet points that have been read into the record.  And

1     we -- the trustee takes very seriously, the procedures that

2     have been put in place here, and all the time that has gone by

3     and all of the requests for adjournments and all of the actions

4     to delay the final hearing on this motion.

5           You know, where auctions have been reopened, you know,

6     typically it's not to reopen for a party who has been actively

7     involved throughout the process and has had ample opportunity

8     to make bids during the process.  But, at the same time, we

9     recognize the competing policy of maximizing value, and are

10    always concerned that you may be leaving a few dollars on the

11    table.  But I think in the end, Your Honor, the few dollars

12    won't make a bit of difference to the creditors of this estate,

13    and the creditors of this estate are in the creditor group,

14    Your Honor.

15          So, with all that, we're prepared to move forward on

16    the motion, but, of course, Your Honor has the final say and if

17    Your Honor's inclined -- as I said on Friday -- if Your Honor's

18    inclined to reopen the auction, we would ask that it be done

19    immediately; in fact, here and now would be what we would

20    suggest.  But I guess I'll leave it there unless Your Honor has

21    any questions.

22          THE COURT:  I don't have any questions.

23          I'm not inclined to reopen the auction.  This motion

24    was filed back in March, March 2nd.  The original auction date,

25    I believe, was going to be sometime in April.  There were

1    discovery disputes, which we did resolve, and then at a hearing

2    in May, I directed the auction to take place on June 8th.

3            On June 4th the trustee's counsel sent an email

4    regarding bid procedures.  On June 5th, the Pursuit Parties'

5    counseling objected and asked for a conference with the Court,

6    which this Court gave the Pursuit Parties.  At that conference

7    on June 15th, I directed the trustee to file a motion regarding

8    the bid procedures so that there would be clear to be due

9    process.

10           I would say even though I didn't necessarily think we

11   needed a motion, given the facts of this case, with respect to

12   bid procedures, we had the hearing on bid procedures.  I, then,

13   approved them.  At a subsequent hearing on July 2nd, I directed

14   that the auction be on July 7th with the hearing on the 16th.

15   Apparently, the auction started on July 7th; it didn't conclude

16   and the -- or maybe it didn't start on that date.  Maybe it was

17   later, even in July, that it was finally heard -- had an

18   auction.

19           Then the trustee asked for sealed bids.  One party

20   followed the rules.  The other party chose not to provide a

21   sealed bid.  The Pursuit Parties have had ample time to make

22   their bid to suggest an entire resolution of this case, to take

23   whatever actions they thought were appropriate and they did not

24   do so during the course of this case and they did not submit a

25   bid by the bid deadline.

1     I'm not clear today whether what we heard in court was

2  an actual bid.  I'm not sure it's fully baked.  I certainly

3  don't see a signed agreement.  And I don't think it's

4  appreciably higher to upset the auction procedures that we have

5  in this case, given the history of this particular case.  So, I

6  will not order that the auction be reopened, and we will go

7  forward with the sale hearing.

8         MR. FELGER:  Thank you, Your Honor.  Mark Felger,

9  again, for the record.

10        What I would propose that we do, Your Honor --

11  although you'll probably hear a lot of what Your Honor just

12  said in my proffer -- but what I would propose we do is proffer

13  the testimony of the trustee, Mr. Burtch, and then we can offer

14  him for cross-examination by any party that's interested in

15  cross-examining the trustee.

16        THE COURT:  Does anyone have an issue with the

17  procedure that Mr. Felger has suggested?

18    (No verbal response)

19        THE COURT:  I hear no one.  That's acceptable.

20        MR. FELGER:  Thank you, Your Honor.

21        Mr. Burtch is in the courtroom with us today.  If

22  called to testify, Mr. Burtch would testify that he is the

23  trustee for the estate of Pursuit Capital Management LLC,

24  Chapter 7 debtor.

25        He would testify that the estate has no cash and that

1    the only scheduled assets are an indemnification claim against

2    the limited partnership and a claim for breach of a

3    confidential settlement agreement, and as a reference, in the

4    statement of financial affairs, to a distribution to equity

5    holders totaling over $600,000.

6              He would testify that he entered into an agreement to

7    settle, transfer, and assign certain claims, rights and

8    interest on or about February 27th, 2015, which dealt with the

9    three scheduled assets.

10             He would testify that the agreement was the

11   culmination of months of negotiation with the so-called

12   creditor group, as well as discussions with the so-called

13   Pursuit Parties.

14             He would testify that he filed a motion to approve the

15   agreement, on or about March 2nd, 2015, and that the motion

16   included a provision affording other parties the opportunity to

17   submit higher bids.

18             He would testify that the motion provided that if

19   other bids were received, then the trustee would request final

20   sealed bids from the bidders.

21             He would testify that a hearing was initially set for

22   the first week of April, 2015, to consider the motion.

23             He would testify that, through various requests by the

24   Pursuit Parties for adjournment and discovery, all of which is

25   laid out accurately in the creditor group's objection to the

1   motion to continue, the hearing was adjourned several times,

2   ultimately to today, four months after it was originally

3   scheduled for hearing.

4        He would testify that on May 13th, pursuant to a court

5   order, which was dated April 21st, the Pursuit Parties

6   submitted a competing bid.

7        He would testify that an auction was initially set for

8   June 8.

9        He would testify that in advance of that auction,

10  trustee, through his counsel, provided the two bidder groups

11  with procedures for the auction.

12       He would testify that the Pursuit Parties objected to

13  those procedures and a hearing was subsequently held at which

14  time the Court requested the trustee file a motion to approve

15  auction procedures.

16       He would testify that that motion was, indeed, filed

17  on June 18th and approved by this Court on June 30th.

18       He would testify that on July 7th, an auction

19  commenced, but not concluded; the transcript, of which, is

20  filed of record with the Court.

21       He would testify that during the auction, the Pursuit

22  Parties needed to break at approximately three o'clock so that

23  counsel could take a scheduling conference and that the Pursuit

24  Parties could not rejoin the auction until 8:30 or 9:00 that

25  evening.  At that point, the trustee decided to adjourn the

1    auction to a later time.

2           He would testify that he, through his counsel,

3    attempted to reconvene the auction over the several-day period

4    after the auction commenced and proposed at least eight

5    alternative dates to reconvene the auction.

6           He would testify that no date was acceptable to all

7    parties, so rather than engage in further delay, he requested

8    final sealed bids on July 24th, from the bidders to be

9    hand-delivered to trustee's counsel on July 30th at four

10   o'clock.

11          He would testify that on July 30th at four o'clock,

12   the trustee received one bid -- trustee's counsel received one

13   bid from the creditor group.

14          He would testify that he did not receive a bid from

15   the Pursuit Parties, and, in fact, was advised by the Pursuit

16   Parties' counsel, that the Pursuit Parties had withdrawn their

17   prior bids.

18          He would testify that the bid received from the

19   creditor group on July 30th provided for a payment of

20   $180,000.01, which was $10,000.01 higher than the high bid by

21   the Pursuit Parties at the auction.

22          He would testify that he has, since, had discussions

23   with the creditor group to make certain changes to the language

24   of the agreement and the creditor group has agreed to make all

25   requested changes.

1          He would testify that the material terms of the

2     agreement are as follows:  Cash payment of $180,000.01, paid

3     within 20 days of Court approval -- and I would note that that

4     is $55,000.01 higher than the cash payments of the original

5     agreement filed with the Court.

6          He would testify that -- excuse me -- the estate

7     claims and causes of action, as defined in the agreement will

8     be pursued by the creditor group at the creditor group's sole

9     cost and expense.

10          He would testify that any net recovery realized on

11     such claims, after reimbursement of the creditor group's costs

12     and expenses, which do not include the purchase price, shall be

13     paid into the estate for distribution to all creditors, in

14     accordance with the Bankruptcy Code; that, too, is a new term.

15     It wasn't included in the original agreement.

16          He would testify that he has made no representations

17     or warranties of any kind, with respect to the claims and

18     causes of action or the state or quality of the debtors' books

19     and records that will be transferred, pursuant to the

20     agreement.

21          He would testify that any claim or cause that's

22     pursued by the creditor group is subject to whatever defenses

23     parties may have, including a right to contest that such claims

24     should be brought in another court or in arbitration.

25          He would also testify that, with respect to any claim

Burtch - Direct (Via Proffer)                    22

1    that is not a scheduled claim, that the creditor group wishes

2    to pursue, the creditor group must provide notice to the

3    trustee, as follows:

4          Except, with respect to the UBS claim and the insider

5    avoidance action, the creditor group will provide the trustee

6    with three business days' notice before commencing any action

7    in the bankruptcy court, on behalf of the debtor, asserting

8    claims that were not referenced in the debtors' bankruptcy

9    schedules.  If the trustee objects to the assertion of any such

10   claim, then the creditor group shall obtain an order from the

11   Bankruptcy Court before commencing any such action in the

12   bankruptcy court.

13         The standard for asserting such claims will be the

14   colorable claim standard set forth in the Third Circuit

15   Cybergenics case at 330 F.3d 548, provided, however, that only

16   the trustee shall have standing to object.

17         With respect to the UBS claim, the creditor group may

18   pursue such non-scheduled claims without following the

19   procedure described above, provided that the relief requested

20   in such action will not result in the debtor and/or the estate

21   or the trustee being reinstalled as a general partner of any of

22   the Pursuit funds, other than for the limited purpose of

23   collecting funds it is due, including, without limitation, any

24   incentive fee or carried interest.  The proposed action

25   requests such relief and the creditor group shall follow the

1    procedure for non-scheduled claims.

2              The agreement also provides that the trustee will not

3    move to closed case before the first week of April 2016.

4    He would testify that this is not an issue, because under any

5    such circumstances -- any set of circumstances, the case would

6    not be closed before that time.

7              He would testify that these are the material terms of

8    the agreement.  There are other terms that are set forth in the

9    agreement, as well.

10             He would testify that at the time that the bidding

11   closed at four o'clock on July 30th, it was the only -- the bid

12   that I just described -- is the only bid for the assets,

13   because the Pursuit Parties withdrew their prior bid.  But even

14   had the Pursuit Parties not withdrawn their bid, the creditor

15   bid was the higher bid.

16             He would testify that the agreement is fair and

17   reasonable, as it provides a floor of $180,000.01 for the

18   estate with the possibility of upside, at no cost, if there's a

19   recovery on various causes of action.  Also, the agreement

20   provides for no reps or warranties of any kind and requires a

21   Court determination for non-scheduled assets -- for the pursuit

22   of non-scheduled assets, that such claims are colorable,

23   thereby, minimizing any downside risk to the estate.

24             He would testify that the only groups that he's aware

25   of that had any interest in acquiring control of these assets

1    are the creditor group and the Pursuit Parties.  The creditor

2    group, being the only creditors of this estate, and their

3    interest is in pursuing them, and the Pursuit Parties being the

4    insiders or targets of the actions and their interests being to

5    settle and release them.

6           He would testify that the negotiations with both

7    groups as been ongoing for the better part of a year.

8           He would testify that each party has had ample

9    opportunity through July 30th to submit its highest and best

10   bid for the assets.

11          And he would testify that based upon all the

12   foregoing, that the agreement is in the best interests of

13   creditors and ought to be approved by the Court.

14          And I would constitute his -- Mr. Burtch's testimony

15   on direct, Your Honor.

16          THE COURT:  Thank you.

17          Does anyone wish to cross Mr. Burtch?

18          MR. MARTIN:  I would like to, Your Honor; Craig

19   Martin.

20          THE COURT:  Thank you.

21          Mr. Burtch?

22          MR. SCOTT:  Your Honor, if I may, while Mr. Burtch is

23   taking the stand, I'd like to make -- can I speak?

24          THE COURT:  Well, we're in the middle of evidence,

25   here.

1          MR. SCOTT:  Well, I just want to say, Your Honor, that

2     as Mr. Felger just said that Mr. Burtch would testify to, the

3     Pursuit Parties are not creditors, so I don't understand the

4     basis for the cross-examination.  They don't have standing to

5     object.  They're not parties in interest in this bankruptcy

6     case.  They don't have standing to object, so I don't know what

7     the purpose of this cross-examination is.

8          THE COURT:  Well, I guess I don't know that they

9     aren't creditors in this case.  I know that there was an

10    objection filed to proofs of claim that hasn't been adjudicated

11    in front of me, and I'm going to permit the cross-examination,

12    under those circumstances, where I have not ruled on the claims

13    that have been filed.  So we'll go forward.

14         THE CLERK:  If you would please raise your right hand.

15    **JEOFFREY L. BURTCH, CHAPTER 7 TRUSTEE, SWORN**

16         THE CLERK:  And will you please state your full name

17    and spell your last name for the record.

18         THE WITNESS:  It's Jeoffrey Lynn Burtch, B-u-r-t-c-h.

19         THE CLERK:  Thank you.  You may be seated.

20                        **CROSS-EXAMINATION**

21    **BY MR. MARTIN:**

22    Q    Good afternoon, Mr. Burtch.

23    A    Good afternoon.

24    Q    Craig Martin, I represent the Pursuit Parties.  I just have

25    a few questions for you this afternoon about your testimony.

1          I want to start with the sealed-bid auction.  Is it your

2     understanding that the proposed auction procedures permitted

3     you to solicit sealed bids?

4     A    I don't recall that.  I know there was a discussion

5     regarding the procedures and they may have been modified, but

6     I'm not sure what the original procedures said.

7     Q    Are you aware that in the original procedures it said that:

8               "The auction may include individual negotiations with

9               each bidder and/or open bidding, provided, however,

10              that all bids shall be made and received in one room,

11              on an open basis, and each bidder shall be entitled to

12              be present for all bidding and all material terms of

13              each bid shall be fully disclosed to all bidders."

14    A    I believe those are standard terms.  I don't have any

15    specific recollection in this one.

16    Q    Okay.  And the sealed bid that you've accepted and

17    presented to the Court today for approval, was not presented in

18    one room, on an open basis, was it?

19    A    No, I believe it was submitted to my counsel.

20    Q    And that bid was submitted, approximately, on July 30th, I

21    think it was.  Does that sound correct?

22    A    I don't recall the date.

23    Q    Do you recall authorizing your counsel to circulate that

24    bid to the parties that participated in the auction on the

25    following day, July 31st?

1    A    I believe that's correct.

2    Q    And you did, in fact, circulate a signed agreement on that

3    date.  Is that correct?

4    A    I believe that's correct.

5    Q    And the agreement to settle, transfer and assign certain

6    claims, rights and interest that you're presenting today is not

7    the same agreement that was circulated on the 31st?

8    A    I don't -- I think it's been amended, as Mr. Felger said

9    earlier today.

