# 15-cv-801 (RGA)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

In re:

Pursuit Capital Management, LLC,

Debtor.

Anthony Schepis, Frank Canelas, Pursuit Investment Management, LLC, Pursuit Opportunity Fund I, L.P., and Pursuit Capital Management Fund I, L.P.,

Appellants,

- against -

Jeoffrey L. Burtch, Chapter 7 Trustee,

Appellee.

On Appeal from the United States Bankruptcy Court for the District of Delaware, Chapter 7 Case No. 14-10610 (LSS)

## APPELLEE'S BRIEF

Mark E. Felger (No. 3919)
Barry M. Klayman (No. 3676)
COZEN O'CONNOR
1201 North Market Street, Suite 1001
Wilmington, Delaware
(302) 295-2087
mfelger@cozen.com
bklayman@cozen.com

*Attorneys for Appellee Jeoffrey L. Burtch, Chapter 7 Trustee*

# <u>TABLE OF CONTENTS</u>

**Page**

SUMMARY OF ARGUMENT ..............................................................................1

JURISDICTIONAL STATEMENT .......................................................................7

COUNTER-STATEMENT OF ISSUES  AND STANDARD OF REVIEW...........7

STATEMENT OF THE CASE................................................................................8

ARGUMENT .........................................................................................................18

I.      THIS APPEAL IS MOOT ..........................................................................18

II.     LEGAL CHALLENGES TO THE SALE'S EFFECTIVENESS ARE
        MERITLESS.................................................................................................25

        A.      The Bankruptcy Court Properly Approved the Sale of the Claims to
                Purchasers Pursuant to Section 363(b)(1) of the Bankruptcy Code ...25

        B.      In this District, Derivative Standing Can be Awarded Where, as Here,
                a Chapter 7 Trustee Lacks the Resources to Fund a Litigation ..........29

III.    THE TRUSTEE'S REQUEST FOR SEALED BIDS WAS
        APPROPRIATE ...........................................................................................32

IV.     THE BANKRUPTCY COURT DID NOT ERR IN DENYING THE
        PURSUIT PARTIES' LAST MINUTE ATTEMPT TO POSTPONE THE
        SALE HEARING SO THEY COLD DEPOSE THE TRUSTEE WHEN
        THEY HAD TIME TO DO SO PRIOR TO THE HEARING......................37

V.      THE PURCHASERS' BID WAS SUPERIOR TO THE PURSUIT
        PARTIES' BID.............................................................................................40

        A.      The Bankruptcy Court Did Not Usurp the Trustee's Business
                Judgment ...........................................................................................40

        B.      The Bankruptcy Court's Decision Not to Reopen the Auction was
                Not an Abuse of Discretion................................................................42

CONCLUSION .....................................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abbotts Dairies of Pennsylvania, Inc.*,
    788 F.2d 143 (3d Cir. 1986) ...........................................................................19

*In re AMC Investors, LLC*,
    No. 08-12264 (Bankr. D. Del. June 2, 2011)...................................................29

*AMC Investors, LLC v. Eugenia VI Venture Holdings Ltd.*,
    No. 11-592, 2012 WL 868775 (D. Del. March 14, 2012)............................4, 30

*Anheuser-Busch, Inc. v. Miller (In re Stadium Mgmt. Corp.)*,
    895 F.2d 845 (1st Cir. 1990)..........................................................................23

*Avalanche Maritime, Ltd. v. Parekh (In re Parmetex, Inc.)*,
    199 F.3d 1029 (9th Cir. 1999) ........................................................................31

*In re Bigler, LP*,
    443 B.R. 101 (Bankr. S.D. Tex. 2010) ............................................................45

*Boeing Co. v. Kaiser Aircraft Indus. (In re Ala. Aircraft Indus., Inc.)*,
    464 B.R. 120 (D. Del. 2012)...........................................................................19

*Boeing Co. v. Kaiser Aircraft Indus. (In re Ala. Aircraft Indus., Inc.)*,
    514 Fed. App'x 193 (3d Cir. 2013) ........................................................... 19, 20

*Briggs v. Kent (In re Professional Inv. Props. Of Am.)*,
    955 F.2d 623 (9th Cir. 1992) ..........................................................................28

*In re Bryan*,
    No. 12-31486, 2013 WL 4716194 (Bankr. M.D. Ala. Sept. 3, 2013)...............45

*Cadle Co. v. Mims (In re Moore)*,
    608 F.3d 253 (5th Cir. 2010) ..........................................................................26

*Canzano v. Ragosa (In re Colarusso)*,
    382 F.3d 51 (1st Cir. 2004)............................................................................25

*In re Cloverleaf Enterps., Inc.*,
    No. 09-20056, 2011 WL 873145 (Bankr. D. Md. March 11, 2011) .................45

*Cinicola v. Scharffenberger,*
  248 F.3d 110 (3d Cir. 2001) ..............................................................................23

*In re Cooper,*
  405 B.R. 801 (Bankr. N.D. Tex. 2009)................................................................29

*Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp.*
  *(In re Montgomery Ward Holding Corp.),*
  242 B.R. 147 (D. Del. 1999)..................................................................................8

*In re Del. & Hudson Ry. Co.,*
  124 B.R. 169 (Bankr. D. Del. 1991)....................................................................17

*In re Dow Corning Corp.,*
  198 B.R. 214 (Bankr. E.D. Mich. 1996)..............................................................26

*Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.),*
  177 F.3d 774 (B.A.P. 9th Cir. 1999)............................................................. 27, 28

*In re Edwards,*
  228 B.R. 552 (Bankr. E.D. Pa. 1998) ..................................................................44

*In re Electroglas, Inc.,*
  No. 09-12416, 2009 WL 8503455 (Bankr. D. Del. Sept. 23, 2009) ..................43

*In re Frontier Energy Res., Inc.,*
  No. 93-5020, 1993 WL 390983 (10th Cir. Oct. 6, 1993) ...................................25

*Gilchrist v. Westcott (In re Gilchrist),*
  891 F.2d 559 (5th Cir. 1990) ..............................................................................25

*Goodwin v. Mickey Thompson Ent. Grp., Inc.*
  *(In re Mickey Thompson Ent. Grp., Inc.),*
  292 B.R. 415 (B.A.P. 9th Cir. 2003) ...................................................................26

*In re Greenberg,*
  266 B.R. 45 (Bankr. E.D.N.Y. 2001) .............................................................. 26-28

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,*
  530 U.S. 1 (2000)..................................................................................................28

*Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.,*
  141 F.3d 490 (3d Cir. 1998) ................................................................................21

LEGAL\25360317\1

*L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.),*
    209 F.3d 291 (3d Cir. 2000) ....................................................................... 19, 21

*In re Nicole Energy Servs., Inc.,*
    385 B.R. 201 (Bankr. S.D. Ohio 2008) ...............................................................26

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*
    *(In re Cybergenics Corp.),*
    226 F.3d 237 (3d Cir. 2000) ................................................................. 3, 27, 28

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*
    *(In re Cybergenics Corp.),*
    330 F.3d 548 (3d Cir. 2003) ..................................................................... 30, 32

*Official Comm. of Unsecured Creditors v. Anderson Senior Living Property, LLC*
    *(In re Nashville Senior Living, LLC),*
    407 B.R. 222 (B.A.P. 6th Cir. 2009) ...................................................................23

*Official Comm. of Unsecured Creditors v. Trism, Inc. (In re Trism, Inc.),*
    328 F.3d 1003 (8th Cir. 2002) .............................................................................23

*In re Orthopedic Bone Screw Prods. Liab. Litig.,*
    246 F.3d 315 (3d Cir. 2001) ...............................................................................8

*Parker v. Goodman (In re Parker),*
    499 F.3d 616 (6th Cir. 2007) .............................................................................25

*In re Phoenix Steel Corp.,*
    82 B.R. 334 (Bankr. D. Del. 1987)........................................................ 17, 42, 43

*Pittsburgh Food & Bev. v. Ranallo,*
    112 F.3d 645 (3d Cir. 1997) ....................................................... 3, 20, 22-24

*In re Racing Servs., Inc. v. North Dakota Racing Comm'n,*
    540 F.3d 892 (8th Cir. 2008) .............................................................................31

*In re Revel AC, Inc.,*
    No. 14-22654 (Bankr. D. N.J. March 18, 2015)................................................44

*In re Rim,*
    No. 10-1066, 2010 WL 4615174 (D. N.J. 2010)................................................30

iv

*In re Sandenhill, Inc.,*
304 B.R. 692 (E.D. Pa. 2004) .............................................................................31

*In re Sax,*
796 F.2d 994 (7th Cir. 1986) ........................................................................3, 24

*Simantob v. Claims Prosecutor, LLC (In re Lahijani),*
325 B.R. 282 (B.A.P. 9th Cir. 2005) ..................................................................26

*Steffen v. Menchise (In re Steffen),*
552 Fed. App'x 946 (11th Cir. Jan. 16, 2014)...................................................25

*In re Trailer Source, Inc. v. Jackson Truck & Trailer Repair, Inc.,*
555 F.3d 231 (6th Cir. 2009) .............................................................................30

*In re Tribune Co. Fraudulent Conveyance Litig.,*
499 B.R. 310 (S.D.N.Y. 2013) ..........................................................................32

*Weisfelner v. Fund 1 (In re Lyondell Chem. Co.),*
503 B.R. 348 (Bankr. S.D.N.Y. 2014)...............................................................32

*Will v. Nw. Univ. (In re Nutraquest, Inc.),*
434 F.3d 639 (3d Cir. 2006) ...............................................................................8

*In re Wilson,*
527 B.R. 253 (Bankr. N.D. Tex. 2015)...............................................................29

*In re Yes! Entm't  Corp.,*
316 B.R. 141 (D. Del. 2004)...............................................................................31

**Statutes**

28 U.S.C. § 158(a)(1)...............................................................................................7

11 U.S.C. § 108(a)(2)..............................................................................................34

11 U.S.C. § 341 .........................................................................................................1

11 U.S.C. § 363 ............................................................................................ *passim*

11 U.S.C. § 506(c) ..................................................................................................28

11 U.S.C. § 544(b) ...................................................................................... 7, 27, 32

v

11 U.S.C. § 546 ................................................................................... 32, 34

11 U.S.C. § 548 ....................................................................................32

11 U.S.C. § 549 ......................................................................................7

## Other Authorities

Mark Wege, *et al*., Current Issues Involving Section 363(k) Credit Bids,
   6 Pratt J. Bankr. L. 1, 21-22 (Jan. 2010) ...............................................7

LEGAL\25360317\1

## SUMMARY OF ARGUMENT

The above-captioned debtor (the "Debtor") commenced a chapter 7 case shortly after the Claridge Parties (defined below), one of the Debtor's two non-insider creditor constituencies, obtained judgments awarding them over $6 million in damages and directing the Debtor to submit to an accounting. At the Debtor's meeting of creditors pursuant to section 341 of the Bankruptcy Code, the Debtor represented that it commenced a chapter 7 case to ensure that all of its creditors received a fair distribution of the Debtor's property notwithstanding those judgments.