10   Q    And that amended agreement hasn't been presented to the

11   Pursuit Parties, has it?

12   A    I don't know.  I have not.  Whether it's done through my

13   counsel, I have no idea.

14   Q    Are you aware that on the following Monday, August the 3rd,

15   that the Pursuit Parties, through me as counsel, made a request

16   to Mr. Felger to adjourn the sale hearing until August 10th?

17   A    I believe I recall that.

18   Q    And do you recall that on August 4th, Mr. Felger

19   communicated back to me that you were not willing to have a

20   continuance and that we should file a motion for such

21   continuance for the Court to consider?

22   A    I think that's correct.

23   Q    Do you recall, then, on Wednesday, August 5th that the

24   Pursuit Parties asked Mr. Felger to reconsider that request

25   for, among other reasons, they wanted to take a deposition and

Burtch - Cross                                    28

1    that due to both counsel's attendance of the conference in

2    Hershey, Pennsylvania, for the American Bankruptcy Institute,

3    there would unlikely be time for that deposition to occur,

4    prior to this hearing and asking for reconsideration of the

5    continuance request?

6    A    I don't recall that.  What I do recall is that for months,

7    I'd been advised by my counsel that the Pursuit Parties wanted

8    to take my deposition and I was well-informed of that months

9    ago.  At no time did anyone, any party, ever notice my

10   deposition or ask me to schedule certain days for my

11   deposition.

12       And if what you're saying is accurate, any request to take

13   my deposition would have been requested, like, hours before

14   Thursday or Friday that week.  So, there's plenty of time to

15   take it.  Nobody's taken it and nobody's requested to take it.

16   Q    Well, you're unaware that no one's requested it.  Is that a

17   better way to say that?

18   A    Nobody's noticed me, as the party, of my deposition.

19   Q    So you've not been deposed --

20   A    Have not.

21   Q    -- in connection with this hearing.

22       Now, you're aware that on Thursday, August 6th, that the

23   Pursuit Parties contacted your counsel about a potential way to

24   resolve these bankruptcy cases?

25   A    I don't recall.

1   Q   Do you remember an offer to pay $200,000 from the Pursuit

2   Parties, in exchange for release of the various claims that the

3   estate might have against the Pursuit Parties that would leave

4   behind the defined UBS claim and require the trustee to seek

5   dismissal of the case promptly?

6   A   You know, there's been so many variations back and forth.

7   I had discussions -- Mr. Felger was in Hershey --

8   Q   Don't go into -- I want to go into attorney-client

9   privilege, so please don't tell me what the content of those

10  are.

11  A   I was not presented with any specific offer.  I think there

12  was some concerns about time of payment, if I recall.  I think

13  that my understanding, if I recall, was that payment would be

14  made at the end of the case.  Monies would be put in escrow.

15  That was a no-deal; it was a deal breaker.

16      And, so, I think there were some various discussions

17  regarding an offer or proposal -- I don't think it was an offer

18  -- but it never materialized.

19  Q   So you're not aware that the Pursuit Parties made an offer

20  to Mr. Felger, through me?

21  A   I don't know.  I know there were discussions.  If there was

22  an offer made, I didn't consider it.

23      MR. MARTIN:  Your Honor, I have an email from me to

24  Mr. Felger that I'd like to offer into evidence and show Mr.

25  Burtch that it has the contents of the offers that my client

1    made through me to Mr. Felger, if that would be acceptable.

2           MR. FELGER:  Your Honor, I'm going to object to this

3    line of questioning.  Your Honor has already ruled that you're

4    not going to reopen the auction.  All of this happened after

5    the auction closed; I'm not sure how this is relevant at all.

6    We've gone through all of this in connection with the request

7    to reopen the auction.  Your Honor ruled that there's no basis

8    to reopen the auction, so all of this, I just don't see the

9    relevance in any of it.

10          THE COURT:  How is this relevant?

11          MR. MARTIN:  Your Honor, it's relevant because the

12   trustee has offered in his direct testimony that he has

13   accepted the highest and, otherwise, best offer.  I've

14   established during this cross-examination, that the auction

15   procedures required that all bids were supposed to be made in

16   an open forum.  The bid he accepted was not.

17          Since that bid has been accepted, my clients have been

18   making offers of increasing amounts to try to continue to

19   participate in the auction.  My client has authorized me and

20   Mr. Cane, who's on the phone today, to participate in an

21   auction.  We have authority to offer more than is on the table

22   now and I think it's relevant and should be in the record that

23   an offer of $220,000 was made over the weekend.  And it's

24   simple math:  $220,000 is more than two forty -- I mean one

25   eighty.

1          And so I think it's relevant to establish that we've

2    made these offers and that the bid that's being accepted is not

3    the highest or, otherwise, best bid.

4          THE COURT:  Well, I think those are two different

5    things.  Whether your client put in an email that he was

6    willing to pay $200,000 under some circumstances at some point

7    in time is different than whether he's established that he's

8    made an offer that's higher and better.

9          I'll accept the email for what it's worth.

10         MR. MARTIN:  Okay.  Thank you, Your Honor.

11         Your Honor, this is my first time in front of you

12   since you've been on the bench.  Would you like for me just to

13   present it to you and -- or do I need to present it to the ERO

14   to be marked as Exhibit 1?

15         THE COURT:  Let's have it marked as Exhibit 1, and

16   then you can provide me a copy, as well.

17         MR. MARTIN:  Okay.  Thank you.

18     (Exhibit P-1 received in evidence)

19         THE COURT:  Thank you.

20         MR. MARTIN:  Thanks.

21   BY MR. MARTIN:

22   Q    Okay.  Mr. Burtch, I've shown you what's been marked as P-1

23   for Pursuit Parties.  If you flip to the second page, you'll

24   see an email from me to Mr. Felger, and you will see that in

25   the context of this email, we had four points in which the

1    Pursuit Parties offered $200,000 in Point 1.  In Point 2, they

2    sought releases.  In Point 3, they offered to leave the UBS

3    claim to pass through the estates.  In Point 4, they sought

4    that you would dismiss the case promptly.

5         Were you made aware of this offer?

6    A    I believe I was.  I think I don't recall having read this,

7    but I suspect that Mr. Felger discussed it with me.

8    Q    And then you'll see, if you turn back to Page 1, there's a

9    modification to Points 1 and 2, identified as raising the offer

10   by $20,000, based on a condition that you found unacceptable,

11   that we would end the auction process today with that being the

12   highest and best bid, and in Point 2, we sought to identify the

13   release that was sought in the prior point.

14        Were you made aware of that offer?

15   A    Well, if you give me a second, and let me read this.

16   Q    Okay.

17   A    I do recall having discussed this, but I don't recall if I

18   actually read it.

19   Q    Okay.  So having reviewed the Plaintiff's Exhibit Number 1,

20   you do now recall this offer?

21   A    I recall having discussion.  I think some of the points --

22   I'm not sure if all the points were raised.  I know that there

23   was a discussion regarding the additional $20,000 and whether

24   that was acceptable, and I recall telling Mr. Felger --

25   Q    I don't want to have you say what you and Mr. Felger

Burtch - Cross                                              33

1    discussed --

2    A  It wasn't acceptable.

3    Q   -- without giving him a chance to ...

4    A   Oh, okay.  The -- I didn't think it was appropriate to cut

5    off the bidding if it was going to be reopened for the

6    additional $20,000, the way I read that or the way I understood

7    it.

8         There was also some concern regarding payment of the

9    monies.  Monies were to be put into escrow and wouldn't be

10   distributed until the end of the case.  I had concerns whether

11   -- now, the only thing that would have been acceptable, if the

12   payment would have been made immediately, upon approval of the

13   Court, rather than wait three or four years down the road or

14   six months, whatever the time would be, waiting for the money,

15   so that was not acceptable.

16        Those are the two items I specifically recall that I had a

17   problem with.

18   Q   Okay.  And the reason you didn't want to wait for the money

19   is because you needed to pay administrative expenses.  Is that

20   the reason for that?

21   A   Well, I wanted to make sure it was paid.

22   Q   So if it was paid immediately, upon Court approval, but put

23   in escrow, that would satisfy that concern, wouldn't it?

24   A   I believe that would satisfy -- yes.

25   Q   Okay.

1    A    That wasn't what was offered, from my understanding.

2    Q    And were you in the courtroom -- I think I saw you, but I

3    was addressing the Court -- when I stated on the record that my

4    client has further modified its offer to $205,750?

5    A    I heard that.

6    Q    And were you also in the courtroom when I indicated to the

7    Court and Mr. Felger that my client would be willing to pay

8    those funds immediately to be held in escrow, by you, pending

9    further order of the Court?

10   A    I don't know if I heard that, but if that's what you're

11   saying, I hear it now.

12   Q    Okay.  And are you -- you hopefully heard me indicate that

13   my client was prepared to go back to Mr. Felger's offices and

14   reopen the auction and continue bidding if there were other

15   bids made?

16   A    If you're saying that now, then I'm hearing that now.

17   Q    Okay.  And even though my client is willing to put the new

18   bid on the table and return to the auction and continue

19   bidding, should the other parties make other bids, you've

20   decided that you would prefer to present the hundred-and-

21   eighty-thousand-dollar offer?

22             THE COURT:  No.  I decided that.

23             THE WITNESS:  No.

24             THE COURT:  He's not going to answer that question.

25   I've made that decision.

1          MR. MARTIN:  Okay.  Understood.

2          THE WITNESS:  Thank you, Judge.  That was my answer.

3    BY MR. MARTIN:

4    Q    That's fair.  Now, I think when Mr. Felger was presenting

5    to the Court this morning, he indicated that under the

6    settlement that's been presented to the Court, the trustee will

7    have to stay involved in these cases.  Did you hear him say

8    that?

9    A    The trustee will be involved in the cases.

10   Q    And is it -- your expectation is that you will, then, incur

11   additional administrative expenses?

12   A    It's possible.

13   Q    And the $180,000 that's being paid, have your

14   administrative expenses exceeded that amount at this point?

15   A    I have not received a bill from my counsel, but I heard his

16   representation that they have.

17   Q    Okay.  So you'll have $180,000 and then you'll -- which

18   isn't enough to cover the administrative expenses, as we stand

19   here today, and you expect to incur additional administrative

20   expenses, correct?

21   A    That's correct.

22   Q    Now, is it correct to state that the settlement agreement

23   contemplates that the claims and causes of action that are

24   being assigned, will be prosecuted on behalf of the estate?

25   A    I believe that's correct.

1    Q    Do you have any anticipation that the lawyers that will be

2    prosecuting those claims on behalf of the estate will submit

3    employment applications to this Court for approval to ensure

4    that they're disinterested, and otherwise qualified, to act on

5    behalf of the estate?

6    A    If that's what's required, I suspect they will do that.

7    Q    But you haven't discussed that, have you?

8    A    I don't recall a discussion on that, no.

9    Q    And the agreement doesn't require it, does it?

10   A    I don't think it speaks to that issue.

11   Q    And the proceeds that will be, if any, that will arise from

12   any causes of action, will be net of the fees and costs of

13   prosecuting those causes of action.  Isn't that correct?

14   A    I believe that's correct.

15   Q    So -- and isn't it correct that the settlement agreement

16   also does not require those attorneys to submit fee

17   applications, in accordance with Sections 330 or 328 of the

18   Bankruptcy Code?

19   A    I don't recall that being discussed in the offer.

20   Q    Is it in the -- but it's not in the settlement agreement,

21   is it?

22   A    I don't think so.  I'll defer to the settlement agreement,

23   but I don't recall it being in there.

24   Q    As I was coming to the podium, I indicated to Mr. Felger

25   that I had received an email from my co-counsel and he

1    indicated to me that we are now authorized to offer you

2    $250,000 --

3                THE COURT:  No.  Not going to do it from the podium.

4                MR. MARTIN:  Okay.  I have no further questions at

5    this time, Your Honor.

6                THE COURT:  Thank you.  Your redirect?

7                MR. FELGER:  I have no redirect, Your Honor.

8                THE COURT:  Thank you.

9                Mr. Burtch, you may step down.

10               THE WITNESS:  Thank you.

11               THE COURT:  You can just leave it.

12               THE WITNESS:  Leave it here?

13               THE COURT:  Thank you.

14        (Witness excused)

15               THE COURT:  Is there any further evidence that the

16   trustee seeks to put on?

17               MR. FELGER:  No, Your Honor.  That's all that we have,

18   other than asking Your Honor to take judicial notice of the

19   docket and the pleadings that have been filed in connection

20   with these proceedings, all of which are included in the agenda

21   notice and the binder that's been delivered to Your Honor.

22               THE COURT:  Okay.  Do we have a copy of the revised

23   agreement?

24               MR. FELGER:  I do, Your Honor.

25               MR. MARTIN:  And Your Honor, I would object to the

1   entry of the revised agreement into the record, as there's no

2   witness to authenticate it and Mr. Burtch has finished his

3   testimony.

4           MR. FELGER:  I have the revised agreement that is

5   attached as an order -- attached to the order as an exhibit.

6   The order -- the agreement has been -- the agreement has been

7   explained to Your Honor through the proffer of Mr. Burtch, and

8   I think that's sufficient in terms of advising the Court and

9   the parties as to what the agreement provides.

10          THE COURT:  If we really have an authentication

11  problem, I would ask Mr. Burtch to get back on the stand.

12          MR. MARTIN:  Your Honor, my issue is not only did he

13  not authenticate it, but this is the first time we've seen this

14  order or this agreement.  The agreement that we were provided

15  with was the one that I elicited from Mr. Burtch that was

16  circulated on July 31st, and I would respectfully submit that

17  it's prejudicial for an agreement to be submitted when we

18  haven't been given the chance to review it in advance of the

19  hearing.

20          So I would, therefore, object to the admission of the

21  offer on those grounds, as well.

22          MR. FELGER:  I'm not sure of any requirement that we

23  need to provide a revised agreement that was actually revised

24  as recently as five minutes before hearing.  And as Your Honor

25  knows, this is an ever-developing process, so this agreement,

1    in fact, was finalized moments before we appeared before Your

2    Honor.

3             THE COURT:  Well, auctions are fluid and we all know

4    that that's how this process works.  I'll give you 20 minutes

5    to take a look at the agreement and in the meantime, if you can

6    hand it up -- if you come back and think that there is an

7    authentication problem, I'll ask Mr. Burtch to retake the stand

8    for that.

9             MR. FELGER:  May I approach?

10            THE COURT:  You may.

11            Let's have the agreement marked.  Let's have the

12    agreement marked as trustee's exhibit.