During the case, Jeoffrey L. Burtch, the chapter 7 trustee for the Debtor's estate (the "Trustee"), and the Claridge Parties and the Debtor's only other non-insider creditor, Alpha Beta Capital Partners, L.P. (together, the "Purchasers"), reached an agreement for the Trustee to sell substantially all of the Debtor's assets (specifically, litigation claims, including certain Claims (defined below) against appellants (the "Pursuit Parties"), all of which are insiders/affiliates of the Debtor) to the Purchasers for $125,000 (subject to higher/better offers). The Trustee determined that a sale of the Claims to the highest bidder was the best way to maximize the estate's value for the benefit of all creditors as the estate had no funds or other property and the Trustee therefore could not otherwise pursue the Claims. Following an auction, which was ordered by the Bankruptcy Court, the

1

purchase price increased to $180,001, plus the contribution to the estate of net recoveries from three Claims, which net recoveries the Purchasers valued at not less than $500,000.

The Pursuit Parties – the main recipients of improper transfers which form the basis of most of the Claims – are now trying to scuttle the market tested, Bankruptcy Court-approved sale of the Claims to Purchasers for $180,001 (plus the Purchasers' agreement to return net proceeds of certain Claims to the estate) not to maximize creditor recoveries, but rather to insulate themselves from liability by requesting that this Court (1) determine that the sale of the Claims was ineffective as a legal matter, or (2) alternatively, reverse the Sale Order (defined below) because of alleged problems with the sale process.

The relief sought by the Pursuit Parties should be denied, and the Sale Order should be affirmed.

<u>This Appeal is Moot</u>. This appeal is moot under section 363(m) of the Bankruptcy Code, which prohibits even indirect attempts to reverse or modify an order approving the sale of estate property to good faith purchasers if the order is not stayed pending appeal.  Either form of relief sought by the Pursuit Parties would deprive the Purchasers of the benefit of their bargain, as they have already paid the Trustee $180,001 for the Claims and the Purchasers have already taken significant action on the Claims, in accordance with the Sale Order.  In addition,

2

the Pursuit Parties did not even attempt to seek, let alone obtain, a stay of the Sale Order from the Bankruptcy Court or this Court and the Bankruptcy Court expressly found the Purchasers acted in good faith.  Significantly, even if this Court were to determine that the Bankruptcy Court erred in approving the sale, this Court still could not grant the relief sought by the Pursuit Parties.  *Pittsburgh Food & Bev. v. Ranallo*, 112 F.3d 645, 649 (3d Cir. 1997) (quoting *In re Sax*, 796 F.2d 994, 997 (7th Cir. 1986)) ("Section 363(m) does not say the sale must be *proper* under § 363(b); it says the sale must be *authorized* under § 363(b) … At this juncture, it matters not whether the authorization [approving the sale] was correct or incorrect").  Thus, this appeal should be denied on this basis alone.

<u>Legal Challenges to Sale's Effectiveness are Meritless</u>.  The Pursuit Parties raise two arguments in support of their assertion that the sale of the Claims to the Purchasers was ineffective.  <u>First</u>, the Pursuit Parties argue *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237 (3d Cir. 2000) prohibits the Trustee from selling causes of action, including the Claims.  This is plainly incorrect: *Cybergenics* only addressed the sale of "estate" causes of action (avoidance actions arising under the Bankruptcy Code, as opposed to state law) and specifically declined to prohibit the sale of such actions.  Rather, the sale of avoidance actions and other causes of action belonging to an estate need only pass muster under section 363(b)(1) of the Bankruptcy Code

3

to be sold.  Second, the Pursuit Parties argue that the sale is ineffective, because the Purchasers do not qualify for derivative standing to bring the actions in the Trustee's name and on the estate's behalf.  However, that is not the law in this district.  *See AMC Investors, LLC v. Eugenia VI Venture Holdings Ltd.*, No. 11-592, 2012 WL 868775, at *2 (D. Del. March 14, 2012) (denying leave to appeal Bankruptcy Court order awarding creditor derivative standing in chapter 7 case where, as here, the estate lacked sufficient resources to fund the relevant litigation).

The Trustee's Request for Sealed Bids was Appropriate.  Below, the Pursuit Parties objected to the sale on the grounds that the Trustee's modification of the Bankruptcy Court-approved auction procedures to request sealed bids from all interested parties to conclude the sale process was inconsistent with his fiduciary obligation, and therefore not permitted by such procedures.  The Bankruptcy Court specifically addressed and rejected this argument, stating "under the circumstances of this case, requiring sealed bids to conclude the auction was appropriate."  Aug. 17, 2015 Hr'g Tr. (the "Dec.") (included in Opening Br. App'x, Ex. 4) 14.  Now the Pursuit Parties argue this finding was not supported by sufficient evidence.  As described below, however, there is abundant evidence in the record that the Pursuit Parties were engaged in a strategy of delaying the sale of the Claims, presumably to thwart the Purchasers' efforts to recover improper transfers made to the Pursuit Parties in the months preceding the commencement of the Debtor's chapter 7 case

and to reduce the Claims' value in Purchasers' hands as the end of the limitations period grew nearer.  The Pursuit Parties also complain they were not treated on equal footing with the Purchasers because the Trustee continued to negotiate with the Purchasers, but not with the Pursuit Parties, after the bid deadline.  However, not only did the Pursuit Parties not submit a sealed bid by the bid deadline, as required, but they instead informed the Trustee that they withdrew their prior bids and therefore were no longer participating in the auction process.  Although the Pursuit Parties subsequently reversed course and e-mailed Trustee's counsel general bid terms in the days before the hearing on the Trustee's motion to sell the Claims (the "Sale Hearing") (and after the bid deadline had passed), such terms included conditions which were not acceptable to the Trustee and which the Bankruptcy Court properly concluded were not "fully baked."  In any event, the value of the Pursuit Parties' offer, which amounted to a settlement of the Claims with no recovery to creditors of the estate, was considerably less than the value of the Purchasers' Bankruptcy Court-approved offer.

The Bankruptcy Court Did Not Err in Denying the Pursuit Parties' Last Minute Attempt to Postpone the Sale Hearing so They Could Depose the Trustee. The Pursuit Parties argue that the Bankruptcy Court abused its discretion by refusing to continue the Sale Hearing so that they could take the deposition of the Trustee.  In fact, as the Bankruptcy Court found, they had ample time to schedule

and notice the Trustee's deposition between the conclusion of the auction and the Sale Hearing, or to invoke the Bankruptcy Court's assistance if necessary, but they failed to do so.[1]  Under the circumstances, the Bankruptcy Court's decision not to postpone the Sale Hearing was not an abuse of discretion.

The Purchasers' Bid was Superior to that of the Pursuit Parties.  The Pursuit Parties argue the Bankruptcy Court erred when it allegedly usurped the Trustee's business judgment by declining to reopen the auction when presented with the Pursuit Parties' allegedly superior bids.  However, that is not what transpired.  At the outset of the Sale Hearing, when presented with the Pursuit Parties' $205,700 cash bid, the Trustee requested approval of the Purchasers' bid, because it conferred greater value on the estate.   After the Bankruptcy Court denied the Pursuit Parties' request to reopen the auction, they offered up to $250,000 for the Claims, but at the close of the hearing the Trustee reiterated his prior request that the Bankruptcy Court approve the sale to the Purchasers.  Thus, at no point was the Trustee's business judgment usurped.   The Pursuit Parties also argue the Bankruptcy Court's decision not to reopen the auction was an abuse of discretion because it contravenes an alleged "local custom" in Delaware allowing bidding up until the Sale Hearing notwithstanding the close of an auction.  However, none of

---

[1] It bears noting that the Pursuit Parties obtained a document production from the Trustee in advance of the Sale Hearing, cross-examined the Trustee at the Sale Hearing without restriction, and never once filed a motion to compel a deposition of the Trustee.

LEGAL\25360317\1

the authorities cited by the Pursuit Parties support the existence of such custom, let alone the propriety of its application in this context.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to review the Bankruptcy Court's *Order Approving Agreement to Settle, Transfer, and Assign Certain Claims, Rights and Interests*, entered August 28, 2015 (the "Sale Order"), pursuant to 28 U.S.C. § 158(a)(1).

## COUNTER-STATEMENT OF ISSUES
## AND STANDARD OF REVIEW

Issue 1.  Whether this appeal is moot pursuant to section 363(m).

Standard of Review (Issue 1): N/A.  This issue was not addressed by the Bankruptcy Court.

Issue 2.   Whether the Bankruptcy Court erred in approving the sale and assignment of the Claims (including avoidance actions under sections 544-549 of the Bankruptcy Code) to the Purchasers pursuant to section 363(b)(1).

Issue 3.   Whether the Bankruptcy Court erred in determining that the Trustee's request for sealed bids from the Pursuit Parties and the Purchasers was consistent with his fiduciary obligation.

Issue 4.    Whether the Bankruptcy Court erred in denying the Pursuit Parties' last minute attempt to postpone the Sale Hearing so they could depose the Trustee when they had ample time to do so prior to the scheduled hearing.