13        (Exhibit T-1 received in evidence)

14            THE COURT:  And, Mr. Martin, I'll take a recess so you

15    can take a look at the agreement.  But before we do, is anyone

16    going to be offering any other evidence, with respect to the

17    motion?

18            MR. MARTIN:  We do not have any evidence.

19            With respect to the offered evidence, that you take

20    judicial notice of the pleadings, to the extent that those

21    pleadings contain argument and hearsay, we would oppose them,

22    but I think the Court is sufficiently able to determine what's

23    what and otherwise would not object to the pleadings

24    themselves.  But hearsay -- attached exhibits that haven't been

25    authenticated, et cetera, we would object to.

1          THE COURT:  I think that is -- that's fine.  I'm going

2     to rule on the evidence that's been presented today in court.

3          Okay.  So let's reconvene at a quarter to four.

4     Quarter to four.

5          (Recess taken at 3:25 p.m.)

6          (Proceedings resume at 3:45 p.m.)

7          THE COURT:  Please be seated.

8          MR. MARTIN:  If I may address the Court, Your Honor,

9     Craig Martin.

10         I did confer with Mr. Felger over the agreement and we

11    have gotten comfortable on the authentication objection I

12    raised, so I'm happy to withdraw that.

13         THE COURT:  Thank you.

14         MR. MARTIN:  The other objection that I raised relates

15    to a change that I thought was in the agreement, but was

16    actually in the proposed form of order, so I would stand on my

17    earlier objection, which I think Your Honor has already ruled

18    on, about being presented with it at this hearing.  But I --

19    that's the status of what we've accomplished during the break.

20         THE COURT:  Okay.  Does this agreement raise any

21    questions that you would like to cross-examine Mr. Burtch on?

22         MR. MARTIN:  The agreement that's actually attached to

23    the order is similar to the one that I had with a very slight

24    modification, so I was able to ask the questions of Mr. Burtch

25    regarding the agreement, that I had intended to, when I walked

1      in here.

2              THE COURT:  Okay.  Thank you.

3              Mr. Felger?

4              MR. FELGER:  Your Honor, based upon the record here

5      today, we would ask Your Honor to enter the order approving the

6      agreement with the creditor group.  We think the testimony

7      fully supports the sound exercise of the trustee's business

8      judgment in moving forward with the proposed agreement.

9              As we've set forth in my opening and in the proffer,

10     the agreement provides for a cash payment into the estate, as

11     well as, potential upside for the estate through the pursuit of

12     causes of action by the creditor group, on behalf of the

13     estate.

14             I would address one point that Mr. Martin had made

15     during the cross-examination, and that is with respect to the

16     rules of the auction procedure.  Your Honor, the rules of the

17     auction procedure specifically provide -- specifically include

18     a qualification, which I believe is in every bid procedures,

19     auction procedures approved by Courts in this district and that

20     is the qualifier that enables the trustee to make

21     modifications, as he deems appropriate, in his fiduciary duty.

22     And that's what he did here, in terms of adjusting from the

23     "open auction" to concluding the auction by the sealed-bid

24     process, which I'll remind the Court was the manner in which we

25     had proposed it at the outset, through the motion.

1          So, Your Honor, just in summing up -- I think we've

2     talked about this before -- this is a motion -- this is an

3     unusual motion that, perhaps, the trustee could have filed in a

4     different way, perhaps under 9019, without soliciting higher

5     and better offers and, perhaps, had this motion approved back

6     in April.  But the trustee decided to file it in a way that

7     enabled the Pursuit Parties to submit a proposal to the extent

8     they were interested in doing so, and, you know, that has led

9     a, basically, four-month process of fits and starts, and a lot

10    of delay, but at the same time, plenty of opportunity -- more

11    than adequate opportunity for both sides to come forward and

12    submit their highest and best bid.

13         We've had a lot of activity over the past few days,

14    including the past few minutes, in terms of revised bids, new

15    bids, but, Your Honor, there's something to be said about the

16    integrity of the process.  We've had rules here.  We've given

17    ample opportunity for parties to bid and what we have here is

18    -- not a new party, not an outside party, but the insiders of

19    this business, the debtors' principals, the parties related to

20    the debtors, the targets -- the targets of these causes of

21    action, seeking to delay this process and continue to, for

22    whatever reason, keep this process from concluding.

23         And I think in the end, the trustee's decision was

24    it's time to move forward.  There's been, as Your Honor has

25    said -- I think Your Honor has said there's been, perhaps, too

1    much process or at least more than enough process to finally

2    bring this to a conclusion.  So we'd ask Your Honor to bring

3    this to a conclusion to approve the agreement, to enter the

4    proposed form of order, approving the agreement, as we've

5    described it today.

6              THE COURT:  Thank you.

7              MR. FELGER:  Thank you, Your Honor.

8              THE COURT:  Does anyone else wish to speak in support

9    of the motion first?

10       (No verbal response)

11             THE COURT:  Mr. Martin?

12             MR. MARTIN:  Thank you, Your Honor.  Craig Martin, on

13   behalf of the Pursuit Parties.

14             I'd just like to make five or six points in opposition

15   to the trustee's request to approve the agreement to settle,

16   transfer and assign certain claims, rights and interests.

17   First, I would like to object on the grounds that the bid

18   presented by the trustee is not the highest or, otherwise, best

19   bid.  You've heard evidence today that there were bids made

20   over the weekend for additional consideration and we started

21   today by our client willing -- indicating a willingness to

22   continue to participate in an auction.

23             You've further heard testimony that the estate has

24   administrative expenses, as of today, and expects to incur

25   administrative expenses that it will not have enough money to

1    pay, based on the offer made today, and, therefore, I'm

2    hard-pressed to see how accepting this bid is in the best

3    interests of the estate when there's a party ready, willing and

4    able, to bid more and engage in a further process, which might

5    actually resolve that issue.

6           The second point I would like to make, Your Honor, is

7    that the auction procedures and their modification -- and Mr.

8    Felger has indicated that the auction procedures contain a

9    provision that permit him to modify the auction procedures.

10   And in Tab B of the -- of today's agenda binder, there is a

11   draft of the -- not a draft -- a copy of the trustee's motion

12   for the auction procedures.  And on Pages 4 and 5, the proposed

13   auction procedures are set forth and just, for the record, at

14   Tab C, there's the order, which is Docket Number 149, that Your

15   Honor entered, granting the auction motion and approving the

16   proposed procedures.

17          So, unlike some auction procedures motions where the

18   procedures are actually attached to the order, I think that

19   order approves these on Pages 4 and 5 of Docket Index Number

20   133.  And I think the provision that Mr. Felger was referring

21   to was on Page 5, Paragraph 13, I guess -- romanette is how I

22   say it -- (x).  And it talks about the trustee reserving his

23   right to determine and instill discretion which bids are

24   highest, and, otherwise, best, and reject, at any time, a bid

25   that the trustee deems to be inadequate or insufficient, not in

1    conformity with the Bankruptcy Code, Bankruptcy Rules, local

2    rules or these procedures.

3         And then at (xi), there's a provision that talks about

4    individual negotiations and/or open bidding provided; however,

5    that all bids shall be made and received in one room on an open

6    basis and each bidder shall be entitled to be present for all

7    bidding and all material terms of each bid shall be fully

8    disclosed to all bidders.

9         So, I've listened to the other side say that we didn't

10   follow the rules; there's this long history where we didn't do

11   what the trustee liked; that we violated the rules of the

12   auction procedure.  And then I'm told, but we get to change the

13   rules; we get to have sealed bids, and at the sealed-bid

14   process, you're required to bid under a sealed bid and then I'm

15   going to make a decision.

16         That's contrary to Auction Procedure (xi).  So I would

17   simply make the point, Your Honor, that you should deny this

18   request today, because the proposed auction procedures were not

19   complied with.  And, certainly, if we're going to have the

20   other side stand up and accuse my client of not following the

21   auction procedures, and that's going to be the basis for

22   approving this sale, I think it's -- it would not be consistent

23   to, then, permit the trustee to just modify the procedures at

24   his discretion.

25         And so I don't see the provision that says the trustee

1   can change the rules at his discretion in this, what Mr. Felger

2   has pointed out:

3          "Subject to modification by the trustee, as he deems

4          appropriate, to comply with his fiduciary

5          obligations."

6          Paragraph 13, the lead-in to the romanettes.

7          Thank you, Mr. Felger.

8          THE COURT:  I will note, too, Mr. Martin, before you

9   were involved, the idea of sealed bids was raised at least two

10  or three times in court, but I understand that you would not

11  know that because you were not involved.

12         MR. MARTIN:  Thank you, Your Honor.

13         I was looking at what I had in front of me and trying

14  to get up to speed, so I appreciate that.

15         THE COURT:  Of course.

16         MR. MARTIN:  Let me move on to my next point, then,

17  Your Honor, which is that the trustee is assigning claims and

18  he's going to allow another party to prosecute claims, on

19  behalf of the estate.  And we objected, in our preliminary

20  objection, to another party prosecuting claims, on behalf of

21  the estate.

22         The various avoidance actions say that the trustee may

23  bring certain types of claims, preferences or fraudulent

24  transfers.  The Supreme Court has interpreted the trustee may,

25  in the context of Section 506, to mean only the trustee may.

1    Certainly, in the context of Chapter 11 cases, creditors'

2    committee, which are estate fiduciaries, are often times given

3    the right to prosecute the estate claims.

4         And in the context of a Chapter 7, I would

5    respectfully submit that allowing a non-estate fiduciary to

6    prosecute claims is inconsistent with the Bankruptcy Code, and

7    that the only party that is permitted to bring a preference or

8    fraudulent transfer cause of action is, in fact, the trustee.

9    I do note, however, that the agreement preserves all of my

10   client's defenses and so it may very well be that we raise the

11   standing issues as grounds for a motion to dismiss any lawsuits

12   that are filed against us.

13        However, I think there's some inconsistency in the

14   agreement that's been presented to Your Honor, because while it

15   says that all of our rights, claims and defenses are preserved,

16   in Paragraph 3, it gives standing to the creditors.  I believe

17   on the copy that was submitted to the Your Honor, it's on the

18   Attachment A, Page 6, third line down:

19        "Creditors ... are deemed to have standing to bring

20        such claims in the Bankruptcy Court, to the extent of

21        applicable law."

22        So -- and then later in the agreement, it talks about

23   how the trustee's selling actions as-is, where-is.  So, to the

24   extent that there's any confusion, we do not believe that these

25   creditors can bring these causes of action.  I guess they've

1    paid for something that they may not be able to enforce, and,

2    perhaps, good for the trustee for getting somebody to pay him

3    money for something that he can't prosecute, but we certainly

4    don't believe that the standing provision is permitted by

5    applicable law, and want to be clear that if the Court does

6    approve this order, that we're not prejudiced by those rights.

7           To the extent that the Court disagrees and that

8    standing is somehow appropriate, if and when the creditor

9    demonstrates that claims are colorable and that there's been a

10   demand made on the trustee and the trustee either hasn't

11   pursued it or lacks the resources to pursue it, based on the

12   record and the evidence today, there was no delineation of the

13   claims that they intend to bring.  There was no evidence put in

14   to show that they're at least colorable.

15          Mr. Harris made some allegations from the podium about

16   things that he thinks have occurred, some very strong language

17   about looting the estate, et cetera, et cetera.  But there was

18   no evidence put in the record to demonstrate the claims are

19   colorable.  So, certainly -- and I don't intend to engage Mr.

20   Harris on those statements -- rather than, my client reserves

21   its rights and if those allegations are asserted in litigation,

22   I anticipate that we will vigorously dispute them.  I don't

23   think the agreement prevents us from doing so.

24          Finally, Your Honor, the final two points I have

25   relate to provisions of the Bankruptcy Code when there is a

1    creditor that pursues causes of action, on behalf of the

2    estate, there's processes under the Bankruptcy Code and rules

3    and the Bankruptcy Rules that require employment applications

4    and fee applications.  There's nothing in the agreement that

5    would require the submission of either.  Mr. Burtch testified

6    that it's not in the agreement and we now have the agreement to

7    see that it's not in the agreement.  And he indicated that it

8    hadn't been discussed.

9          So I think that approving an agreement that permits a

10   non-estate fiduciary to prosecute estate causes of action

11   without having to participate in the Bankruptcy Rule

12   requirements of filing an employment application and filing fee

13   applications is inconsistent with the Bankruptcy Code.

14         For those reasons, Your Honor, we would object to the

15   entry of an order approving the agreement to settle, transfer

16   and assign certain claims, rights and interests.  Unless Your

17   Honor has any questions, I would submit that as my closing

18   arguments.

19         THE COURT:  No, I don't.  I think on that last point,

20   the agreement is silent on whether whoever is representing the

21   creditor, who may bring the cause of action, has to submit a

22   retention application.  I think it was just silent on that

23   point.

24         MR. MARTIN:  I agree.

25         THE COURT:  Okay.  Thank you.

1          MR. MARTIN:   Thank you.

2          THE COURT:   Anything further, Mr. Felger?

3          MR. FELGER:   Real fast?

4          THE COURT:   Yeah.

5          MR. FELGER:   Just a few points in response, Your

6     Honor.

7          On the first point that the offer is not the highest

8     and best bid that's been received by the trustee; to the

9     contrary, it is the highest and best bid received by the

10    trustee, in accordance with the rules.   Moreover, the semblance

11    of an offer that was discussed today on the record, the trustee

12    could not conclude that that is a higher and better offer for

13    the assets for a whole host of reasons.   So, certainly in terms

14    of bids received, in accordance with the rules, the agreement

15    that we provided for approval today is, indeed, the best and

16    highest offer that the trustee has received.

17         Mr. Martin makes a comment about the estate being

18    administratively insolvent.   While the estate is

19    administratively insolvent, under either proposal, under the

20    two-hundred-and-five-thousand-dollar proposal, under the

21    hundred-and-eighty-thousand-dollar proposal, my fees are higher

22    than both of those numbers at this point and will certainly

23    grow even higher.

24         Under the creditors' bid, there's an opportunity for

25    recoveries that will flow into the estate and be shared by

1     creditors, in accordance with the Bankruptcy Code's priority

2     scheme.  Under Mr. Martin's revised proposal today, there would

3     be no opportunity for additional monies flowing into the

4     estate.

5          In terms of the auction procedures, I think we've

6     clarified that.  The intro to Paragraph 13, as is very common

7     in this district, and, frankly, all over the country, and in

8     terms of auction procedures, there's a qualification for the

9     procedures that a trustee can modify the auction rules and

10    procedures in his discretion, to the extent, consistent with

11    his fiduciary obligation to creditors.  It's in Paragraph 13

12    and that's what Mr. Burtch did to conclude this auction.