Standard of Review (Issues 2-4): Orders approving the sale of estate property under section 363(b)(1) are reviewed under an abuse of discretion standard. *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 152-53 (D. Del. 1999). This standard, in turn, is "at root a deferential standard of review." *Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 645 (3d Cir. 2006). In applying this standard, the Third Circuit has instructed that an appellate court should not:

> disturb an exercise of discretion unless there is a definite and firm conviction that the court … committed <u>clear error of judgment</u> in the conclusion it reached upon weighing the relevant factors. Put another way, for [an appellate court] to find an abuse of discretion, [the lower court's] decision must rest on a <u>clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact</u>.

*Id*. (citing *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 320 (3d Cir. 2001)) (emphasis added). Accordingly, the second issue is a legal question subject to *de novo* review, while the third issue is a question of fact subject to clear error review. The fourth issue is reviewed under an abuse of discretion standard.

## STATEMENT OF THE CASE

The Debtor commenced a chapter 7 case on March 21, 2014, soon after the entry of judgments in a state court action awarding over $6 million in damages to Claridge Associates, LLC, Jamiscott, LLC, Leslie Schneider, Lillian Schneider, and the Estate of Leonard Schneider (together, the "<u>Claridge Parties</u>") and ordering

the Debtor to submit to an accounting. Appendix ("App'x") 1-3, 61-64, 73-85 (Voluntary Petition, Claridge Parties' Stay Relief Motion ¶¶13-22 and Ex. H). At the time, the Debtor was also facing claims brought by Alpha Beta in New York State Court for breach of a settlement agreement.

At the Debtor's section 341 hearing, the Debtor represented the purpose of the case was to ensure a fair distribution of its assets in the face of these claims and judgments. App'x 53 (Apr. 29, 2014 Hr'g Tr. (the "341 Hr'g Tr.") 32:18-21).[2]

On March 2, 2015, the Trustee moved to sell the estate's interest in several pending/potential causes of action pursuant to section 363(b)(1) ("Sale Motion"). The initial bid provided for a sale upon the following terms:

(1) Purchase Price. Purchasers would pay the Trustee $125,000 within twenty (20) days of entry of a Bankruptcy Court order approving the sale.

(2) Transfer of Certain Claims. The Trustee would transfer to the Purchasers the estate's interest in the following causes of actions (together with the Debtor's books and records):

    (a) Insider Avoidance Claim. A potential action for the recovery of approximately $650,000 paid to the Debtor's members shortly before the commencement of its chapter 7 case;

---

[2] The Debtor also revealed at the section 341 hearing that immediately before commencing the case, the Debtor, as general partner, transferred its interest as general partner of a fund it managed to a new general partner owned and managed by the Debtor's principals. This too, the Debtor stated, was done in furtherance of its fiduciary obligations to creditors (without explanation). App'x 49, 54, 56-57 (341 Hr'g Tr. 8:8-14, 49:12-16, 51:13-52:22).

      (b)     <u>Indemnification Claim</u>.  A potential action against Pursuit Capital Management Fund I, L.P. for indemnification obligations;

      (c)     <u>UBS Claim</u>.  Debtor's interest in *Pursuit Partners, LLC v. UBS AG*, D.N.X08-cv-4013452 S (Conn. Super. Ct.); and

      (d)     <u>Debtor Claims</u>.  Other potential claims against Debtor's insiders and affiliates.

   (3)    <u>Dismissal of New York Action</u>.  Dismissal of the Debtor's claims in a prepetition action commenced by the Debtor and certain Pursuit Parties against the Purchasers, *Pursuit Investment Management, LLC, et al. v. Alpha Beta Capital Partners, L.P., et al.*, Index No. 652457/2013 (Sup. Ct. N.Y. Co.) (the "<u>New York Action</u>," and together with the Insider Avoidance, Indemnification, UBS, and Debtor Claims, the "<u>Claims</u>").

App'x 99-101 (Sale Motion, Ex. B).  The Purchasers valued net recoveries from the Insider Avoidance Claim, Debtor Claims, and UBS Claim at no less than $500,000, while the Debtor's personal property schedule ascribed only an "unknown" value to the other Claims.  App'x 11, 211 (Schedule B; Sale Order, Ex. A ¶2(b)).

The Sale Motion also provided the Trustee would consider alternative, written bids for the Claims submitted prior to the objection deadline (March 19, 2015).  App'x 95 (Sale Motion ¶¶31-32).

The Pursuit Parties filed a preliminary objection to the proposed sale, but did not submit a bid for the Claims.  Rather, they contended (inexplicably) that they did not have a meaningful opportunity to bid on the Claims (which they wished to

LEGAL\25360317\1

buy to insulate themselves from liability).  App'x 112-14 (Preliminary Objection ¶¶7-13); Dec. 5.

The Bankruptcy Court found the Pursuit Parties' preliminary objection to be meritless.  App'x 125 (Apr. 2, 2015 Hr'g Tr. 52:2-7) ("I am also going to say that I read the motion to give the [Pursuit] Parties an opportunity to make a higher and better offer.  I read the [Pursuit] Parties' response that you think the agreement precludes that.   I do not read the agreement that way.  I don't think it precludes a higher or better offer, whatever that might mean in the context of this case").  Nevertheless, on April 21, 2015, the Bankruptcy Court entered a scheduling order giving the Pursuit Parties until May 20, 2015 to file a final objection and until May 13, 2015 to bid on the Claims.   App'x 126-28 (Scheduling Order); Dec. 5.

On May 13, 2015, the Pursuit Parties submitted a competing bid for the Claims (for $147,500), resulting in the need for an auction.   App'x 149 (Procedures (defined below) ¶6); Dec. 6.  The competing bid was submitted on behalf of an entity to be formed, which, upon information and belief, has not been formed or at least has never been identified to the Trustee despite numerous requests.

On June 18, 2015, the Trustee filed a motion for an order approving certain auction procedures (the "Procedures"), which order the Bankruptcy Court entered on June 30, 2015.  App'x 164 (Order); Dec. 6.  Paragraph 13 of the Procedures

provided, *inter alia*, that "all bids shall be made and received in one room, on an open basis, and each bidder shall be entitled to be present for all bidding, and all material terms of each bid shall be fully disclosed to all bidders," subject to the limitation that the Procedures were "subject to modification by the Trustee as he deems appropriate to comply with his fiduciary obligation." App'x 151-52.

On July 7, 2015, over four months after the Sale Motion was filed with the Bankruptcy Court, the auction commenced. During the auction, the Purchasers improved their bid by increasing the cash component to $157,500 and agreeing to contribute any proceeds from the Debtor Claim and UBS Claim to the estate. App'x 168-69 (July 7, 2015 Auction Tr. ("Auction Tr.") 62:11-63:11) (Purchasers' counsel (describing bid modifications): "Then we're adding a sentence, 'the debtor claims,' 'along with the UBS claim, will be pursued on behalf of the bankruptcy estate and any recoveries will be property of the bankruptcy estate to be distributed in accordance with the priorities established by the Bankruptcy Code'").

In response, the Pursuit Parties, appearing at the auction telephonically through counsel, proposed purchasing the Claims for $170,000. App'x 175-76 (Auction Tr. 69:1-70:10). Immediately following such bid, the Pursuit Parties indicated that they needed to break at 3:00 p.m. so their counsel could attend to another matter. App'x 176-78 (Auction Tr. 70:20-72:16); Dec. 6. The Pursuit Parties' counsel indicated that he and his client would not be available again until

LEGAL\25360317\1

later that evening. Rather than press on without the Pursuit Parties, the Trustee agreed to a brief adjournment of the conclusion of the auction.

Thereafter, the Trustee proposed no fewer than <u>eight</u> alternative dates/times to reconvene the auction, none of which were agreeable to both parties.  App'x 181-82, 191 (July 16, 2015 Hr'g Tr. 5:6-6:15; Aug. 7, 2015 Hr'g Tr. 7:1-17); Dec. 7.  Accordingly, after suggesting on the record at the July 16 hearing that he may exercise his right to do so, on July 24, 2015, the Trustee requested that the parties submit their highest and best offer by sealed bids at 5:00 p.m. on July 30, 2015. App'x 181-82 (July 16, 2015 Hr'g Tr. 5:17-6:1); Dec. 7.

Prior to the bid deadline, the Pursuit Parties requested an extension of the deadline until after the trial in the UBS action concluded (at least one month out), as they had done previously.  App'x 142-43, 191-92 (June 15, 2015 Hr'g Tr. 13:21-14:20; Aug. 7, 2015 Hr'g Tr. 7:18-8:4).  After consulting with the Purchasers regarding the request for an extension, the Trustee denied the request and proceeded with sealed bids.  App'x 192-94 (Aug. 7, 2015 Hr'g Tr. 8:4-10:6).

The Trustee received only one bid by the bid deadline, from the Purchasers, upon substantially the same terms as their prior bid, except they increased the cash component to $180,001.  Dec. 7.  No bid was received from the Pursuit Parties. Moreover, the Pursuit Parties also notified the Trustee they were withdrawing all prior bids.  App'x 192 (Aug. 7, 2015 Hr'g Tr. 8:11-15); Dec. 7, 9.

Between the bid deadline and the August 10, 2015 Sale Hearing, the Trustee and Purchasers engaged in further negotiations which resulted in the Purchasers improving their bid by agreeing to contribute to the estate net recoveries from the Insider Avoidance Claim (in addition to the Debtor and UBS Claims). App'x 210-11 (Sale Order, Ex. A ¶2); Dec. 8. The Insider Avoidance Claim relates to payments made to the principals of the Pursuit Parties totaling in excess of $600,000.