13         With respect to the comments about the trustee

14    assigning the claims, I would recite -- and not inconsistent

15    with what Mr. Martin said -- we've -- we're assigning these on

16    an as-is, where-is basis, making no reps and warranties, at

17    all, with respect to these claims, whether they can be brought,

18    where they can be brought, whether there's any merits to any of

19    these claims.

20         And, in addition, the one change that was made today

21    that's in the order, as opposed to in the agreement, because it

22    was made at such a late hour, goes to that point or at least

23    those related points that Mr. Martin was raising at the end,

24    and that is, if there are claims that are not scheduled, other

25    than the UBS claim, which is treated a little differently, the

1   claim has to be presented to the trustee and if the trustee

2   objects, the creditor group will have to seek an order from

3   this Court finding that the claim is a colorable claim, under

4   the Cybergenics standard.  So, there is that protection, if you

5   will, from a claim being asserted that the estate was not aware

6   of.

7          And in the last point, in terms of the 327, 333, 331

8   issue, the trustee is not retaining any party.  Three

9   twenty-seven talks to the trustee retaining professionals.  The

10  trustee is not retaining any professionals.

11         Whether a lawyer representing a creditor group

12  pursuing claims, on behalf of the estate, would need to be

13  retained and would need to file fee applications, the agreement

14  is -- you're right -- the agreement is silent on that.  We did

15  not get involved in that issue, and any lawyer who's pursuing

16  those claims will have to decide whether they will need to be

17  employed and need to file fee applications.  And if they decide

18  not to, then, you know, they will take that risk.

19         So I think those were the points that Mr. Martin

20  raised and I just wanted to address them, on behalf of the

21  trustee.  Thank you.

22         THE COURT:  Thank you.

23         Well, I'm going to take this matter under advisement.

24  I am not planning to write on it, however.  I expect to let you

25  know that I would like you to come back to hear a ruling from

1    the bench.  It will be this week sometime.  I have first-days

2    on a new matter tomorrow, so I need to focus on that, between

3    now and tomorrow, and I do have a contested confirmation on

4    Friday.

5            But I'm going to try to squeeze you in, with the goal

6    of being heard this week.  If not, for some reason, you will

7    definitely be ruled on, on Monday, but my goal is to get it

8    done this week.

9            Anything further today?

10           MR. FELGER:  Nothing further from the trustee, Your

11   Honor.

12           MR. MARTIN:  Thank you, Your Honor.

13       (Proceedings concluded at 4:07 p.m.)

14                                    * * * * *

54

1               CERTIFICATION

2          I certify that the foregoing is a correct transcript

3     from the electronic sound recording of the proceedings in the

4     above-entitled matter to the best of my knowledge and ability.

5

6

7

8     /s/ Coleen Rand                      September 17, 2015

9     Coleen Rand, AAERT Cert. No. 341

10    Certified Court Transcriptionist

11    For Reliable

EXHIBIT 2

**Martin, Craig**

| | |
|---|---|
| **From:** | Martin, Craig |
| **Sent:** | Saturday, August 08, 2015 5:51 PM |
| **To:** | Mark Felger (mfelger@cozen.com) |
| **Cc:** | Peter Cane (peter@canelaw.com) |
| **Subject:** | Pursuit Capital Management - Revised Settlement Offer |

Dear Mark,

Thank you for speaking with me last night about the offer below in the context of the Sale Hearing.  Based on that conversation and follow up discussions today with my client, my client is willing to make two modifications to the offer below, which I embed in this e-mail chain:

      1.     Like your client, my client desires to have the auction completed and the chapter 7 resolved.  As such, if the Trustee were to accept the offer below as modified by this e-mail and declare that the Pursuit Parties were the prevailing bidder at the auction, the Pursuit Parties would we willing to pay an additional $20,000 for a total payment of $220,000.  This point would then ensure that point 4, dismissal of the cases could occur promptly, and that the Trustee not engage in further negotiations with the Harris Creditor Group to sell any claims.  Regarding the payment of the $220,000, we would be willing to make that available in readily available funds, but would want it to be held in escrow of some form pending actual approval of the Trustee's final distribution, at which time it could be made available to the Trustee for final distributions immediately prior to closing the bankruptcy case.  Points 3 and 4 would thus remain the same as in the offer below.

      2.     Additionally, with respect to the release in point 2 below, my client is willing to narrow the release to have it consist of the items you mentioned in your discussion last night, which, based on our conversation, I understand to be any claims related to or arising out of the item listed on the Schedules as the "Potential Indemnification claim against Pursuit Capital Management Fund I, L.P., Claim asserted in Pursuit Investment Mgmt., LLC et al. v. Alpha Beta Capital Partners, L.P., et al., Index No. 652457/2013 (Supreme Court of the State of New York)" and any allegedly fraudulent transfer claim related to the $645,571.22 itemized in footnote 1 on the Statement of Financial Affairs.  Please let me know if you intended to communicate something differently.

Please let me know if you would like to discuss any aspects of this further and how we might go about presenting it to the Court on Monday with an appropriate Sale Order.  I will be available tomorrow on my cell phone once you have had the chance to discuss this with the Trustee.

Thank you and the Trustee in advance for your consideration.


**R. Craig Martin**
Partner
Fellow of INSOL International

T+1 302.468.5655
F+1 302.778.7834
M+1 267.975.7962
Ecraig.martin@dlapiper.com

 **DLA PIPER**

DLA Piper LLP (US)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801-1147

1

United States
www.dlapiper.com

---

**From:** Martin, Craig
**Sent:** Thursday, August 06, 2015 8:01 PM
**To:** Felger, Mark
**Cc:** Peter Cane
**Subject:** Pursuit Capital Management

CONFIDENTIAL SETTLEMENT COMMUNICATION

Dear Mark,

Thank you again for the time this morning as I think it was helpful to discuss the issues. As we discussed, my clients are interested in a resolution to the bankruptcy case and have authorized me to propose the following to the Trustee in furtherance of that effort:

1. Pursuit Parties to pay estates $200,000, which sums can be provided to be held in some form of an escrow pending approval of a resolution to ensure Trustee the funds are readily available,

2. The various claims that the estates would otherwise assert against the Pursuit Parties would be released.

3. The "UBS Claim" would not be addressed or transferred or released, as our client's position is that it is not an estate asset that can be administered in the bankruptcy. As such all parties' rights with respect thereto would "pass through" the bankruptcy case.

4. The Trustee would seek to dismiss the bankruptcy case promptly as estate will be fully administered as a result of this settlement. We would like this to occur promptly as time is of the essence.

There may be additional details as we move to document this in the usual and customary fashion, but this approach may provide the basis for a general discussion around these terms that we hope will permit prompt and full administration of the bankruptcy case.

Please let us know if you or the Trustee have any further thoughts or if you would like to discuss this further.

Thank you for your consideration

R. Craig Martin
Partner
Fellow of INSOL International

T +1 302.468.5655
F +1 302.778.7834
M +1 267.975.7962
E craig.martin@dlapiper.com

DLA Piper LLP (US)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801-1147
United States
www.dlapiper.com

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                           :    Chapter 7
                                                 :
PURSUIT CAPITAL MANAGEMENT, LLC,                 :
                                                 :
            Debtor.                              :    Case No. 14-10610 (LSS)
                                                 :
                                                 :
_____                 :

## AGREEMENT TO SETTLE, TRANSFER AND ASSIGN
## CERTAIN CLAIMS, RIGHTS AND INTERESTS

This agreement is made this 30th day of July 2015 by, between and among Jeoffrey L. Burtch, as Chapter 7 Trustee for the estate of Pursuit Capital Management, LLC (the "Trustee" for the "Estate" of the "Debtor"), on the one hand, and (i) Harris, O'Brien, St. Laurent & Chaudhry LLP (the "Harris Firm"), (ii) Reed Smith LLP ("Reed Smith"), (iii) Alpha Beta Capital Partners, L.P. ("Alpha Beta"), and (iv) Claridge Associates, LLC ("Claridge"), Jamiscott LLC ("Jamiscott"), Leslie Schneider, and Lillian Schneider, individually and as the personal representative of the executor of the estate of Leonard Schneider (the "Schneiders") (collectively, Alpha Beta, Claridge, Jamiscott and the Schneiders are the "Creditors") (the "Trustee," the "Harris Firm," "Reed Smith," and the "Creditors" are the "Parties").

WHEREAS, on April 7, 2014 (the "Petition Date") the Debtor commenced this case by filing a voluntary petition under Chapter 7 of the Bankruptcy Code;

WHEREAS, on or about the Petition Date, the Trustee was appointed to serve as the trustee for the Estate of the Debtor, and since the time the 341 meeting was held and concluded on April 29, 2014, the Trustee has been serving as the permanent trustee in this case;

WHEREAS, on the Petition Date, the Debtor filed its Chapter 7 Bankruptcy Schedules and the Statement of Financial Affairs;

WHEREAS, the only assets listed on the Debtor's Bankruptcy Schedule B are (i) claims asserted in *Pursuit Investment Management, LLC, et al. v. Alpha Beta Capital Partners, L.P., et al.*; Index No. 652457/2013 (Supreme Court of the State of New York) (the "New York Action"); and (ii) potential indemnification claims against Pursuit Capital Management Fund I, L.P. (the "Indemnification Claims"). These two assets are listed as having an "unknown" value;

WHEREAS, while no other assets are listed in the Bankruptcy Schedules, a footnote in the Statement of Financial Affairs reveals that gross income for calendar year 2011 in the amount of $645,571.22 was disbursed to the Debtor's members purportedly "in the ordinary course of business on 1/16/13"  (the "Insider Avoidance Claim");

WHEREAS, the Debtor may have additional rights, claims and causes of action of any kind or nature, (including without limitation actions to recover for fraudulent conveyances or other transfers made without value or for less than fair value or for fees or its share of any carried interest), against the owners, managers, insiders, affiliates, members, successors, transferees and assignees of the Debtor (including, without limitation, Northeast Capital Management, LLC, Pursuit Partners, LLC, Pursuit Investment Management, LLC, Anthony Schepis, Frank Canelas and Ruth Canelas), against the Pursuit Capital Management Fund I, L.P or other partnership(s) of which the Debtor served as general partner or to which the Debtor rendered services, or against any other person or entity (such rights, claims and causes of action, together with the Insider Avoidance Claim, the "Debtor Claims");

2

WHEREAS, during the 341 meeting of creditors, the Debtor's representative testified without providing any backup that the Debtor owned no assets other than those disclosed in the Bankruptcy Schedules;

WHEREAS, during discussions with counsel for the Creditors, the Creditors stated that there is pending litigation in which various "Pursuit" entities have asserted claims against UBS Securities LLC and other defendants captioned *Pursuit Partners, LLC v. UBS AG*, D.N.X08 CV 4013452 S (Conn. Super. Ct.) (the "UBS Litigation"), and the Creditors believe that the Debtor has a valuable interest in the proceeds of any such claims as the general partner of the Pursuit Capital Management Fund I, L.P and other partnerships, which belief is strongly supported by, among things, the relevant partnership agreements and a letter sent on April 28, 2011 by Pursuit Investment Management, LLC to investors in the Pursuit Capital Management Fund, I, L.P stating that the Debtor would receive its "incentive allocation" from any recoveries against UBS (See letter attached as Ex. 1);

WHEREAS, the Creditors believe that Debtor has (i) a direct or indirect interest in the UBS Litigation, (ii) a direct or indirect interest in any recoveries of any kind from the UBS Litigation whether by settlement or judgment or otherwise (a "Recovery"), including without limitation through the payment, distribution or allocation of any such Recovery or any portion thereof to any partnership (or side pocket) of which the Debtor served as general partner, or to any successor or substitute general partner of any such partnership or side pocket, and /or (iii) an interest or claim to any fees or carried interest to be paid to the general partner of any funds (or side pockets) for which the Debtor served as general partner, including any payments, distributions or allocations made to any purported substitute or successor general partners of any

3

such funds, including, without limitation, Northeast Capital Management, LLC) (such claims to be collectively called, (the "UBS Claim"));

WHEREAS, the Estate currently has no funds with which to administer the Estate, let alone pursue the claims and litigation referenced hereinabove;

WHEREAS, the Creditors, the Harris Firm, and Reed Smith have made an offer (i) to settle the New York Action, and (ii) for the Creditors to pursue (initially at their own expense) the interests of the Debtor, the Trustee or the Estate, if any, in the Debtor Claims, the Indemnification Claims, and the UBS Claim;

WHEREAS, the Creditors are the only non-insider creditors[1] listed in Bankruptcy Schedules D, E or F; and

WHEREAS, after arm's length negotiation, the Parties have reached an agreement to settle, transfer and assign certain claims on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, stipulate and agree to settle, transfer and assign certain claims as set forth herein below.

1.      The recitals set forth in the "Whereas" clauses above are incorporated herein by reference.

---

[1] The only other "creditors" listed in Bankruptcy Schedule F are Messrs. Schepis and Canelas, the members of the Debtor, and the recipients of the funds giving rise to the Potential Avoidance Claim.  They are listed as holding contingent, unliquidated indemnification claims.

2.      In exchange for:

(a) a cash payment by the Creditors, the Harris Firm and /or Reed Smith to the Trustee in the amount of one hundred eighty thousand and one dollars ($180,001) (the "Cash Payment"), plus

(b) a contribution to the estate (the "Additional Consideration") by the Creditors of all net amounts recovered from

(i)   the Insider Avoidance Claim,

(ii)  the Debtor Claims; and

(iii) the UBS Claim,

which Additional Consideration, in the aggregate, the Creditors value at no less than $500,000.00, after payment of all fees and expenses, as set forth in Paragraph 3, *infra* (together, with the "Cash Payment" the "Total Settlement Consideration"),

the Trustee, on behalf of the Estate shall sell, transfer and convey to the Creditors, free and clear of all liens, claims and interests, all of the right, title and interest of the Debtor, the Trustee and /or the Estate in and to (i) Insider Avoidance Claim; (ii) the Debtor Claims, (iii) the Indemnification Claims, (iv) the UBS Claim, and (v) all books and records of the Debtor, in whatever format and wherever located (except such books and records that are protected by any applicable privilege).  The Trustee may retain originals or copies of said books and records to the extent he determines they are necessary to complete the administration of the Estate.  The Cash

5

Payment shall be paid to the Trustee within twenty (20) days after the entry of a final Order approving this Agreement.