In addition, during this period, notwithstanding the Pursuit Parties' failure to submit a timely sealed bid and the withdrawal of their prior bids, the Pursuit Parties continued to submit informal bids to the Trustee. Specifically, on August 6, 2015 (*i.e.*, four days before the Sale Hearing), the Pursuit Parties e-mailed the Trustee proposing to purchase the Claims for $200,000, on the condition that such amount "be held in some form of an escrow pending approval of a resolution to ensure Trustee the funds are readily available." In addition, on August 8, 2015, the Pursuit Parties proposed increasing their bid to $220,000, on the condition "that the Trustee not engage in further negotiations with [Purchasers] to sell any claims," and that "the payment of the $220,000 … be held in escrow … pending actual approval of the Trustee's final distribution." Opening Br. App'x, Ex. 2; *see also* Dec. 13-14.[3]

---

[3] The Trustee subsequently testified he found the Pursuit Parties' condition that any payment be held in escrow until the conclusion of the case unacceptable. Aug. 10,

14

Then, on August 6, 2015, the Pursuit Parties moved to adjourn the Sale Hearing for 45 days to "permit the[m] adequate time to take the Trustee's deposition and permit final briefing with respect to the [sale] [m]otion" ("Adjournment Motion").  The Bankruptcy Court denied the adjournment motion. App'x 200-01 (Aug. 7, 2015 Hr'g Tr. 16:19-17:8) ("I have concerns, significant concerns, over the way ... this Court's orders are being ignored … by the Pursuit Parties.  So [although] in isolation, the request seems reasonable … I'm not sure that it does when I looked at the last five months, since the [Sale Motion] was filed … So I think we're going to go forward with the [Sale Hearing] on Monday").

At the Sale Hearing, the Pursuit Parties indicated on the record that they were willing to purchase the Claims for $205,750, and requested that the auction be reopened.  Sale Hr'g Tr. 4:20-6:9.

In response, the Trustee requested a brief adjournment and weighed the option of proceeding with the hearing to approve the signed agreement with the Purchasers versus reopening the auction process based upon the oral and untimely bid by the Pursuit Parties.  The Trustee took into account all of the facts and circumstances of the five month sale process, including the fact that the bid deadline had passed, the oral bid was not "fully baked," and that the upside potential from the net recoveries on the Claims rendered the Purchaser's offer the

---

2015 Hr'g Tr. ("Sale Hr'g Tr.") (included in Opening Br. App'x, Ex. 1) 29:11-15, 33:8-34:1.

superior offer.  *Id*. at 9:8-10:22.  When the hearing recommenced, the Trustee requested that the Bankruptcy Court <u>not</u> reopen the auction, both because the additional cash under the Pursuit Parties' oral offer would not affect unsecured creditor recoveries and because they failed to submit a timely bid.[4]

The Bankruptcy Court denied the Pursuit Parties' request to reopen the auction.  *Id*. at 15:23-17:7.[5]

Next, the Trustee proffered testimony in support of the then-proposed sale and the Pursuit Parties cross-examined the Trustee.  During this cross-examination, the Pursuit Parties' counsel disclosed their prior $220,000 offer and indicated that the Pursuit Parties had just then authorized a $250,000 purchase price.  *Id*. at 30:17-25, 36:24-37:2.

However, the Bankruptcy Court again declined to reopen bidding.  *Id*. at 34:17-22, 37:3.

---

[4] Sale Hr'g Tr. 15:5-16 ("where auctions have been reopened … typically it's not to reopen for a party who has been actively involved throughout the process and has had ample opportunity to make bids during the process … [W]e … are always concerned [about] leaving a few dollars on the table.  But in the end, Your Honor, the few dollars [under the Pursuit Parties' offer] won't make a bit of difference to the creditors of this estate, and the creditors of this estate are [the Purchasers]").

[5] The Bankruptcy Court questioned whether the Pursuit Parties' informal bids, including their bid at the hearing, were fully formed.  Sale Hr'g Tr. 17:1-5 ("I'm not clear today whether what we heard in court was an actual bid.  I'm not sure it's fully baked.  I certainly don't see a signed agreement.  And I don't think it's appreciably higher to upset the auction procedures that we have in this case, given the history of this particular case").

16

At the hearing's conclusion, the Trustee reiterated his request that the Bankruptcy Court approve the sale to the Purchasers. *Id*. at 42:23-43:5. Thereafter the Pursuit Parties raised objections to the proposal. *Id*. at 43:12-49:18. The Bankruptcy Court took the matter under advisement. *Id*. at 52:23.

On August 17, 2015, the Bankruptcy Court delivered its decision, which, in addition to addressing the Pursuit Parties' sale objections, analyzed factors relevant to whether the Trustee met his burden of proof under section 363(b)(1) to obtain Bankruptcy Court approval of the sale, namely:

(1)     whether the sale has a sound business purpose;

(2)     whether the sale was adequately noticed;

(3)     whether the purchase price is fair; and

(4)     whether the parties acted in good faith.

Dec. 11-12.[6]

In analyzing good faith, the Bankruptcy Court found:

> *The fourth factor is whether the parties acted in good faith.  I find that they did.*  The Pursuit Parties raised the issues of good faith in their preliminary objection; however, there is no evidence of collusion, and nothing to suggest the bidding on the assets was anything but at arm's length.

---

[6] *See*, *e.g.*, *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (Bankr. D. Del. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335 (Bankr. D. Del. 1987) (section 363(b)(1) sale should be approved when these factors are satisfied).

17

> The [Purchasers] made their bids in accordance with the bid procedures, including their last bid, which was delivered on July 30, under seal.  Since then, the trustee requested certain revisions, to which the [Purchasers] agreed.  Those revisions improved the consideration to the estate.  This is not unusual in the context of an auction.

*Id*. (emphasis added).

On August 28, 2015, the Bankruptcy Court entered the Sale Order, which the Pursuit Parties now appeal.  No stay of the sale was sought by the Pursuit Parties from the Bankruptcy Court or from this Court.

On September 30, 2015, Purchasers paid the $180,001 purchase price to the Trustee.  App'x 219 (Wire Confirmation). The Trustee has since utilized a portion of these funds to pay in part an allowed chapter 7 administrative expense.

The Trustee and the Purchasers subsequently filed a stipulation dismissing the New York Action, with prejudice.

## ARGUMENT

### I.    THIS APPEAL IS MOOT

This appeal is moot pursuant to section 363(m), which provides as follows:

> The reversal or modification on appeal of an authorization under subsection (b) … of a sale … of property does not affect the validity of a sale … under such authorization to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

Courts in this district have held "[n]arrowly circumscribing § 363(m) protection … undercuts the purpose of the statute, which this Circuit has defined as 'not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders … on which third parties rely.'" *Boeing Co. v. Kaiser Aircraft Indus. (In re Ala. Aircraft Indus., Inc.)*, 464 B.R. 120, 125 (D. Del. 2012), *aff'd*, 514 Fed. App'x 193 (3d Cir. 2013) (quoting *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)).

In this Circuit, "two conditions must be met before an appeal becomes moot under section 363(m): (1) the underlying sale … must not have been stayed pending appeal, and (2) reversing or modifying the authorization to sell … would affect the validity of the sale." *L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 298 (3d Cir. 2000).[7]

The sale at issue was indisputably not stayed.  Therefore, the only issue to decide is whether the relief sought by the Pursuit Parties would affect the validity of the sale of the Claims to the Purchasers.  Because it would do so, this appeal is moot.

---

[7] The statute also requires that the purchaser acquired the property in good faith, but this is already a requirement in this Circuit for obtaining approval of a bankruptcy sale in the first instance. *Abbotts Dairies*, 788 F.2d at 150 ("In short, we hold that when a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser").  Here, The Bankruptcy Court made such a finding and the Pursuit Parties do not challenge it.

LEGAL\25360317\1

The Third Circuit has held "[i]n considering whether reversal or modification would affect the validity of a sale, courts must look to the remedies sought and assess whether these would impact the terms of the bargain struck by the buyer and seller." *Ala. Aircraft*, 514 Fed. App'x at 195. *See also Ranallo*, 112 F.3d at 649 ("One cannot challenge the validity of a central element of a purchase … without challenging the validity of the sale itself").

Here, the Pursuit Parties seek, in the first instance, a finding that the Trustee lacked authority under the Bankruptcy Code to sell the Claims to the Purchasers and the Purchasers may not prosecute those Claims. Opening Br. 51.

Although such relief does not <u>directly</u> seek reversal or modification of the Sale Order, it without question would have a clear and adverse effect on the sale. Purchasers paid over $180,000 for the Claims, and did not agree to contribute net proceeds from the Indemnification Claim to the estate under the Sale Order. Moreover, with regard to Claims which the Purchasers agreed to contribute (namely, the Insider Avoidance, Debtor, and UBS Claims), the Purchasers are the estate's largest creditors and the only creditors whose proofs of claim are not the subject of a pending objection.[8]  As such, they would likely realize substantial net recoveries on the contributed Claims.

---

[8] The Claridge Parties filed a joint, $6.2 million unsecured claim (Claim No. 1), and Alpha Beta Capital Partners, L.P. filed a $2.94 million claim (Claim No. 7). Certain Pursuit Parties also filed unliquidated claims (Claim Nos. 2-6) to which there are pending objections.  App'x 220-22 (Claims Register).

The Claims are worth materially less to the Purchasers if this Court determines the transfer of the same to them was invalid and/or the Purchasers cannot prosecute them, because in such case Purchasers would no longer control litigation of the Claims, as they currently do.  App'x 212 (Sale Order, Ex. A ¶3). Instead, the Claims would be funded and controlled by the Trustee, whose estate is administratively insolvent even after accounting for the Purchaser's cash payment of $180,001,[9] who may not be capable of funding protracted litigations against the Pursuit Parties over a period of years, and who would be under pressure to compromise the Claims for a reduced amount notwithstanding the wishes of the Debtor's creditor constituency.  Accordingly, the Pursuit Parties' request for a determination that the Trustee lacked authority to transfer Claims, if granted, would diminish Purchasers' ability to exercise the rights they acquired.

The Third Circuit has held such indirect attacks on a sale are moot.  In *Rickel Home*, 209 F.3d at 305-06, for example, the Third Circuit dismissed as moot a landlord's appeal from an order which authorized the assumption and assignment of the debtor's lease to a purchaser and the excising of a use restriction because an adverse determination on those issues would "affect the validity of the sale." Similarly, in *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490,

---

[9] Sale Hr'g Tr. 10:14-17 (Trustee's counsel: "neither of these bids covers the legal fees in the case.  Both of these … bids are less than the total administrative expense in this case"); *id.* at 50:17-23 (same); *id.* at 35:10-21 (Trustee testimony to this effect).