3. The Creditors (or any one of the Creditors) shall be permitted (but not required) to bring the Insider Avoidance Claim, Debtor Claims and UBS Claims in the Bankruptcy Court, and are deemed to have standing to bring such claims in the Bankruptcy Court to the extent of applicable law. The Creditors may assign, allocate amongst themselves, or transfer or convey amongst themselves the rights acquired hereto to the Insider Avoidance Claim, the Debtor Claims and the UBS Claims, including assigning to any one or more of the Creditors the rights to bring such claims, it being understood and agreed that the Insider Avoidance Claim, Debtor Claims, and the UBS Claim will be pursued on behalf of the bankruptcy Estate and any net recoveries will be property of the bankruptcy Estate to be distributed in accordance with the priorities established by the Bankruptcy Code. The Creditors shall initially bear all of their own costs and expenses associated with doing so, and the costs and expenses of pursuing such claims shall be paid out of any proceeds. Further, the Creditors shall (i) support the closing of this bankruptcy case notwithstanding the pendency of any adversary proceeding(s) with respect to the Insider Avoidance Claim, the Debtor Claims and UBS Claim, provided such closing does not result in dismissal of any then-pending adversary proceedings and (ii) agree to pay the Trustee, out of any recovery or settlement of the Insider Avoidance Claim, the Debtor Claims and the UBS Claim all fees and costs reasonably incurred by the Estate and approved by the Court relating directly or indirectly to the pursuit of such claims in the Bankruptcy Court. Notwithstanding the foregoing, the Trustee shall not move to close the chapter 7 case prior to

April 7, 2016.  With regard to any proceedings related to the Insider Avoidance Claim, the Debtor Claims and the UBS Claim in the bankruptcy court:

(a)     No discovery shall be propounded upon, and no deposition shall be taken of, Jeffery L. Burtch, the Trustee;

(b)     Any and all net proceeds, if any, whether by verdict, judgment, settlement or other compromise – are the property of the Estate and shall be promptly remitted to the Trustee for estate administration in accordance with the Bankruptcy Code; and

(c)     Any proposed settlement or compromise, whether in whole or in part, shall be submitted to the Bankruptcy Court for prior approval in accordance with Federal Rule of Bankruptcy Procedure 9019.

4.     Also, upon receipt of the Cash Payment in good funds, the New York Action shall be deemed settled and dismissed with prejudice with respect to claims that have been brought by the Debtor.  The Trustee shall execute a reasonable form of stipulation or notice that the Creditors, the Harris Firm, and Reed Smith will prepare and file in the New York Action marking the Debtor's claims brought in the New York Action settled and dismissed with prejudice.  Such stipulation shall include a release of (a) all claims currently brought by the Debtor in the New York Action, including without limitation all claims that have been or could be compelled to arbitration and (b) all claims that could have been brought by the Debtor against any of the Defendants (or their associated principals, officers, members, partners, agents, attorneys, employees or affiliates) in the New York Action, but shall not include a release of any

claims that could be brought by Debtor against other Plaintiffs or other non-parties to the New York Action which shall be acquired hereunder by Creditors.

5.   The assignments, sales, transfers and conveyances hereunder are on an "as is where is" basis, and the Trustee makes no representation or warranty of any kind with respect to the Debtor Claims, the Indemnification Claims, the UBS Claim, or the existence or quality of any books and records.

6.   This Agreement constitutes the entire agreement and understanding between the Parties relating to the subject matter contained here, and this Agreement may not be altered, amended, or modified in any respect or particular whatsoever, except by a writing duly executed by the Parties.

7.   This Agreement may be executed in several counterparts which may be transmitted by either mail, facsimile, or electronic mail, each of which shall be deemed to be an original, so that all of which taken together shall constitute one and the same instrument.

8.   Each Party agrees to be responsible for and to bear its/his own costs, expenses and attorneys' fees incurred in connection with the negotiation of and entering into this Settlement Agreement and not to seek from each other reimbursement of any such costs, expenses or attorneys' fees (it being understood that the Creditors may, as set forth above, deduct the fees, costs and expenses of pursuing any Insider Avoidance Claim, Debtor Claims or the UBS Claim from the proceeds of such claims.)

8

9.      This Agreement shall be governed by the laws of the State of Delaware and applicable federal law, without giving effect to any choice of law or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction. The Bankruptcy Court shall retain jurisdiction over the enforcement of this Agreement and any disputes concerning the terms of this Agreement.

10.     Each Party acknowledges that the consideration referred to and the other terms of this Agreement do not constitute an admission or concession of liability or of any fact.

11.     Each person signing this Agreement represents and warrants that he or she has been duly authorized and has the requisite authority to execute and deliver this Agreement on behalf of such Party and to bind his or her respective client or Party to the terms and conditions of this Agreement.

12.     This Agreement shall be construed without regard to any presumption or other rule requiring construction against the Party causing the document to be drafted.

13.     Each Party represents and warrants that such Party has been represented and advised by counsel or has had full opportunity to be represented and advised by counsel of its/his/her choosing with respect to this Agreement and all matters covered by it.

14.     This Agreement shall be submitted to the Bankruptcy Court by the Trustee through a motion to sell property of the estate pursuant to 11 U.S.C. § 363(b) and (f). The Parties agree to reasonably cooperate with the Trustee to seek entry of the Order approving the Agreement, and agree to pose no objection, formal or informal, to the Trustee's motion seeking

entry of the Order to the extent that the Order is consistent with the terms and conditions of this Agreement.

IN WITNESS WHEREOF, the Parties have each approved and executed this Agreement.

---

JEOFFREY L. BURTCH AS CHAPTER 7
TRUSTEE FOR THE ESTATE OF
PURSUIT CAPITAL MANAGEMENT, LLC

ALPHA BETA CAPITAL PARTNERS, L.P.

By: *John Scott, Reed Smith LLP*
Its: *Counsel*

CLARIDGE ASSOCIATES, LLC

By: Jonathan Harris
Its: counsel, with authority to sign

JAMISCOTT LLC

By: Jonathan Harris
Its: counsel, with authority to sign

(Signatures Continue on Next Page)

10

LESLIE SCHNEIDER

_____

by: Jonathan Harris, her counsel with authority to sign

LILLIAN SCHNEIDER

_____

by: Jonathan Harris, her counsel with authority to sign

ESTATE OF LEONARD SCHNEIDER

_____

By:  Jonathan Harris
Its:  Counsel, with authority to sign


HARRIS, O'BRIEN, ST. LAURENT & CHAUDHRY LLP

_____

By:   Jonathan Harris
         Managing Partner



REED SMITH LLP



_____

By:
Its:

11

LESLIE SCHNEIDER

_____
by:  Jonathan Harris, her counsel with authority to sign

LILLIAN SCHNEIDER

_____
by:  Jonathan Harris, her counsel with authority to sign

ESTATE OF LEONARD SCHNEIDER

_____
By:  Jonathan Harris
Its:  Counsel, with authority to sign


HARRIS, O'BRIEN, ST. LAURENT & CHAUDHRY LLP

_____
By:  Jonathan Harris
      Managing Partner


REED SMITH LLP

_____
By:   Robert M. Abrahams, Esq., Schulte Roth & Zabel LLP
Its:   Counsel for Reed Smith, LLP

11

EXHIBIT 4

1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | . | Chapter 7 |
| IN RE: | . | |
| | . | Case No. 14-10610 (LSS) |
| PURSUIT CAPITAL MANAGEMENT, LLC, | . | |
| | . | Courtroom No. 2 |
| | . | 824 Market Street |
| Debtor. | . | Wilmington, Delaware 19801 |
| | . | |
| . . . . . . . . . . . . . . . . | . | Monday, August 17, 2015 |

TRANSCRIPT OF COURT DECISION
RE:   TRUSTEE'S MOTION FOR ORDER APPROVING AGREEMENT TO SETTLE,
TRANSFER, AND ASSIGN CERTAIN CLAIMS, RIGHTS, AND INTERESTS
BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Chapter 7
Trustee:                        Mark E. Felger, Esq.
                                COZEN O'CONNOR
                                1201 N. Market Street, Suite 1001
                                Wilmington, Delaware 19801


For Reed Smith, LLP:            Marcos A. Ramos, Esq.
                                RICHARDS, LAYTON & FINGER, PA
                                920 North King Street
                                Wilmington, Delaware 19801




(Appearances Continued)

Audio Operator:                 Electronically Recorded
                                by Michael Miller, ECRO


Transcription Company:          Reliable
                                1007 N. Orange Street
                                Wilmington, Delaware 19801
                                (302) 654-8080
                                Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

APPEARANCES VIA TELEPHONE:

For Alpha Beta:                  Richard A. Robinson, Esq.
                                 REED SMITH, LLP
                                 1201 Market Street, Suite 1500
                                 Wilmington, Delaware 19801

For the Pursuit Parties:         R. Craig Martin, Esq.
                                 DLA PIPER (US), LLP
                                 1201 North Market Street
                                 Suite 1201
                                 Wilmington, Delaware 19801

APPEARANCES VIA TELEPHONE:

For the Claridge Parties:        Jon Harris, Esq.
                                 HARRIS, O'BRIEN, ST. LAURENT
                                  & CHAUDRY

                                 Jesse Silverman, Esq.
                                 DILWORTH PAXSON, LLP

For Reed Smith:                  Matthew J. Moses, Esq.
                                 SCHULTE, ROTH & ZABEL, LLP

For Alpha Beta:                  John L. Scott, Esq.
                                 REED SMITH, LLP

ALSO APPEARING VIA TELEPHONE:

                                 CANE & ASSOCIATES

3

1        (Proceedings commence at 12:03 p.m.)

2        (Call to order of the Court)

3            THE COURT:  Please be seated.

4            Okay.  Well, thank you to everyone.  This is the time

5    when I indicated I would announce my decision with respect to

6    the trustee's motion to approve the agreement to settle,

7    transfer, and assign certain claims and rights and interests.

8            And I'm going to grant the motion.

9            First, so that everyone is clear, as I read through my

10   decision, the "Claridge Parties" are all of the entities, other

11   than the trustees, that are signatory to the agreement dated

12   July 30, 2015, and the "Pursuit Parties" are Anthony Schepis,

13   Frank Canelas, Pursuit Investment Management, LLC, Pursuit

14   Opportunity Fund I, LP, and Pursuit Capital Management I, LP.

15   I felt it was important to define them, for purposes of this

16   motion.

17           My reasoning is as follows:

18           The debtor's petition was filed on April 7, 2014.  The

19   petition reflects that it was signed by Mr. Schepis as managing

20   member.  Mr. Schepis also signed the declaration concerning

21   debtor's schedules, again, as managing member.

22           Mr. Burtch was appointed as the Chapter 7 Trustee of

23   the estate.

24           The Claridge Parties and the Pursuit Parties have been

25   involved in litigation in other courts that predate the

1   bankruptcy.  This Court is aware of three pieces of litigation:

2   One in the State of Connecticut, one in the State of New York,

3   and an arbitration proceeding.  There was also a post-

4   bankruptcy piece of litigation commenced in New York and

5   transferred to this Court.  That adversary proceeding was

6   recently voluntarily dismissed by the Pursuit Parties.

7          As to the pending motion, it was filed on March 2nd of

8   this year.  On August 10th, the Court held an evidentiary

9   hearing on the motion.  Prior to the August 10th hearing, the

10  Court held no less than eight hearings or teleconferences

11  related to this motion, covering discovery disputes, bid

12  procedures, and motions to postpone.  As such, the Court has

13  become overly familiar with the motion and the parties.

14         Mr. Burtch provided testimony at the August 10th

15  hearing.  The Pursuit Parties did not provide a witness, but

16  did cross-examine Mr. Burtch.

17         As for documentary evidence, the Pursuit Parties

18  offered, and I admitted a two-page document reflecting two

19  emails:  One dated August 6th and one dated August 8, from

20  counsel to the Pursuit Parties to counsel to the trustee.  I

21  also admitted into evidence the revised agreement.  Based upon

22  this evidence, as well as the previous hearings on the motion,

23  I find as follows:

24         The estate has no cash.  The only scheduled assets of

25  this debtor are an indemnification claim against Pursuit

1    Capital Management Fund I, LP, and a claim for breach of a

2    confidential settlement agreement.  The schedules also reflect

3    a possible action related to a prepetition distribution to

4    equity holders totaling over $600,000.

5        On February 27th, 2015, the trustee entered into an

6    agreement with the Claridge Parties that dealt with these three

7    assets.  The agreement was the culmination of months of

8    negotiations with the Claridge Parties.  The trustee also had

9    discussions with the Pursuit Parties.

10        The trustee filed his motion on March 2nd, 2015.  The

11    motion set an objection deadline of March 19 and a hearing date

12    of March 26th, which was subsequently adjourned to April 7th.

13    The motion provided that it was subject to higher or better

14    offers.

15        The Pursuit Parties filed a preliminary objection to

16    the trustee's motion on March 12th.  While the pursuit parties

17    questioned whether the agreement was subject to higher or

18    better offers, I dispelled any doubt the Pursuit Parties might

19    have had and ultimately memorialized the issue in my April 21

20    order.

21        In that order, I specifically stated that the

22    agreement was subject to higher and better bids or offers; that

23    the Pursuit Parties, or any subset thereof, could make a bid on

24    or before May 13th; that the bid or offer could be for whatever

25    assets the estate may have, and could take any form.  I also

1    ordered the trustee to entertain any and all bids and offers,

2    and take actions consistent with his duties under the Code with

3    respect to any such bids or offers.

4         The Pursuit Parties submitted a competing offer on the

5    last day to do so, May 13th, 2015.  An auction was initially

6    scheduled for June 8th.  In advance of the auction, the

7    trustee, through his counsel, provided the Claridge Parties and

8    the Pursuit Parties with procedures for the auction, which

9    included bidding and lots.

10        The Pursuit Parties objected to what they deemed to be

11   new procedures for the auction; and, thus, the auction did not

12   go forward on June 8th.  Rather, the Pursuit Parties requested,

13   and the Court convened a hearing, at which time the Court

14   ordered the trustee to file a formal motion to set bid

15   procedures.  The trustee filed that motion on June 18th.

16        On June 30th, the Court approved the bid procedures

17   set forth in the motion.  As reflected in the transcript of

18   that hearing, the Court did not necessarily believe that bid

19   procedures were required, given the assets for sale and the

20   nature of this case, where there are only two parties

21   interested in the assets, and both parties know what the assets

22   are.

23        On July 2nd, an auction was commenced, but not

24   concluded.  I think that was the 7th.  During the auction, the

25   Pursuit Parties indicated they needed to break at three

1    o'clock, so that counsel could take another matter.   The

2    Pursuit Parties informed all others that they could not rejoin

3    the auction until eight o'clock that evening.   The trustee

4    determined to adjourn the auction at that time.