497-50 (3d Cir. 1998), the Third Circuit dismissed an appeal, by the winning bidder at the auction of a franchise agreement, from an order rejecting a prepetition buy/sell agreement between the debtor and such bidder, concluding the appeal was moot because reversal of the rejection order would amount to an attack on the sale. *Id*. at 499 ("Naturally, this would have an impact on the validity of the auction sale of the Jeep-Eagle Franchise, because reversing the rejection would necessarily require reversing the subsequent assumption and assignment of the underlying franchises. Clearly, this remedy is not permitted by section 363(m)"). Further, in *Ranallo*, the Third Circuit dismissed an appeal by PFB, a (former) debtor in possession for which a chapter 11 trustee was appointed, from an order authorizing the trustee's sale of the debtor's assets. 112 F.3d at 649-51. Notably, PFB (like the Pursuit Parties) did not seek reversal of the sale order, but instead sought declaratory judgments regarding the impropriety of the sale. The Third Circuit determined the requested relief was tantamount to an attack on the sale:

> [S]ection 363(m) does not say that absent a stay the reversal or modification of an order authorizing a sale cannot lead to the nullification of a sale. Instead, section 363(m) provides that without a stay the reversal or modification "does not affect the validity" of the sale. Plainly, a finding against Ranallo as the trustee or American as the buyer on any of the inquiries that PFB proposes the bankruptcy court undertake ultimately leading to the imposition of the "equitable remedy" PFB seeks, though not nullifying the sale would affect its validity, as the inquiries all seek to demonstrate that the sale was flawed. For example, what would be the

22

> purpose in an appeal from an order approving a sale of a finding that Ranallo and American "knew that the Bankruptcy Court did not have authority to sell" Smith's assets other than to affect the validity of the sale? Furthermore, if the bankruptcy court, on remand from the district court, required Ranallo or American to pay PFB additional money, as PFB suggests that it could do, surely the court's order would affect the validity of the sale because the order would be founded on a holding that the sale price was inadequate. Thus, the appeal to the district court was moot.

*Id*. at 649-50.

Other circuit courts have likewise refused to allow appellants to "squeeze around the direct bar" of section 363(m) by characterizing their appeals as concerning something other than the sale order itself where the appeal nonetheless seeks to "affect aspects of the deal of which a purchaser would want to be certain prior to completing the purchase," particularly where the requested relief seeks to attack a critical part of the overall "package." *Anheuser-Busch, Inc. v. Miller (In re Stadium Mgmt. Corp.)*, 895 F.2d 845, 848 (1st Cir. 1990). *Accord Official Comm. of Unsecured Creditors v. Anderson Senior Living Property, LLC (In re Nashville Senior Living, LLC)*, 407 B.R. 222, 229 (B.A.P. 6th Cir. 2009). *See also Official Comm. of Unsecured Creditors v. Trism, Inc. (In re Trism, Inc.)*, 328 F.3d 1003, 1007 (8th Cir. 2002) (citing *Cinicola v. Scharffenberger*, 248 F.3d 110, 125-26 (3d Cir. 2001)) ("challenge to a related provision of [a sale] order … affects the validity of the sale when the related provision is integral to the sale of the estate's

assets.  A provision is integral if the provision is so closely linked to the agreement governing the sale that modifying or reversing the provision would adversely alter the parties' bargained-for exchange").

As alternative relief, the Pursuit Parties request reversal of the Sale Order. Opening Br. 51.  Such relief also runs afoul of section 363(m), which specifically limits the ability to reverse or modify an order approving a bankruptcy sale, and therefore cannot be granted at this stage.

Significantly, it should be noted that so long as the elements of section 363(m) are satisfied (good faith purchaser, unstayed sale, relief would affect sale), an appeal must be dismissed as moot whether or not the Bankruptcy Court was correct or incorrect in entering the appealed order.  For example, in *Sax*, 796 F.2d at 997 (quoted approvingly by the Third Circuit in *Ranallo*, 112 F.3d at 650), appellant, an entity with a lien on an individual chapter 11 debtor's yacht, challenged the sale of the yacht to another entity on the grounds that the yacht was not estate property, and thus, the bankruptcy court lacked subject matter jurisdiction to approve the sale.  The Seventh Circuit rejected appellant's position that its appeal was not moot as a result of its jurisdictional challenge, stating:

> Section 363(m) does not say that the sale must be *proper* under § 363(b); it says the sale must be *authorized* under § 363(b).  There is no doubt that when the bankruptcy court authorized the sale and ordered that the Yacht be turned over to the purchaser, it was acting under § 363(b).  At this juncture, it matters not whether the

24

> authorization was correct or incorrect.  The point is that
> the proper procedures must be followed to challenge an
> authorization under § 363(b).  [Under] § 363(m) … a stay
> is necessary to challenge a bankruptcy sale.

*Id*. at 997-98.  Other circuit courts are in accord.[10]

Accordingly, although the Trustee (and Purchasers) believe the Bankruptcy

Court correctly entered the Sale Order authorizing the transfer of the Claims to

Purchasers, even if the Bankruptcy Court were incorrect, it is clear that because the

elements of section 363(m) are present this appeal is now moot.

## II.   LEGAL CHALLENGES TO THE SALE'S EFFECTIVENESS ARE MERITLESS

### A.   The Bankruptcy Court Properly Approved the Sale of the Claims to Purchasers Pursuant to Section 363(b)(1) of the Bankruptcy Code

The analysis applied in evaluating whether causes of action in which a

debtor has an interest (including avoidance actions) may be sold to a creditor

pursuant to section 363(b)(1) is straightforward:

> As a general matter, a trustee may sell causes of action
> belonging to the estate.  Section 363 of the Bankruptcy
> Code governs the sale … of property of the estate,
> allowing the trustee to sell "property of the estate," other
> than in the ordinary course of business, after notice and a
> hearing … Section 541 defines "property of the estate" to

---

[10]  *See also Parker v. Goodman (In re Parker)*, 499 F.3d 616, 622 (6th Cir. 2007); *Canzano v. Ragosa (In re Colarusso)*, 382 F.3d 51, 61 (1st Cir. 2004); *Gilchrist v. Westcott (In re Gilchrist)*, 891 F.2d 559, 561 (5th Cir. 1990); *Steffen v. Menchise (In re Steffen)*, 552 Fed. App'x 946, 949 n.3 (11th Cir. Jan. 16, 2014); *In re Frontier Energy Res., Inc.*, No. 93-5020, 1993 WL 390983, at *2 (10th Cir. Oct. 6, 1993) (all citing *Sax* approvingly).

25

> include … "all legal or equitable interests of the debtor in property as of the commencement of the case" … "[T]he term 'all legal and equitable interests of the debtor in property' is all encompassing and includes rights of action as bestowed by either federal or state law."  A trustee may [therefore] sell litigation claims that belong to the estate, as it can other estate property, pursuant to section 363(b).

*Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 257 (5th Cir. 2010) (citations omitted) (approving sale of alter ego and fraudulent transfer claims).  *See also Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 287-88, 290 (B.A.P. 9th Cir. 2005) ("Causes of action owned by the trustee are intangible items of property of the estate that may be sold"); *Goodwin v. Mickey Thompson Ent. Grp., Inc. (In re Mickey Thompson Ent. Grp., Inc.)*, 292 B.R. 415, 422 n.8 (B.A.P. 9th Cir. 2003) (citations omitted) ("rights of action under the trustee's bankruptcy avoiding powers may be transferred for a consideration that may include a guaranteed minimum recovery for the estate … and that may provide for sharing of additional proceeds of the litigation"); *In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 228-29 (Bankr. S.D. Ohio 2008) (quoting *In re Dow Corning Corp.*, 198 B.R. 214, 247 (Bankr. E.D. Mich. 1996)) ("What constitutes the kind of property a trustee may sell under § 363 is very broad in scope and 'include[s] a trustee's alienation of a chose in action'").[11]

---

[11] Some courts have applied a slightly heightened standard to the sale of an estate's avoidance actions, under which the instant sale would still easily pass muster.  *See In re Greenberg*, 266 B.R. 45, 50-51 (Bankr. E.D.N.Y. 2001) (approving sale of

As noted above, in this case, the Bankruptcy Court properly approved the sale of the Claims after determining the Trustee carried his burden of adequately demonstrating that the sale had a sound business purpose, the sale was properly noticed, the purchase price is fair, and the parties acted in good faith.  Dec. 11-12. Even under the slightly elevated standard for the sale of avoidance actions set forth in *Greenberg*, 266 B.R. at 50-51 and *P.R.T.C.*, 177 F.3d at 782 (quoted in note 11, *supra*), the instant sale easily passes muster, because it is supported by the Trustee and net proceeds of three Claims are being contributed to the estate.

The Pursuit Parties argue that "trustees in this circuit may not assign causes of action," citing *Cybergenics*.   Opening  Br. 26.   However, this misstates *Cybergenics'* holding.  In *Cybergenics*, 226 F.3d at 243-45, the Third Circuit held a debtor did not actually sell the estate's section 544(b) fraudulent transfer claims in a section 363(b)(1) sale of nearly all the debtor's assets, because such claims were not "assets" of the debtor but instead belonged to the debtor's creditors. Notably, the decision only addressed the sale of causes of action arising under section 544(b), not all causes of action in which an estate has an interest.  More significantly, *Cybergenics* does not prohibit the sale of avoidance actions.  226

---

avoidance actions where (1) the trustee supports the sale, and (2) the Bankruptcy Court finds the action(s) by the transferee is in the estate's best interests and necessary/beneficial to the fair and efficient resolution of the case); *Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.)*, 177 F.3d 774, 782 (B.A.P. 9th Cir. 1999) (applying similar standard to sale of avoidance actions to largest creditor in return for 50% of any net recovery).