5           Thereafter, the trustee proposed at least eight

6    alternative dates to the parties for the reconvening of the

7    auction.   No dates were convenient to all parties; so, instead

8    of postponing further, on July 24th, the trustee requested that

9    parties send him final sealed bids by hand-delivery to

10   trustee's counsel, no later than four o'clock p.m. on July

11   30th.

12          On July 30, the trustee received one sealed bid, which

13   was from the Claridge Parties.   The trustee did not receive a

14   sealed bid from the Pursuit Parties; and, in fact, the trustee

15   was advised by the Pursuit Parties that they were withdrawing

16   all prior bids.

17          The Claridge Parties' sealed bid was for $180,000.01,

18   which was $10,000.01 higher than the high bid by the Pursuit

19   Parties at the auction.   Since then, the trustee has had

20   discussions with the Claridge Parties to make certain

21   improvements to the bid, which the Claridge Parties agreed to.

22   The executed agreement, as revised, provides as follows:

23          The consideration to the estate is:

24          A cash payment of $180,000.01 within 20 days after

25   entry of a final order approving the agreement.

1          The net recoveries, if any, from the insider avoidance

2     action, which is the challenge to the payment of $645,000 and

3     change, disbursed to the debtor's members on January 16th,

4     2013.

5          The debtor claims, which are any additional rights,

6     claims, or causes of action, which the debtor may have against

7     the owners, managers, insiders, affiliates, members,

8     successors, transferees, and assignees of the debtors.

9          And the debtor's interest, if any, in the UBS

10    litigation, which the Pursuit Parties deny the debtors have any

11    interest in.

12         In exchange, the following is transferred to the

13    Claridge Parties:

14         All of the debtor's, the trustee's, and the estate's

15    right, title, and interest in the insider avoidance action, the

16    debtor claims, the indemnification claims, the UBS claims.

17         All books and records of the debtor, except those

18    protected by any applicable privilege.

19         Further, there is a New York action that will be

20    deemed settled and dismissed with prejudice, with a stipulation

21    to be filed in the court in which that litigation is pending.

22    It will include a release of all claims.

23         The estate claims and causes of action will be pursued

24    by the Claridge Parties at their cost and expense.  Any net

25    recovery will be paid into the estate for distribution to all

1    creditors, in according with the Bankruptcy Code priority

2    scheme.

3            There are no reps or warranties with respect to causes

4    of action or the state of the records that are being turned

5    over.

6            Any cause of action will be subject to any dispute or

7    defenses.

8            Further, any claim that the Claridge Parties wish to

9    pursue that is not a scheduled claim must be on notice to the

10   trustee.  And if there is an objection, it must be approved by

11   the Court.

12           Further, the trustee agrees that he will not move to

13   close the case before April of 2016.

14           The trustee believes that the agreement is fair and

15   reasonable for multiple reasons:

16           It sets a floor of $180,000, with the possibility of

17   an upside potential at no cost to the estate.

18           He is providing no representations or warranties of

19   any kind.

20           If the Claridge Parties want to pursue other actions,

21   court approval will be necessary, if the trustee does not

22   agree.

23           When bidding closed at the auction, the Claridge

24   Parties' bid was the only bid for the assets because the

25   Pursuit Parties withdrew their prior bid.  But even if the

1   Pursuit Parties' bid at the auction was not withdrawn, the

2   Claridge Parties' bid is higher than the last Pursuit Party bid

3   at the auction.

4           The only groups the trustee is aware of who would want

5   to acquire control of the assets are the Claridge Parties, who

6   want to pursue the estate's causes of action, and the Pursuit

7   Parties, who would want to settle or ignore the estate's causes

8   of action.

9           Finally, the trustee has had discussions with both

10  groups for the better part of a year, and believes each party

11  had ample opportunity through July 30 to make its best bid.

12          The Court agrees with the trustee's decision and, as I

13  said before, will approve the agreement.  As a preliminary

14  matter, I concur with the trustee's assessment that the only

15  interested parties are the Claridge Parties and the Pursuit

16  Parties.

17          And the Pursuit Parties have stated in their filings

18  and in court that these causes of action are worthless, and so

19  they would be interested in them as a defensive measure only.

20  Indeed, I believe that I made statements similar to this in the

21  very first hearing on this matter, and in response to the

22  preliminary objection filed by the Pursuit Parties back in

23  March; that is, that the Claridge Parties want to pursue the

24  causes of action that they believe they have against the

25  Pursuit Parties, and the Pursuit Parties are looking at them

1    from a defensive standpoint.

2            With respect to the motion, the trustee has met his

3    burden of proof under Section 363.

4            The first factor is whether a sound business judgment

5    exists for the sale. Here, the only assets reflected in the

6    schedules or as to which the trustee is aware are litigation

7    assets. The trustee does not have any cash, and so cannot

8    pursue the assets. In these circumstances, it is appropriate

9    to offer these assets for sale to the only entities that have

10   any interest in them. Accordingly, I find that selling the

11   assets is a sound exercise of the trustee's business judgment.

12           The second factor is adequate notice. There is no

13   question that there has been notice here, as the motion was

14   originally filed in March, and according to the notice, was

15   served on all creditors.

16           The third factor is whether the sale produced a faire

17   price. The original agreement provided for a cash payment to

18   the estate of $125,000. By virtue of the auction, the

19   consideration to the estate is now a cash payment of

20   $180,000.01, and the potential upside from any recoveries from

21   the assigned causes of action.

22           The fourth factor is whether the parties acted in good

23   faith. I find that they did. The Pursuit Parties raised

24   issues of good faith in their preliminary objection; however,

25   there as no evidence of collusion, and nothing to suggest that

1    the bidding on the assets was anything, but at arm's length.

2           The Claridge Parties made their bids in accordance

3    with the bid procedures, including their last bid, which was

4    delivered on July 30, under seal.  Since then, the trustee

5    requested certain revisions, to which the Claridge Parties

6    agreed.  Those revisions improved the consideration to the

7    estate.  This is not unusual in the context of an auction.

8           At the hearing, the Pursuit Parties raised the

9    following arguments:

10          First, the Pursuit Parties argue that the Claridge

11   Parties' bid was not the highest or otherwise best.  They argue

12   that the Pursuit Parties made offers on August 8 and 9 for

13   additional consideration; and the Pursuit Parties are willing

14   to continue to participate in an auction, and are ready,

15   willing, and able to bid more.

16          This argument is, in essence, a request to reopen the

17   auction.  As indicated at the hearing, the Court declines to do

18   so.  A request to open an auction necessarily implicates the

19   tension between maximizing value and upholding the integrity of

20   the auction process.  But this tensions is easily resolved

21   here.

22          The Pursuit Parties are not new to the auction.  They

23   had a full and fair opportunity to participate.  The Pursuit

24   Parties chose not to provide a sealed bid, and in fact,

25   withdrew previous offers made at the auction.  Thus, on these

```
 1   facts, the integrity of the auction process, by far, trumps any

 2   potential higher bid.

 3         Further, the Court finds no reason to quarrel with the

 4   trustee's decision that the offers made by the Pursuit Parties

 5   subsequent to the closing of the auction are not highest and

 6   better.  The Claridge Parties' bid has the opportunity for an

 7   upside recovery, based on the potential recoveries in

 8   litigation.  There is no such potential recovery under the

 9   Pursuit Parties' revised proposal, nor could there be, given

10   that they would not pursue litigation.

11         Second, the Pursuit Parties argue that the motion must

12   be denied because the trustee did not follow the auction

13   procedures approved by the Court when he called for sealed bids

14   to conclude the auction.  Specifically, the Pursuit Parties

15   assert that all bids had to be in an open forum, in one room.

16         As pointed out by the trustee, the auction procedures

17   specifically provide that the procedures were subject to

18   modification by the trustee, as he deems appropriate to comply

19   with his fiduciary obligation.  The Pursuit Parties, who asked

20   the Court to require the trustee to propose bid procedures, did

21   not object to this aspect of the bid procedures.

22         Further, the Pursuit Parties themselves seek to ignore

23   the auction procedures to their benefit.  In the August 8

24   email, admitted into evidence, the Pursuit Parties offer the

25   trustee an additional $20,000 if he will declare the Pursuit
```

14

1    Parties to be the prevailing bidder at the auction, and not

2    have further negotiations with the Claridge Group.  Thus, it is

3    clear that the Pursuit Parties are not opposed to offers that

4    are not made in an open forum, as provided in the bid -- in the

5    approved bid procedures.

6              I should note that, while I do not view modification

7    clauses contained in bid procedures as granting the trustee

8    unlimited discretion to modify bid procedures, under the

9    circumstances of this case, requiring sealed bids to conclude

10   the auction was appropriate.

11             Third, the Pursuit Parties question the right of the

12   trustee to assign the claims as inconsistent with the

13   Bankruptcy Code.  They specifically wish to reserve all

14   defenses to the Pursuit Parties' ability to prosecute the

15   claims on behalf of the estate or otherwise.  It is clear that

16   the Pursuit Parties must be able to raise any and all defenses

17   they have to whatever litigation is brought, and the order

18   entered by the Court approving the sale must so provide.

19             Fourth, the Pursuit Parties raise the issue of whether

20   the attorneys prosecuting any assigned actions must be approved

21   by the Court.  This point is premature.  This Court is not

22   absolving any attorneys of their obligation to be retained by

23   the Court, if, in fact, they must be.  And that issue will be

24   determined at an appropriate time.

25             That concludes my ruling.  Do you have any questions?

1          MR. FELGER:  Good afternoon, Your Honor.  Mark Felger

2    of Cozen O'Connor on behalf of Jeoffrey Burtch, the Chapter 7

3    Trustee.

4          I guess the only question I would have is, you

5    indicated that any order should include language that preserves

6    the right of the Pursuit Parties to raise defenses with respect

7    to the issues that Mr. Martin raised at the last hearing.  The

8    proposed form of order does not -- I don't believe it includes

9    that language.  So I think we'll need to settle an order and

10   submit it under a COC.

11         Did Your Honor contemplate any other changes to the

12   order, other than addressing that specific issue?

13       (Pause in proceedings)

14         THE COURT:  No, I don't think so.  But why don't you

15   and Mr. Martin confer on the form of order.  If there is some

16   other issue that Mr. Martin sees, based on my ruling, then, if

17   you can't work it out, let me know.  But the intent is to

18   preserve any and all defenses that the Pursuit Parties have to

19   raise in this court or any other court.

20         MR. FELGER:  Right, with respect to the claims that --

21         THE COURT:  With respect --

22         MR. FELGER:  -- have been assigned.

23         THE COURT:  -- to what has been assigned, yes.

24         MR. FELGER:  Right.  Okay.

25         THE COURT:  All right.

16

1          MR. FELGER:  That's all we have.

2          THE COURT:  Thank you very much.

3          MR. FELGER:  Thank you, Your Honor.

4          THE COURT:  We stand adjourned.

5          UNIDENTIFIED:  (Via Telephone) Thank you, Your Honor.

6      (Proceedings concluded at 12:24 p.m.)

7                          *****

17

1                        CERTIFICATION

2          I certify that the foregoing is a correct transcript

3     from the electronic sound recording of the proceedings in the

4     above-entitled matter to the best of my knowledge and ability.

5

6

7

8     /s/ Coleen Rand                    August 18, 2015

9     Coleen Rand, AAERT Cert. No. 341

10    Certified Court Transcriptionist

11    For Reliable

EXHIBIT 5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Chapter 11
                                    .
FOAMEX INTERNATIONAL, INC.,         .    Case No. 09-10560(KJC)
*et al.*,                           .    (Jointly Administered)
                                    .
            Debtors.                .    May 21, 2009 (2:10 p.m.)
                                    .    (Wilmington)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE

Appearances:

| | |
|---|---|
| For the Debtor: | Mark E. Felger, Esq. |
| | Cozen O'Connor |
| | Abid Qureshi, Esq. |
| | Akin Gump Strauss Hauer & Feld |
| For the PBGC: | Deborah J. Bisco, Esq. |
| | PBGC |
| For ACE Insurance: | Christopher Winter, Esq. |
| | Duane Morris, LLP |
| For Oracle USA, Inc. | Amish Doshi, Esq. |
| | Day Pitney, LLP |
| For the U.S. Trustee: | David Buchbinder, Esq. |
| | U.S. Trustee's Office |
| For Law Debenture as Agent: | William Baldiga, Esq. |
| | Brown Rudnick |
| For MP Foam DIP LLC: | Jennifer Feldsher, Esq. |
| | Bracewell Guiliani |
| For Bank of New York, Agent: | J. Mark Chevallier, Esq. |
| | Jonathan Thalheimer, Esq. |
| | McGuire, Craddock & Strother |

2

| | |
|---|---|
| For the 1st Lien Lenders | Keith Simon, Esq.<br>Latham & Watkins LLP<br>Steve Yoder, Esq.<br>Potter Anderson & Corroon |
| For Bank of America: | Benjamin Mintz, Esq.<br>Kaye Scholer |
| For the Committee: | Sharon Levine, Esq.<br>Lowenstein Sandler |
| For RBF Capital: | Maria Aprile Sawczuk, Esq.<br>Stevens & Lee PC |
| For Deutsche Bank as Indenture Trustee: | Dewey & LeBoeuf LLP |
| For Wayzata: | Greg Taylor, Esq.<br>Ashby & Geddes<br>Michael Stewart, Esq.<br>Faegre & Benson |

| | |
|---|---|
| Audio Operator: | Al Lugano |
| Transcriber: | Elaine M. Ryan<br>(302) 683-0221 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1    auction.  Had we at the outset, without the agent present and

2    with all of the procedural defects and the execution risks

3    simply said sure, the auction would have been over.  Instead,

4    it went up to $130 million, and again and again the Matlin

5    Patterson group come back on at least two occasions and made

6    a cash bid that we were looking for.  And so, we think we did

7    add value.  Two more quick points, Your Honor.  Much has been

8    said today about the support of all of the constituencies in

9    this room for the Matlin Patterson bid.  Not at the auction,

10   Your Honor.  At the time the auction terminated, there was no

11   definitive settlement that we were informed of with the

12   Matlin Patterson group and the second lien lenders or the

13   Matlin Patterson group and the unsecured creditors.  Those

14   are all events that occurred subsequent to the auction.

15   Lastly, Your Honor, consultation rights.  A number of people

16   have alleged that we failed to appropriately consult them,

17   and if we do eventually get to the testimony, Your Honor, I

18   think you will find that nothing could be further from the

19   truth.  There were extensive consultations.  At the last

20   round, when the conditional offer was made by Matlin

21   Patterson, which again, in our view, wasn't even a bid

22   because it was conditional, and we didn't accept it for

23   exactly the same reasons that we had spent hours discussing

24   with all of the constituencies present at the auction that we

25   had not accepted it earlier, and so, the notion that we

1    somehow left $5 million on the table by not accepting that

2    could not be further from the truth.  Again, there was not a

3    $5 million increase on the table.  It was a conditional offer

4    and we were entirely consistent with how we had decided the

5    matters previously that evening by not accepting that as a

6    qualified bid item.