F.3d at 244-45 (citing *Briggs v. Kent (In re Professional Inv. Props. Of Am.)*, 955 F.2d 623, 626 (9th Cir. 1992) and *P.R.T.C.*, 177 F.3d at 782) ("Appellees cite these cases as standing for the proposition that avoidance powers may be sold.   We … need not reach this issue because the 1996 transaction was not an assignment of avoidance powers (or even an authorization of the right to exercise the avoidance powers), but rather, it was a sale of Cybergenics' 'assets'");[12] *Greenberg*, 266 B.R. at 50-51 ("*Cybergenics* ... made no finding whether a trustee's avoidance powers may be assets or property of a bankruptcy estate").[13]

The other cases cited by the Pursuit Parties likewise do not support its position that avoidance actions (or other actions in which the estate has an interest) cannot be sold.  *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 13 n.5 (2000) (addressing whether a party other than the trustee may surcharge a secured creditor's collateral pursuant to section 506(c) of the

---

[12] The Pursuit Parties noted that in *In re Parirokh*, Case No. 11-5409 (W.D. Mich. Dec. 1, 2015), the Bankruptcy Court denied a motion to sell avoidance actions in a chapter 7 case, citing *Cybergenics*.  However, the *Parirokh* court's conclusion went much further than *Cybergenics*, which specifically did not hold as much, as noted above.  Further, the *Parirokh* court's conclusion was dicta, given that it separately held the sale at issue did not meet the bare minimum requirements for approval under section 363(b)(1), as the trustee "ha[d] not identified with any precision the transfers at issue [or] theories of avoidance." *Id*. at *5.

[13] That *Cybergenics* does not prohibit the sale of avoidance causes of action is confirmed by the Bankruptcy Court's local rules, which expressly permit their sale. Del. Bankr. L.R. 6004-1(b)(iv)(k) (requiring that a sale motion "highlight any provision pursuant to which the debtor seeks to sell … its rights to pursue avoidance claims under chapter 5 of the Bankruptcy Code").

LEGAL\25360317\1

Bankruptcy Code, but declining to address whether creditors may be granted derivative standing to commence avoidance actions, stating "[w]hatever the validity of that practice, it has no analogous application here"); *In re Wilson*, 527 B.R. 253, 256 (Bankr. N.D. Tex. 2015) ("Courts have granted standing to a creditor in a chapter 7 case when the trustee expressly transferred that power to the creditor with the bankruptcy court's approval").

### B.   In this District, Derivative Standing Can be Awarded Where, as Here, a Chapter 7 Trustee Lacks the Resources to Fund a Litigation

The Pursuit Parties argue that the Bankruptcy Court erred in approving the sale of the Claims by the Trustee, because the Purchasers do not qualify for derivative standing to prosecute the Claims.  Opening Br. 24-27.  In support of this position, they cite *In re Cooper*, 405 B.R. 801, 811-14 (Bankr. N.D. Tex. 2009), which held a creditor may not be granted derivative standing to pursue estate causes of action in a chapter 7 case.

However, that is not the law in this district.  In *In re AMC Investors, LLC*, Bankruptcy Judge Brendan L. Shannon overruled an objection from the debtors that relied extensively on *Cooper*, and concluded a creditor may be awarded derivative standing in a chapter 7 case where, as here, a chapter 7 trustee lacks the resources to fund a litigation.  App'x 226 (Case No. 08-12264 (Bankr. D. Del. June 2, 2011) 38:5-10).

The debtors in *AMC Investors* subsequently requested leave to appeal the Bankruptcy Court's order awarding derivative standing, which request the District Court denied, holding:

> The debtors' main argument is that the bankruptcy court misapplied the ... standard [from *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548 (3d Cir. 2003), which governs derivative standing awards in chapter 11] by erroneously applying its tenets to a Chapter 7 bankruptcy.  The debtors, however, have failed to show that courts have interpreted the case so narrowly.  To the contrary, several courts have applied *Cybergenics* – or its rationale – in Chapter 7 cases …
>
> Moreover, the bankruptcy court's decision to confer derivative standing to [a creditor] was based not only on its interpretation of *Cybergenics* and other case law, but also on the facts specific to this case – namely, that the trustee lacks the funds to prosecute potentially colorable claims, and that the trustee consents to Eugenia's derivative status. These facts distinguish it from other cases where no derivative status was conferred in a Chapter 7 case.
>
> Thus, in making its decision, the bankruptcy court did not make a ruling on an issue where there has been substantial ground for difference of opinion.

*AMC Investors*, 2012 WL 868775, at *2 (citations omitted).[14]

---

[14] *See also In re Rim,* No. 10-1066, 2010 WL 4615174, at *7 (D. N.J. 2010) ("While the Third Circuit has not addressed derivative standing for Chapter 7 creditors, other courts have permitted individual creditors to bring derivative avoidance actions where the Trustee has declined to do so") (citing *In re Trailer Source, Inc. v. Jackson Truck & Trailer Repair, Inc.,* 555 F.3d 231, 243–44 (6th Cir. 2009) ("there is no textual support in the Code for drawing such a distinction between the Chapter 7 and Chapter 11 contexts" and that "there are substantial

In the instant case, derivative standing requirements (colorable claims which the trustee declines to pursue, *see Yes! Entm't*, 316 B.R. at 145) were easily satisfied, as the estate has no property other than the Claims, and further, is administratively insolvent.

The Pursuit Parties argue the Bankruptcy Court erred in entering the Sale Order, because there is insufficient record evidence that the assigned Claims are colorable. Opening Br. 27-30. That is not true. The Pursuit Parties described the UBS Claim as "a real case" worth up to $100 million, and the Trustee stated such claim "is really what's driving this whole case." App'x 145 (June 15, 2015 Hr'g Tr. 16:15-24); Sale Hr'g Tr. 9:14-23. Likewise, the Debtor scheduled the Indemnification Claim and described the nature of the same at the section 341 hearing. App'x 11, 45, 51 (Schedule B; 341 Hr'g Tr. 4:15-25, 17:10-25). In

---

policy reasons for allowing derivative standing in Chapter 7 proceedings"), *In re Racing Servs., Inc. v. North Dakota Racing Comm'n,* 540 F.3d 892, 898 (8th Cir. 2008) ("derivative standing is available to a creditor to pursue avoidance actions when it shows that a Chapter 7 trustee ... is 'unable or unwilling' to do so"), and *In re Sandenhill, Inc.,* 304 B.R. 692, 694 (E.D. Pa. 2004) ("[W]e frankly cannot imagine that the Third Circuit would employ a different rationale in a Chapter 7 matter [than it did in *Cybergenics* ]")); *Avalanche Maritime, Ltd. v. Parekh (In re Parmetex, Inc.),* 199 F.3d 1029 (9th Cir. 1999) (citations omitted) ("we hold that under these particular circumstances – where the trustee stipulated that the Creditors could sue on his behalf and the bankruptcy court approved that stipulation – the Creditors had standing to bring the suit"); *In re Yes! Entm't Corp.,* 316 B.R. 141, 145 (D. Del. 2004) ("Although Cybergenics did not specifically lay out the procedures that should be followed in allowing creditors derivative standing, the Third Circuit expressed its agreement with the approaches taken by [other] Circuits").

addition, the Insider Avoidance Claim relates to a January 16, 2013 transfer disclosed in a footnote to the Debtor's statement of financial affairs. App'x 29 (Statement of Financial Affairs Item 1). Moreover, the Sale Motion and Order describe each Claim in detail. This, together with the fact that the Pursuit Parties offered to purchase the Claims for $250,000, demonstrates the Claims are colorable.[15]

## III.  THE TRUSTEE'S REQUEST FOR SEALED BIDS WAS APPROPRIATE

Below the Bankruptcy Court overruled the Pursuit Parties' objection to the then-proposed sale on the grounds that the Trustee's request for sealed bids was inconsistent with his fiduciary obligations. Sale Hr'g Tr. 44:6-46:15 (objection);

---

[15] In any event, the Sale Order does not grant Purchasers derivative standing, in the technical sense (the right to bring an action "on behalf of the estate," *see Cybergenics*, 330 F.3d at 570-71), but rather provides for the sale to Purchasers of the Insider Avoidance, Indemnification, UBS, and Debtor Claims in exchange for $180,001 plus a contribution of net recoveries from the Insider Avoidance, UBS, and Debtor Claims. App'x 210-11 (Sale Order, Ex. A ¶2). The Pursuit Parties will likely argue there is no functional difference between selling Claims which are then contributed to the estate, on the one hand, and conferring derivative standing on Purchasers to pursue these Claims, on the other. However, there can be little doubt the manner in which causes of action owned by an estate are transferred and commenced can have significant effects on available remedies for affected parties. *Cf. In re Tribune Co. Fraudulent Conveyance Litig.*, 499 B.R. 310, 315-20 (S.D.N.Y. 2013) (limitation on trustee's avoidance power under section 546(e) of the Bankruptcy Code did not apply to trustee for litigation trust established by chapter 11 plan that sought avoidance pursuant to state fraudulent transfer statute, as opposed to sections 548 or 544(b) of the Bankruptcy Code (the latter of which incorporates state fraudulent transfer law), of transfers made by debtor in connection with prepetition leveraged buyout); *Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*, 503 B.R. 348, 358-59 (Bankr. S.D.N.Y. 2014) (same).

32

Dec. 14 ("under the circumstances of this case, requiring sealed bids to conclude the auction was appropriate").[16]

On appeal, the Pursuit Parties challenge the Bankruptcy Court's factual determination on the grounds that it is not supported by adequate evidence. Opening Br. 32 ("The only evidence on the record as to why the Trustee decided to modify the auction procedures was that during late summer in August, just before Labor Day, he was having trouble finding a mutually convenient date to reconvene the auction").

Putting aside the fact that sealed bids were due over a month before Labor Day, this is plainly incorrect.  The record is replete with evidence that the Pursuit Parties were engaged in a strategy of delaying the Trustee's sale of the Claims:

(1)   Discovery.  Following the filing of the Sale Motion, the Pursuit Parties submitted a frivolous request for further discovery which sought to rehash arguments that were already made and decided and which they themselves acknowledged sought information that "is either within the Trustee's knowledge, or is 'self-evident,'" and which the Bankruptcy Court therefore denied.  App'x 129-38 (Memorandum

---

[16] The Bankruptcy Court also noted the irony of the Pursuit Parties' position, given that they sought to ignore the auction procedures by offering, two days before the Sale Hearing, $220,000 for the Claims on the condition that the Trustee cease further negotiations with the Claridge Parties.  Dec. 13-14 ("Thus, it is clear that the Pursuit Parties are not opposed to offers that are not made in an open forum, as provided … in the approved bid procedures").  Further, the Bankruptcy Court observed the Pursuit Parties did not previously object to the relevant provision which permitted the Trustee to modify the auction procedures "as he deems appropriate to comply with his fiduciary obligation."  App'x 151-52 (Procedures ¶13).

of Law in Support of Discovery; Order Denying Request for Further Discovery ¶3).