7            THE COURT: Thank you.  Alright.  The situation

8    involves at least in concept so many of the common features

9    of bankruptcy auctions and that is a tension between the

10   dynamic which is probably the most important one, and that is

11   to maximize value to the estate and its constituents and

12   finality and integrity in the process, as some have

13   mentioned.  The other tension involved is one again that's

14   also present in auctions and that is the comparison not of

15   apples to apples, but apples to oranges, and there is that

16   factor here as well, but I am convinced, based upon what has

17   occurred, that there may be more value to be had for the

18   estate here, so I'm unprepared today to move forward with the

19   debtors' motion to approve the sale.  I am going to order a

20   resumption of the auction at the point at which it concluded.

21   I am going to specifically permit the agent to credit bid

22   pursuant to rights under 363(k) if it wishes to do so.  I

23   expect the consultation process will continue.  Now, in

24   having said that, that is not intended to be a disposition of

25   the issues raised by various of the parties today concerning

1  the agent's rights, some of which may be appropriate for this

2  Court to decide, some of which may be for later dispute and

3  resolution in another forum or issues of absolute priority or

4  other things, all of those issues and objections will be

5  reserved until the time of the next sale hearing.  I have a

6  couple of questions that I'd like to throw out to the parties

7  for them to give me their views on.  One is in terms of other

8  than what I've just stated, is it necessary to further

9  articulate additional rules or an additional framework for

10  the resumption of bidding, and two, give me some notion of

11  time frame by which the auction can be concluded and you can

12  come back to me.  I have some dates coming up relatively

13  soon, May 26th, June 1st, if that gives you enough time to do

14  what you need to do.  I also assume the discussions that were

15  described by the Committee will resume.  I don't know how

16  they'll end up, and if you want some time to talk among

17  yourselves before you respond to me, I will give that to you

18  now.  Are there any questions or comments?

19          MR. QURESHI: Your Honor, again for the record Abid

20  Qureshi on behalf of the debtors.  I think we do need a

21  little time to discuss that the most pressing concern for the

22  debtors is going to be a DIP that expires on June the 8th, but

23  we'll have to take a few minutes to discuss that.

24          THE COURT: Alright.

25          MR. QURESHI: But we would appreciate the break.

EXHIBIT 6

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | Chapter 11 |
| | ) | |
| IN RE: | ) | Case No. 09-11525 (MFW) |
| | ) | (Jointly Administered) |
| | ) | |
| FILENE'S BASEMENT, INC., et al. | ) | Courtroom 4 |
| | ) | 824 Market Street |
| | ) | Wilmington, Delaware |
| Debtors. | ) | |
| | ) | June 10, 2009 |
| | ) | 10:31 a.m. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:                    Pachulski Stang Ziehl
                                   & Jones LLP
                                BY:  LAURA DAVIS JONES, ESQ.
                                919 North Market Street
                                17th Floor
                                Wilmington, DE 19899
                                (302) 778-6401


For the Official Committee      Cooley Godward Kronish LLP
of Unsecured Creditors:         BY:  JEFFREY COHEN, ESQ.
                                The Grace Building
                                1114 Avenue of the Americas
                                New York, NY 10036
                                (212) 479-6218



ECRO:                           BRANDON MC CARTHY

Transcription Service:          DIAZ DATA SERVICES
                                331 Schuylkill Street
                                Harrisburg, Pennsylvania 17110
                                (717) 233-6664


Proceedings recorded by electronic sound recording; transcript
produced by transcription service

APPEARANCES:
(Continued)

For the Official Committee          Morris, Nichols, Arsht
of Unsecured Creditors:               & Tunnell LLP
                                    BY:   ROBERT J. DEHNEY, ESQ.
                                    1201 North Market Street
                                    18th Floor
                                    Wilmington, DE 19899
                                    (302) 351-9353


For Men's Wearhouse:                Landis Rath & Cobb LLP,
                                    BY:  ADAM G. LANDIS, ESQ.
                                    919 Market Street, Suite 1800
                                    Wilmington, DE 19899
                                    (302) 467-4400

                                    K&L Gates
                                    BY:   CHARLES A. DALE, ESQ.
                                    State Street Financial Center
                                    One Lincoln Street
                                    Boston, MA 02111
                                    (617) 261-3112


For Crown:                          King & Spalding
                                    BY:  ARTHUR J. STEINBERG, ESQ.
                                    1185 Avenue of the Americas
                                    New York, NY 10036
                                    (212) 556-2158


United States Trustee:              Office of the U.S. Trustee
                                    BY:   JANE LEAMY, ESQ.
                                    J. Caleb Boggs Federal Building
                                    844 King Street, Room 2207
                                    Lockbox 35
                                    Wilmington, DE 19801
                                    (302) 573-6491


For PBGC:                           Pension Benefit Guaranty Corp.
                                    BY:   DEBORAH J. BISCO, ESQ.
                                    1200 K Street NW
                                    Washington, DC  20005
                                    (202) 326-4020


For Federal Realty,                 Ballard Spahr Andrews
201 Needham Street                    & Ingersoll, LLP
and Grosvenor:                      BY:   DAVID L. POLLACK, ESQ.
                                    1735 Market Street, 51st Floor
                                    Philadelphia, PA  19103
                                    (215) 864-8325

APPEARANCES:
(Continued)

| | |
|---|---|
| For Manhasset Venture LLC,<br>Talisman Towson Limited,<br>Partnership and Quadrangle<br>Development Corporation: | Monzack Mersky McLaughlin<br>  and Browder, P.A.<br>BY:  RACHEL B. MERSKY, ESQ.<br>1201 North Orange Street<br>Suite 400<br>Wilmington, DE 19801<br>(302) 656-8162 |
| For 620 Owner One: | Ciardi Ciardi & Astin, P.C.<br>BY:  ANTHONY M. SACCULLO, ESQ.<br>One Commerce Square<br>2005 Market Street, Suite 1930<br>Philadelphia, PA  19103<br>(215) 557-3550 |
| For Lockwood Retail: | Cole, Schotz, Meisel, Forman<br>  & Leonard, P.A.<br>BY:  KAREN M. MC KINLEY, ESQ.<br>500 Delaware Avenue, Suite 1410<br>Wilmington, DE  19801<br>(302) 651-2003 |
| For Vornado Realty Trust: | Blank Rome LLP<br>BY:  VICTORIA A. GUILFOYLE, ESQ.<br>1201 Market Street, Suite 800<br>Wilmington, DE 19801<br>(302) 425-6400 |
| | Friend Frank<br>BY:  BRAD ERIC SCHELER, ESQ.<br>One New York Plaza<br>New York, NY  10004<br>(212) 859-8019 |
| For SYMS: | Lowenstein Sandler PC<br>BY:  KENNETH A. ROSEN, ESQ.<br>65 Livingston Avenue<br>Roseland, NJ  07068<br>(973) 597-2548 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For Creditor<br>Grosvenor International: | Schenk, Annes, Brookman<br>  & Tepper<br>BY:  ROBERT D. TEPPER<br>311 S. Wacker Drive, Suite 5125<br>Chicago, IL  60606<br>(312) 554-3100 |

Case 1:15-cv-00801-RGA  Document 13  Filed 12/01/15  Page 103 of 121 PageID #: 234
Case 09-11525-MFW    Doc 412    Filed 06/25/09    Page 4 of 76

4

TELEPHONIC APPEARANCES:
(Continued)

For DSW, Inc.:                      Hahn Loeser & Parks LLP
                                    BY:   LEE D. POWAR, ESQ.
                                    200 Public Square, Suite 2800
                                    Cleveland, OH 44114
                                    (216) 274-2295

For 201 Needham Street:             Cohn Whitesell & Goldberg LLP
                                    BY:   MICHAEL  J.  GOLDBERG, ESQ.
                                    101 Arch Street
                                    Boston, MA  02110
                                    (617) 951-2505

1   hear them bid.   The stalking horse agreement was signed in

2   early May; May 3rd, I believe.   Five weeks later they're

3   standing on 22 when we're looking at 60 plus.

4        The committee stands strongly behind us getting

5   an opportunity at Your Honor's earliest convenience to have

6   considered for approval this SYMS Vornado bid.

7        Thank you, Your Honor.

8        THE COURT:  Thank you.  Well, let me say this.  I

9   think it's clear we're going to have to reopen the bidding.

10   The procedure is that the -- the problem is that the

11   procedures were not quite followed.  Even if we could argue

12   that the auction followed the procedures since then with

13   respect to the bid announced for the first time this morning

14   being accepted by the Debtor and the committee, that doesn't

15   follow the procedures.  And it does preclude other bidders

16   from countering that bid.  That's the whole point of having

17   an auction and closing the auction.

18        I have allowed reopening of auctions where

19   parties have expressed concerns with how the auction was run

20   or concerns with whether or not it resulted in the highest

21   price.

22        I think it's clear that there are additional bids

23   that have been received, namely the SYMS bid, that should be

24   considered.  But I think it has to be considered in the

25   context of a further auction that allows all other bidders

1  who participated in the original auction the opportunity to

2  bid against that.

3       I do appreciate the efforts of the Debtor and

4  creditors committee to maximize the value and that there has

5  to be some flexibility, but again it can't be at the expense

6  of the other bidders, nor at the expense of the landlords.

7  And I expressed that view originally at the procedures

8  hearing that the landlords do have to have sufficient time

9  to vet the adequate assurance of future performance issue

10 with the successful bidder, who has to be clear who that is.

11      So we will reopen the auction, give everyone a

12 chance to bid again.  We'll start with the SYMS current bid.

13 I think given the agenda that the Debtor sent out, we can't

14 have it today.  I think it has to be clear that there has to

15 be some time for the parties -- some notice to the parties

16 to participate.

17      MS. JONES:  Your Honor, with all the parties in

18 the courtroom and despite what might be suggested by at

19 least one party, everyone is ridiculously familiar with

20 these assets and the -- and this Debtor.  May I suggest,

21 Your Honor, that that auction either be later today or

22 tomorrow?

23      MR. STEINBERG:  Your Honor, we think it should be

24 no earlier than Monday.

25      MR. DEHNEY:  Your Honor, Robert Dehney on behalf

EXHIBIT 7

UNITED STATES BANKRUPTCY COURT
IN THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | ) | Case No. 14-22654 |
| | ) | |
| | ) | |
| REVEL AC, INC., | ) | |
| | ) | Camden, New Jersey |
| Debtor. | ) | March 4, 2015 |
| | ) | 2:32 p.m. |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE GLORIA M. BURNS
UNITED STATES CHIEF BANKRUPTCY JUDGE

For the Debtor:               JOHN CUNNINGHAM, ESQUIRE
                              EVAN M. GOLDENBERG, ESQUIRE
                              WHITE & CASE, LLP
                              Wachovia Financial Center
                              Suite 4900
                              200 South Biscayne Blvd.
                              Miami, FL  33131

                              MICHAEL VISCOUNT, ESQUIRE
                              JOHN STROCK, ESQUIRE
                              FOX ROTHSCHILD, LLP
                              2000 Market Street, 20th Floor
                              Philadelphia, PA  19102-3222

For the Committee:            WARREN USATINE, ESQUIRE
                              RYAN JARECK, ESQUIRE
                              COLE SCHOTZ
                              900 Third Avenue, 16th Floor
                              New York, NY 10022

For Casino Reinvestment       PATRICK McAULEY, ESQUIRE
Development Authority:         CONNELL FOLEY
                              85 Livingston Avenue
                              Roseland, NJ 07865

For Amenity Tenants:          ROBERT SCHECHTER, ESQUIRE
                              WARREN MARTIN, ESQUIRE
                              RACHAEL PARISI, ESQUIRE
                              PORZIO BROMBERG & NEWMAN
                              29 Thanet Street
                              Princeton, NJ 08540

2

(Appearances continued)

For the U.S. Trustee:          JEFFREY SPONDER, ESQUIRE
OFFICE OF THE U.S. TRUSTEE
One Newark Center
Suite 2100
Newark, NJ 07102


For LGD:          ROBERT DAKIS, ESQUIRE
MORRISON COHEN
909 Third Avenue
New York, New York 10022


For ACR Energy:         STUART BROWN, ESQUIRE
RICHARD CHESLEY, ESQUIRE
CRAIG MARTIN, ESQUIRE
TIMOTHY LOWERY, ESQUIRE
DLA PIPER
1201 North Market Street
Wilmington, DE 19801


For Atlantic City:      RUSS PASSAMANO, ESQUIRE
MATTHEW CASSIDY, ESQUIRE
DeCOTIIS FITZPATRICK & COLE, LLP
Glennpointe Centre West
500 Frank W. Burr Boulevard, STE 31
Teaneck, NJ 07666
(Via Telephone)

JASON HOLT, ESQUIRE
CITY SOLICITOR'S OFFICE
City of Atlantic City
(Via telephone)


For Ace American
Insurance:         TOBEY DALUZ, ESQUIRE
BALLARD SPAHR
919 North Market Street, 11th Floor
Wilmington, Delaware 19801
(Via telephone)


For JPMorgan Chase:     CHRISTOPHER UPDIKE, ESQUIRE
CADWALADER WICKERSHAM & TAFT, LLP
One World Financial Center
New York, NY 10281

3

(Appearances continued)

|  | WILLIAM S. KATCHEN, ESQUIRE |
|  | WILLIAM S. KATCHEN, LLC |
|  | 1037 Raymond Boulevard |
|  | Newark, NJ 07102 |
|  | (Via Telephone) |

For Wells Fargo:          THOMAS KRELLER, ESQUIRE
                         JULIAN GURULE, ESQUIRE
                         MILBANK, TWEED, HADLEY & McCLOY
                         601 South Figueroa Street, 30th Fl.
                         Los Angeles, CA 90017

For New Jersey Treasurer:  PATRICIA ROACH, DAG
                         Richard J. Hughes Justice Complex
                         25 Market Street
                         Trenton, NJ 08625
                         (Via Telephone)

For Bank of New York:     THOMAS PITTA, ESQUIRE
                         EMMET MARVIN & MARTIN, LLP
                         120 Broadway, 32nd Floor
                         New York, NY 10271

                         BRADLEY O'NEILL, ESQUIRE
                         KRAMER LEVIN
                         1177 Avenues of the Americas
                         New York, NY 10036

For IDEA:                JEFFREY COOPER, ESQUIRE
                         BARRY ROY, ESQUIRE
                         RABINOWITZ LUBETKIN & TULLY
                         293 Eisenhower Parkway, #100
                         Livingston, NJ 07039

For Polo North:          STUART J. MOSKOVITZ, ESQUIRE
                         819 Highway 33
                         Freehold, NJ 07728

For DTLA Development      KURT F. GWYNNE, ESQUIRE
Group, LLC:               REED SMITH
                         1201 N. Main Street, Suite 1500
                         Wilmington, DE 19801

4

Audio Operator:          DEBORAH CARY

Transcribed by:          DIANA DOMAN TRANSCRIBING, LLC
                         P.O. Box 129
                         Gibbsboro, NJ  08026-0129
                         Office:   (856) 435-7172
                         Fax:      (856) 435-7124
                         E-mail:   dianadoman@comcast.net

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

1    there's somebody who wants to match or improve or -- or offer

2    even something less, there's always the -- I think it

3    strengthens your case that this is the best deal that the

4    debtor can get today, but, you know, I did this on shortened

5    time at your request, but -- and if closing had to be

6    tomorrow, maybe that would be something I'd have to take into

7    consideration, but there is a lot of litigation expense the

8    debtor has to undertake under this new agreement, which the

9    original agreement didn't have, because closing was supposed

10   to take place by February 9th.  So now the debtor has to do

11   more -- more work.