(2)   <u>UBS Trial</u>.  The Pursuit Parties repeatedly sought to delay the sale of the UBS Claim until its merits were adjudicated so its value could be better assessed.  App'x 142-43, 191-94 (June 15, 2015 Hr'g Tr. 13:21-14:20; Aug. 7, 2015 Hr'g Tr. 7:18-10:6).

(3)   <u>Auction Delay Tactics</u>.  The Pursuit Parties requested an adjournment of the auction immediately after submitting a topping bid at the auction.  App'x 176-78 (Auction Tr. 70:6-72:16).  When the Trustee tried to reschedule the auction (no fewer than <u>eight</u> times), the Pursuit Parties refused to agree to the proposed dates/times.  App'x 181-82, 191 (July 16, 2015 Hr'g Tr. 5:6-6:15; Aug. 7, 2015 Hr'g Tr. 7:1-17); Dec. 4, 7.

(4)   <u>Adjournment Motion</u>.  When all else failed, the Pursuit Parties moved to adjourn the Sale Hearing for 45 days so they could take the Trustee's deposition and file a <u>third</u> sale objection, which motion the Bankruptcy Court denied.  App'x 184-88, 200-01 (Adjournment Motion; Aug. 7, 2015 Hr'g Tr. 16:19-17:8).

Moreover, the Pursuit Parties had plenty of incentive to delay the sale. Successfully delaying a sale to the Purchasers would have reduced the value of each of the Debtor, Indemnification, and Insider Avoidance Claims, all causes of action against the Pursuit Parties.  Under section 546, the deadline for asserting preference and fraudulent transfer claims is March 21, 2016, and under section 108(a)(2) of the Bankruptcy Code, applicable statutes of limitations that expire before this date are only extended as a result of the Debtor's bankruptcy filing until that date.  Reducing the value of the Claims in the Purchasers' hands would result in the Pursuit Parties having to spend less in order to purchase such Claims.  At a minimum, successful delay of the sale would give the Purchasers less time to

prepare for and file a complaint with respect to the Claims in the event they were the successful purchasers.

Under these circumstances, the Bankruptcy Court's approval of the Trustee's request for sealed bids can hardly be considered erroneous, let alone clearly erroneous.  In fact, bidding by sealed bids is a relatively common procedure for concluding an auction.

The Pursuit Parties' alternative position, that the Trustee's request for sealed bids "was applied in a discriminatory fashion," likewise lacks merit.  The Pursuit Parties make the following assertions in arguing they were not treated on equal footing with the Purchasers:

(1)    <u>Post-Auction Negotiations</u>.  They claim that following the bid deadline, the Trustee engaged the Purchasers, but not the Pursuit Parties, in further negotiations.

(2)    <u>Bankruptcy Court Sanctioning of Post-Auction Negotiations</u>.  They claim that the Bankruptcy Court did not adequately explain why post-auction negotiations under these circumstances was not unusual.

(3)    <u>Criticism of Pursuit Parties</u>.  They claim that the Bankruptcy Court's criticism of the Pursuit Parties for attempting to ignore the Procedures for their benefit (*see* note 16, *supra*) was unfair, because the Pursuit Parties sought to reopen the auction at the Sale Hearing.

Opening Br. 33-35.  None of the foregoing demonstrates the Pursuit Parties were treated unfairly, as described below.

The Trustee had good reason to engage the Purchasers, but not the Pursuit Parties, in further negotiations: the Purchasers were the only parties with a valid

LEGAL\25360317\1

bid following the close of the auction, as the Pursuit Parties withdrew their bid instead of submitting a sealed bid as requested.   Although the Pursuit Parties subsequently reversed course and made informal bids, their bids included unacceptable conditions and were not "fully baked."   *See* notes 3-4, *supra*. Further, notwithstanding the fact that the Pursuit Parties' informal bids had a higher cash component, the Trustee determined that selling the Claims to the Purchasers was in the estate's best interest, because their bid included the contribution of net proceeds from certain Claims to the estate, whereas the Pursuit Parties' bids did not.   Sale Hr'g Tr. 9:8-10:22, 14:14-15:21, 41:4-13.

With respect to the Bankruptcy Court, it had no obligation to explain whether or not post-auction negotiations under similar circumstances are unusual, or reopen the bidding in the face of the Pursuit Parties' informal bids over the objection of every other party in interest.   The Bankruptcy Court's sole responsibility at the Sale Hearing was to decide if the Trustee met his burden under section 363(b)(1) to obtain Bankruptcy approval of the proposed sale.   It did exactly that, and the Pursuit Parties do not dispute any of the Bankruptcy Court's conclusions in this regard, including its determination that the parties acted in good faith.[17]

---

[17] The Pursuit Parties also state the Sale Order should be reversed because turning away "bidders with ready cash that are attempting to pay more for assets, as a policy concern, has a chilling effect on bidders' willingness to participate in bankruptcy auctions."   Opening Br. 35.   The Pursuit Parties cite <u>no authority</u> for

## IV. THE BANKRUPTCY COURT DID NOT ERR IN DENYING THE PURSUIT PARTIES' LAST MINUTE ATTEMPT TO POSTPONE THE SALE HEARING SO THEY COLD DEPOSE THE TRUSTEE WHEN THEY HAD TIME TO DO SO PRIOR TO THE HEARING

The Pursuit Parties allege that the Bankruptcy Court abused its discretion by refusing to continue the hearing on the Sale Motion so that they could take the deposition of the Trustee. They argue that they understood that prior to the Sale Hearing, after the conclusion of the auction, there would be time afforded for a deposition of the Trustee. In fact, they had ample time to schedule and notice the Trustee's deposition, but they failed to do so.

The auction commenced on July 7, 2015, but was not concluded. When the Trustee attempted to reconvene the auction, no date was acceptable to all parties so, on July 24, 2015, he requested final sealed bids to be delivered to the Trustee's counsel on July 30, 2015. The Pursuit Parties did not submit a sealed bid on that date and, instead, notified Trustee's counsel that they had withdrawn their prior bids. Thus, at least as of July 30, the Pursuit Parties were on notice that the auction had been concluded and they were not the successful bidder. Between July 31 and August 10, they could have noticed and taken the Trustee's deposition.

---

this bold statement, and further ignore that the Purchasers' bid was considered more valuable by the Trustee, because it included the contribution of net proceeds from certain Claims to the estate. To the contrary, undermining the integrity of the auction process by allowing a bidder to flout the rules dis-incentivizes potential bidders from participating and providing their best offers during the auction itself.

LEGAL\25360317\1

Instead, at the last minute, at the close of business on August 6 (the Thursday before the Monday hearing), the Pursuit Parties filed a motion to continue the Monday hearing in part because they had not had an opportunity to take the Trustee's deposition.  The Bankruptcy Court did not err in denying their request.  At the hearing, the Bankruptcy Court inquired of the actions taken by the Pursuit Parties to notice the deposition, and the response was silence:

> THE COURT: Did you notice it for last week?
>
> Mr. CANE: I believe it was a topic of conversations between Messrs. Felger and Nelson [sic].
>
> THE COURT: Well, why didn't you notice it, and come to me and say, they're not giving me a deposition?
>
> (No verbal response)
>
> THE COURT: I mean, we do have – there is – there are processes, there are ways to get depositions, when you know you have a hearing coming up.  But we did build in time for depositions, even with the delay, there was an entire week where there could have been a deposition.

App'x 201-02 (Aug. 7, 2015 Hr'g Tr. 17:17-18:2).

The Bankruptcy Court found the Pursuit Parties' last-minute request to further delay the Sale Hearing, when they had failed to timely schedule and notice the Trustee's deposition or promptly to invoke the Bankruptcy Court's assistance if required, to be unreasonable, and refused to postpone the hearing on those grounds. The Bankruptcy Court's decision not to postpone the hearing so that the Pursuit

LEGAL\25360317\1

Parties could first notice and take the Trustee's deposition, was not an abuse of discretion.

On appeal, the Pursuit Parties seek to excuse their delay in scheduling and noticing the Trustee's deposition on the grounds that they were allegedly unaware of the scheduled hearing date on August 10 because it had been set at the July 16, 2015 hearing, which dealt with the Bankruptcy Court's approval of motions to withdraw by the Pursuit Parties' counsel.  They argue that the Trustee asked for and obtained a hearing date "at the very end of the hearing," after the Bankruptcy Court signed orders approving the withdrawal of the Pursuit Parties' Delaware bankruptcy counsel and other bankruptcy counsel.  That is false.  The first item of business was the Trustee's Sale Motion and the need to reschedule the Sale Hearing.  The Bankruptcy Court set the Sale Hearing for August 10 <u>prior to</u> hearing the motions to withdraw of counsel for the Pursuit Parties. App'x 180, 182 (July 16, 2015 Hr'g Tr. 4:8-14, 6:16-17).  Moreover, the motion of Delaware counsel was granted only because the Bankruptcy Court was assured that granting the motion would not leave the Pursuit Parties without local counsel. App'x 183 (July 16, 2015 Hr'g Tr. 11:17-23). The Bankruptcy Court further directed withdrawing Delaware counsel to advise Mr. Cane to report to the Court in a week who his local counsel is, which he agreed to do (but which Mr. Cane failed to do). It is unimaginable that withdrawing counsel did not also report the new hearing

date to Mr. Cane, or that Mr. Cane failed to inquire of him as to what else transpired at the hearing.

Regardless, the Pursuit Parties themselves acknowledge that they knew of the Sale Hearing date a week earlier, by at least August 3, since they claim to have made a request then of Trustee's counsel to continue the Sale Hearing.  Opening Br. 37.  Yet they failed to notice the Trustee's deposition or to seek redress from the Bankruptcy Court if the Trustee failed to cooperate.  The fact is that the Pursuit Parties were never serious about taking the Trustee's deposition, which the Bankruptcy Court obviously recognized when refusing to continue the Sale Hearing for that purpose.[18]  The issue is a red herring, and simply one more attempt by the Pursuit Parties to further delay the inevitable assertion of the Claims against them.