12           You know, I have issues and questions about the deal

13   that gives up the 2013 tax credit when the likelihood of

14   success would seem to me -- and I don't know anything about

15   that program or that law -- would be stronger for 2013 when

16   the debtor actually operated for the full year than 2014 when

17   it only operated for part of the year and 2015 when it didn't

18   operate at all.  So -- and the debtor still has to do all the

19   work.  So that's another concern I have about the -- I don't

20   know that much about the IDEA litigation.  So I'm not going to

21   spend a lot of time on that.

22           MR. CUNNINGHAM:  Sure.

23           THE COURT:  But approving the sale today I think is

24   premature, because I don't know that there's enough here for

25   me to make that call based on what you presented.  You know,

1    thought -- I think they thought something would happen --

2              MR. CUNNINGHAM:  Right.

3              THE COURT:  -- in the interim, but here we are with

4    what we have today, and I think in order for me to feel

5    comfortable, you need to satisfy me that every -- every stone

6    has been unturned to find the best deal.

7              MR. CUNNINGHAM:  Understood, Your Honor.  I would

8    say if we're going to continue this hearing, and I think

9    that's the words from -- from the debtor's point of view we

10   need to, because under that provision on termination, which

11   you heard --

12             THE COURT:  Right.

13             MR. CUNNINGHAM:  -- the witnesses discuss, its

14   automatic termination null and void, it provides --

15   automatically terminates if the approval order is not entered

16   by the approval order outside date and that's --

17             THE COURT:  Which is --

18             MR. CUNNINGHAM:  -- a defined term.

19             THE COURT:  Okay.  What's the --

20             MR. CUNNINGHAM:  It says the later of February 27th

21   -- obviously, that's gone -- or the date determined by the

22   Bankruptcy Court due to scheduling as the hearing date for the

23   entry or denial of the approval order.  So Your Honor set a

24   hearing date today.  If you continue to schedule a further

25   hearing, the -- our --

1   control that.  I hope they get together with him on that, and

2   if they can't and they're talking to other bidders and buyers

3   and they want to send inbounds our way that are going to lock

4   in the same certainty that I have right now with the bird in

5   the hand, more power to you.  Mr. Kreller said Wells Fargo is

6   going to be the primary beneficiary of that.  So we will

7   facilitate that.  I don't think anything -- Your Honor, and

8   you have more history and more familiarity with this case,

9   having heard testimony from Shaun Martin and Moelis countless

10  of times.  I don't think Your Honor has had any indication

11  from any party -- maybe Polo North -- about the way we've

12  conducted the sale hearing until now.  Moelis has bent over

13  backwards, and I don't think Your Honor has to -- to, you

14  know, change all the findings you made about how the debtors

15  conducted this -- this sale process.

16          As far as transparency, ACR is getting it by being a

17  member of the Committee under a confidentiality agreement.

18  That's what I would state.

19          THE COURT:  I expect that that level of

20  communication will go on.  It's a short period that I'm --

21          MR. CUNNINGHAM:  Yes.

22          THE COURT:  -- that I'm putting this off.  So please

23  help facilitate the interested parties in being able to do

24  whatever due diligence they need so that hopefully, if they're

25  in a position to make an offer that they think is as good as

1    or better than the one that's before the Court and want to

2    make that offer, that it can be done in advance of the hearing

3    next week.

4           MR. CUNNINGHAM:  We'll do that, Your Honor, and I

5    think one other thing I can take off Your Honor's calendar in

6    terms of the debtor's motion to reject the ACR contract, we're

7    not looking to go forward on that.  We will push that to, in

8    our view, after the proposed closing date, because --

9           THE COURT:  Well, it's actually -- I think it was

10   adjourned to -- or from your -- from the agenda, it was

11   adjourned to March 16th.  So I was thinking of maybe putting

12   off the stay relief motion of Mr. Brown to the same date.

13          MR. CUNNINGHAM:  Yeah, and I can say we would -- if

14   Your Honor were to approve the -- the deal with Polo North --

15   and can deal with that next week.  If that were to occur, we

16   would push that off further to -- to after the closing.  We're

17   not trying -- our view is as long as the rejection -- if we

18   sell to Polo North or anybody else, and we're obviously

19   rejecting that agreement, because we don't have the building

20   anymore, and it would be -- we would seek to make the

21   effectiveness of any rejection of the ACR agreements effective

22   as of the date of closing.

23          MR. BROWN:  Your Honor, I stand -- I don't agree

24   with all of Mr. Cunningham's comments.  I do agree with his

25   efforts, but I really need to make the record crystal clear

EXHIBIT 8

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

JALAL PARIROKH,

Debtor.

_____/

Case No. DG 11-05409
Hon. Scott W. Dales
Chapter 7

MEMORANDUM ORDER REGARDING
SALE OF AVOIDANCE ACTIONS

PRESENT:   HONORABLE SCOTT W. DALES
United States Bankruptcy Judge

## I. INTRODUCTION

Nearly two years into the case, chapter 7 trustee Thomas A. Bruinsma (the "Trustee")

filed a Motion for Sale of Interest in Certain Causes of Action Free and Clear of Liens Pursuant

to 11 U.S.C. § 363 (the "Motion," DN 89). Through the Motion, the Trustee seeks authority to

sell the estate's right under chapter 5 (or otherwise) to avoid unspecified transfers that the Debtor

may have made to his spouse, Iryna Averycheva ("Ms. Averycheva"). The court held a hearing

in Kalamazoo, Michigan, on May 1, 2013, to consider the Motion and Ms. Averycheva's

objection.

In order to prevent the time-bar of § 546 from robbing the estate of the value the Trustee

hopes to derive from the sale, the court must rule on the Motion promptly and, given the

circumstances, succinctly. For the following reasons, the court will deny the Motion.

## II. THE PROPOSED TRANSACTION

The transaction the Trustee describes in the Motion is simple: he intends to sell

"Avoidance Actions" defined broadly as "potential causes of action against [Ms. Averycheva]

under 11 U.S.C. § 544 *et seq.*, including, without limitation, fraudulent -- and preferential --

transfer actions and any other applicable actions under State or Federal law." *See* Motion at ¶ 3. At the hearing, Trustee's counsel conceded that, given the estate's limited resources, the Trustee has been unable to identify with any confidence the precise transfers to be avoided or, for that matter, specific theories of claim. Nor was he certain whether the cause of action under § 544 would import Michigan or California versions of the Uniform Fraudulent Transfer Act. So, to make the best of a bad situation and capture some value, the Trustee proposes to sell to Commercial Property Development Company, LLC ("CPDC") whatever the estate has to sell under chapter 5 or otherwise, for $5,000.00 and 10% of CPDC's net recovery, subject to higher offers at a courtroom auction.

### III. ANALYSIS

A.    General Legal Framework

At the hearing, the parties identified a split of authority concerning a trustee's authority to sell avoidance actions, exemplified by cases such as *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253 (5th Cir. 2010), and *Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.)*, 177 F.3d 774, 781 (9th Cir. 1999), which take a liberal approach to such authority, and *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 242 (3d Cir. 2000), which takes a dimmer view. The parties agreed that the Sixth Circuit has not resolved the controversy. Although the Sixth Circuit, like many courts, recognizes derivative standing of non-trustees to assert avoidance actions, *see Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)*, 66 F.3d 1436, 1446 (6th Cir.1995), the Trustee has not cited, and does not rely on, derivative standing cases.[1] Similarly,

---

[1] Rather, in exchange for $5,000.00 and 10% of CPDC's net recovery, CPDC intends to sue Ms. Averycheva for its own sake, not on the estate's behalf or as its fiduciary.

because the Debtor filed a chapter 7 petition, § 1123 provides no direct authority for the sale. *See* 11 U.S.C. § 103(f) (applicability of chapters).

At the heart of the controversy surrounding the Motion is whether the Trustee is proposing to sell "property of the estate" in the form of the Avoidance Actions, or whether the Avoidance Actions are not included in the "property of the estate." *See* 11 U.S.C. § 363(b) (authorizing trustee to sell property of the estate). Here, the Trustee asserts that the Avoidance Actions are included within the estate, so he must persuade the court that he has an interest to sell. 11 U.S.C. § 363(p). He must also persuade the court that it should authorize him to sell it. *See generally, In re Embrace Systems Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995). The Trustee failed to persuade the court on both counts.

B.      Sale of Avoidance Actions as Estate Property

Regarding whether the Avoidance Actions are included within the property of the estate, the court finds the Third Circuit's decision in *Cybergenics* better-reasoned, and therefore more persuasive than, for example, the Fifth Circuit's decision in *Moore* and similar authorities, many of which arise in chapter 11 cases. First, the court is not convinced that the estate's Avoidance Actions are included within the property of the estate, as defined in § 541 and required for a sale under § 363. Rather, the Third Circuit's characterization of chapter 5 rights as "powers" is more consistent with the Bankruptcy Code and, at least with respect to § 544, applicable non-bankruptcy law. That court explained, by analogy:

> Much like a public official has certain powers upon taking office as a means to carry out the functions bestowed by virtue of the office or public trust, the debtor in possession is similarly endowed to bring certain claims on behalf of, and for the benefit of, all creditors.

*In re Cybergenics Corp.*, 226 F.3d 237, 244 (3d Cir. 2000).   Just as we do not permit public

officials to sell the powers of their office or delegate their authority to private actors, so should

we pause when a trustee proposes what amounts to the same thing.

The Third Circuit also cautioned other courts not to confuse the fraudulent conveyance

rights under UFTA, which belong not to a debtor but to his creditors, with the prepetition causes

of action that the estate succeeds to under § 541(a) upon the commencement of a case.   *Id.*   The

Fifth Circuit, however, committed that very error when it held that fraudulent conveyance

actions under state law are included within the estate under § 541(a)(1).   *Moore*, 608 F.3d at 259-

60.   That court did not explain why prepetition causes of action under UFTA, which belong to

creditors, could qualify as "legal or equitable interests of the *debtor* in property as of the

commencement of the case."   11 U.S.C. § 541(a)(1) (emphasis added).   Moreover, Congress has

decided that only after avoidance and recovery under § 550[2] will the property allegedly conveyed

in fraud of a debtor's creditors be included in the property of the estate.   *Id.* § 541(a)(3); *Meoli v.*

*Huntington National Bank (In re Teleservices Group, Inc.)*, 463 B.R. 28, 33-24 (Bankr. W. D.

Mich. 2012) (discussing *FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 132 (2nd

Cir.1992)).

Moreover, in an admittedly different context, the United States Supreme Court held that

the term "trustee" as used in § 506(c) means only the trustee, and not a creditor, such as CPDC,

suing on its own behalf.   *Cf. Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530

---

[2] Without avoidance, there can be no recovery.   *See* 11 U.S.C. § 550(a) (authorizing recovery "to the extent that a transfer is avoided . . .").

U.S. 1, 9 (2000) ("by far the most natural reading of § 506(c) is that it extends only to the trustee").[3]

For all of these reasons, and in the absence of controlling authority from within our own Circuit, the court rejects the analysis exemplified in *Moore* for the rationale of *Cybergenics,* and concludes that the Avoidance Actions are not property of the estate which the Trustee can sell under § 363(b).[4]

C.    Authority to Sell Under § 363(b)

Regarding whether the sale of the Avoidance Actions is in the best interests of the estate as required under § 363(b), the fact that the Trustee has not identified with any precision the transfers at issue, the theories of avoidance, or possible defenses, precludes the court from approving this aspect of the Motion. *In re Embrace Systems Corp.*, 178 B.R. at 123 ("A sale of assets is appropriate if all provisions of § 363 are followed, the bid is fair, and the sale is in the best interests of the estate and its creditors").   Neither the court nor the Trustee may meaningfully evaluate causes of action defined in exceedingly broad, categorical, and therefore unspecific, terms.

IV. CONCLUSION AND ORDER

The Trustee has failed to persuade the court that the Avoidance Actions constitute property of the estate (as opposed to powers of a trustee), or that the sale meets the minimum requirements for approval under § 363(b), even assuming, *arguendo*, that the subject matter of the Motion were included within the property of estate.   The fact that the Avoidance Actions in

---

[3] The Supreme Court had no occasion to disturb the practice of permitting derivative standing to assert avoidance actions on the estate's behalf, as contemplated in cases such as *Gibson Group*. *See Hartford Underwriters*, 530 U.S. at 13, n. 5.

[4] Accordingly, it is unnecessary to consider whether Ms. Averycheva may bid at any courtroom auction regarding the Avoidance Actions, an issue reserved during the May 1, 2013 hearing.

the hands of the Trustee may soon be time-barred does not change the court's conclusion in this regard.[5]

NOW, THEREFORE, IT IS HEREBY ORDERED that the Motion (DN 89) is DENIED.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Memorandum Order pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Daniel W. Linna, Jr., Esq., Cody Knight, Esq., Jason Bank, Esq., and the United States Trustee.

END OF ORDER

---

[5] A different limitation period may apply to creditors under the UFTA. *Compare* 11 U.S.C. § 546(a) (limitation period for trustees) *with* M.C.L. § 566.39 (or Cal. Civ. Code § 3439.09) *and* 11 U.S.C. § 108(c) (extending limitation periods for creditors).

**IT IS SO ORDERED.**

**Dated May 2, 2013**



Scott W. Dales
United States Bankruptcy Judge