## V.   THE PURCHASERS' BID WAS SUPERIOR TO THE PURSUIT PARTIES' BID

### A.   The Bankruptcy Court Did Not Usurp the Trustee's Business Judgment

The Pursuit Parties claim that the Bankruptcy Court usurped the Trustee's business judgment by declining to reopen the Sale Hearing notwithstanding the Pursuit Parties' allegedly superior bids.  Opening Br. 38-41.

---

[18] *See* Aug. 7, 2015 Hr'g Tr. 15:25 -16:3 ("[I]t concerns me the way the Pursuit Parties are treating the orders of this Court and the process.  And we have afforded the Pursuit Parties significant process in this case."). App'x 199-200.

40

No objective reading of the Sale Hr'g Tr. supports this interpretation of events.  As noted above, at the outset of the hearing, the Pursuit Parties made an informal bid of $205,700 and requested that the auction be reopened.  The Trustee then considered both parties' proposals, and observed that although the cash component of each would be insufficient to satisfy administrative expenses, the Purchasers' proposal has the potential of generating a distribution to unsecured creditors as a result of their contribution of net proceeds of certain Claims.  *Id*. at 10:18-22.  Next, the Trustee requested approval of the sale to Purchasers and that the auction not be reopened.  *Id*. at 15:15-21.  The Bankruptcy Court granted this request, and declined to reopen the auction. *Id*. at 15:23.

It was only during the Trustee's cross-examination that followed that the Pursuit Parties disclosed their prior August 8, 2015 $220,000 offer and proposed reopening the auction and purchasing the Claims for $250,000.  *Id*. at 30:21-31:18, 36:24-37:2.  However, the Bankruptcy Court again declined to reopen bidding.  *Id*. at 34:17-22, 37:2-3.

The Pursuit Parties attempt to paint this second rejection of their request to reopen the auction as a usurpation of the Trustee's business judgment.  Notably, however, the Pursuit Parties do not argue that the Bankruptcy Court usurped the Trustee's judgment when he initially requested that the auction not be reopened and that the sale to the Purchasers be approved, which request the Bankruptcy

LEGAL\25360317\1

Court granted.  In addition, the Pursuit Parties do not argue the Trustee's judgment was usurped when, at the close of Sale Hearing, the Trustee reiterated his prior request that the Bankruptcy Court approve the sale to the Purchasers.  *Id*. at 42:23-43:5.

Instead, the Pursuit Parties argue there is no record evidence that the Purchasers' bid was more valuable than the Pursuit Parties $200,000+ post-auction informal bids.  Opening Br. 42-43.  Putting aside the fact that this is not true, it is irrelevant to the issue of whether the Bankruptcy Court abused its discretion by granting the Trustee's initial request to not reopen the auction given that the Pursuit Parties failed to submit a timely sealed bid and that the Pursuit Parties' bid would not result in a recovery to unsecured creditors.  Sale Hr'g Tr. 15:5-16.

## B. The Bankruptcy Court's Decision Not to Reopen the Auction was Not an Abuse of Discretion

The Pursuit Parties also argue the Bankruptcy Court's decision not to reopen the auction was an abuse of discretion, citing an alleged "local custom" in Delaware pursuant to which a party can bid up to the time of the Sale Hearing, notwithstanding applicable bid procedures or instructions from the party administering the auction that a bidder needs to submit a bid by a date certain to qualify as a potential purchaser (Opening Br. 46-50).  In support of this alleged custom, the Pursuit  Parties cite to bench decisions in *Foamex* and *Filene's* as well as *In re Phoenix Steel Corp.*, 82 B.R. 334 (Bankr. D. Del. 1987) and *In re*

*Electroglas, Inc.*, No. 09-12416, 2009 WL 8503455, at *4 (Bankr. D. Del. Sept. 23, 2009).

None of the foregoing authorities remotely suggest that the Bankruptcy Court abused its discretion in denying the Pursuit Parties' request to reopen the auction.

(1) *Foamex*; *Electroglas*. *Foamex* addressed the extent to which a term loan agent could credit bid its claim pursuant to section 363(k). A competing purchaser challenged the agent's credit bid in the face of the competing purchaser's cash bid. Mark Wege, *et al.*, Current Issues Involving Section 363(k) Credit Bids, 6 Pratt J. Bankr. L. 1, 21-22 (Jan. 2010). At the Sale Hearing, the Bankruptcy Court directed a resumption of the auction to permit the agent to credit bid. Opening Br. App'x, Ex. 5, 77:19-22. In *Electroglas*, the Bankruptcy Court directed that an auction be reconvened after determining that two parties improperly credit bid certain of their claims. 2009 WL 8502344, at *4. Here, however, the Trustee's determination of who won at auction did not involve application of section 363(k), as the Pursuit Parties did not submit a bid and instead moved to reopen the auction at the Sale Hearing.

(2) *Filene's*. In *Filene's*, the Bankruptcy Court directed that an auction be reopened because "the [auction] procedures were not … followed." Opening Br. App'x, Ex. 6, 50:8-21. That is not the case here, where the Bankruptcy Court determined the Trustee's decision to require sealed bids to conclude the auction was entirely appropriate.

(3) *Phoenix Steel*. In *Phoenix Steel*, two parties submitted bids by the relevant deadline (Lukens and Chang), and a continuance of the Sale Hearing was granted until December 30 at the request of all interested parties to evaluate which was better. 82 B.R. at 335. By December 30, negotiations were not advanced enough to evaluate the Chang offer, so the Bankruptcy Court approved a sale to Lukens, whose offer was scheduled to expire the next day, unless a firm, definitive, superior offer materialized from Chang prior to expiration of the Lukens bid. *Id*. Here, the Trustee requested approval of the sale to

the Purchasers, even after considering the Pursuit Parties' informal offers made before/at the Sale Hearing, so there was no need to continue matters or reopen the auction.[19]

Moreover, other decisions have rejected efforts by unsuccessful bidders to upset auction results by submitting competing bids at or prior to the Sale Hearing, even where (unlike here) accepting such competing bids would generate additional proceeds for the estate:

> While the Court certainly appreciates the need to maximize payment of claims, the Court must also always keep one eye cocked on promoting and preserving the integrity of the judicial process. Reneging on clearly established and properly conducted procedures in order to generate some additional dollars for the estate undermines the integrity of the judicial process; indeed, it can undermine the integrity and reputations of the individual litigants and lawyers. The public in general,

---

[19] The Pursuit Parties also cite a *Revel* bench decision and *In re Edwards*, 228 B.R. 552 (Bankr. E.D. Pa. 1998) for the proposition this alleged local custom extends to New Jersey and Philadelphia. Putting aside the fact that non-Delaware practices are irrelevant to this appeal, these cases do not stand for the proposition for which they were cited. In *Revel*, the debtor moved for an order approving the private sale of its property to Polo North Country Club, Inc. for $82 million following two failed auctions (the first of which failed to generate a qualified bid, and the second of which involved failure to close by each of Brookfield Asset Management Inc., as successful bidder, and Polo North, as backup bidder), subject to the limitation the debtor's board would exercise a "fiduciary out" if it reached a better deal with a third party before closing. App'x 230-33 (*In re Revel AC, Inc.*, No. 14-22654 (Bankr. D. N.J. March 18, 2015) 118:8-121:20). It is in this unusual context that the Bankruptcy Court instructed the debtor to hold off on seeking entry of a sale order until after the sale price has been more fully market tested. In *Edwards*, the Trustee stated "that if he received an untimely but better bid, he would ask that [the Bankruptcy Court] allow it to be considered." 228 B.R. at 563. In the instant case, however, the Trustee determined the Purchasers' bid was the best bid and sought approval of that bid.

> and all participants at auctions in particular, need to have
> confidence in the judicial system. A court order
> reopening the auction process when procedures were
> clearly established, when the auction was conducted
> without fraud or collusion and in compliance with the
> procedures, and when an adequate bid was accepted, will
> undercut such confidence and faith in the system. This,
> the Court will not allow, even if reopening the auction
> would generate more proceeds for the estate.

*In re Bigler, LP*, 443 B.R. 101, 115 (Bankr. S.D. Tex. 2010) (citations omitted).

*See also id.* at 107 (surveying cases where court declined to reopen auction so

unsuccessful bidder could submit higher bid); *In re Bryan,* No. 12-31486, 2013

WL 4716194, at *2-3 (Bankr. M.D. Ala. Sept. 3, 2013) (citations omitted)

(denying request by bidders to submit untimely bid that "matches" the successful

bid at auction, and noting that "a losing bidder many not object to a sale after the

fact, on the premise that the bidding should be reopened so that they can now enter

a higher bid"); *In re Cloverleaf Enterps., Inc.*, No. 09-20056, 2011 WL 873145, at

*1-2 (Bankr. D. Md. March 11, 2011) (describing situation as "bidder's remorse"

and declining to grant stay pending appeal of sale order).

In the instant case, the Bankruptcy Court likewise concluded "the integrity

of the auction process, by far, trumps any potential higher bid," given the Pursuit

Parties' not having submitted a timely bid and withdrawal of their prior bids.  Dec.

12.  The Pursuit Parties point to no authority, except their manufactured, erroneous

local custom, supporting reopening the auction under these circumstances.  The

Pursuit Parties were involved in the process since well before the Sale Motion was filed; they were accommodated by the Trustee on countless occasions; and as insiders of the Debtor and the target of the Claims understood the value of the assets better than any other party in this case.  For all of these reasons, it was not an abuse of discretion for the Bankruptcy Court to deny their request to reopen the auction.

## <u>CONCLUSION</u>

This Court should deny the relief requested by the Pursuit Parties and affirm the Sale Order.

Dated: January 7, 2016
Wilmington, Delaware

Respectfully submitted,

*/s/ Mark E. Felger*
_____
Mark E. Felger (No. 3919)
Barry M. Klayman (No. 3676)
COZEN O'CONNOR
1201 North Market Street, Suite 1001
Wilmington, Delaware
(302) 295-2087
mfelger@cozen.com
bklayman@cozen.com
*Attorneys for Appellee Jeoffrey L. Burtch,*
*Chapter 7 Trustee*

LEGAL\25360317\1